No. 24-179

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STATE OF ALASKA DEPARTMENT OF FISH AND GAME,
*Plaintiff/Appellant,*
v.

FEDERAL SUBSISTENCE BOARD, et al.,
*Defendants/Appellees,*
and
ORGANIZED VILLAGE OF KAKE,
*Intervenor-Defendant/Appellee.*

Appeal from the United States District Court for the District of Alaska
No. 3:20-cv-00195-SLG (Hon. Sharon L. Gleason)

**FEDERAL APPELLEES' ANSWERING BRIEF**

TODD KIM
*Assistant Attorney General*
RACHEL HERON
PAUL A. TURCKE
Of Counsel:                           SHANNON BOYLAN
                                      KEVIN W. McARDLE
KENNETH M. LORD                       *Attorneys*
*Attorney*                            Environment and Natural Resources Division
U.S. Department of the Interior       U.S. Department of Justice
                                      Post Office Box 7415
                                      Washington, D.C. 20044
                                      (202) 305-0219
                                      kevin.mcardle@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION .............................................................................. 1

STATEMENT OF JURISDICTION...................................................... 2

STATEMENT OF THE ISSUES............................................................ 2

PERTINENT STATUTES AND REGULATIONS .................................. 3

STATEMENT OF THE CASE ............................................................... 3

I.      Legal background .................................................................... 3

      A.     The Alaska National Interest Lands Conservation Act......................... 3

      B.     Alaska's failed attempt to maintain a compliant rural subsistence management program......................................... 5

      C.     The federal regulatory program............................................ 6

      D.     Prior litigation regarding the Secretaries' regulatory authority under Title VIII. ................................................ 8

II.    Factual background........................................................................ 10

III.   Procedural history ......................................................................... 12

SUMMARY OF ARGUMENT ............................................................. 15

STANDARD OF REVIEW ................................................................... 17

ARGUMENT ...................................................................................... 19

I.      The Board acted well within its delegated ANILCA authority when it approved the Kake hunt. .................................................... 19

      A.     ANILCA grants the federal government authority to open a subsistence hunt on federal land.................................... 20

B.    The federal government's authority under Title VIII is not limited to imposing closures or other hunting restrictions. ...................................................................27

C.    The legislative history contradicts Alaska's position. ........................33

D.    Title VIII is explicitly preemptive..........................................................37

E.    The Board's subsistence management actions are designed to conserve healthy populations of fish and wildlife...............................................................................40

II.    The district court lacked jurisdiction over Alaska's improper-delegation claim, which has no merit in any event. .....................................41

A.    Alaska's improper-delegation claim is barred by the mandate rule. ......................................................................42

B.    Alaska lacks Article III standing to pursue its improper-delegation claim. .......................................................................45

C.    Alaska's improper-delegation claim fails on the merits. ...................48

CONCLUSION ...............................................................................51

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

*Alaska Department of Fish and Game v. Federal Subsistence Board,*
    62 F.4th 1177 (9th Cir. 2023) ........................................... 1, 13, 14, 42, 43, 44, 45

*Alaska v. Babbitt,*
    72 F.3d 698 (9th Cir 1995) ...................................................... 6, 9, 28, 33, 34, 35

*Alaska v. National Parks and Conservation Ass'n, Inc.,*
    No. 91-36297, 1992 WL 361253 (9th. Cir. Dec. 7, 1992)..................................48

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982)................................................................................47

*Apotex, Inc. v. Thompson,*
    347 F.3d 1335 (Fed. Cir. 2003)................................................................51

*Bohac v. Department of Agriculture,*
    239 F.3d 1334 (Fed. Cir. 2001).................................................................32

*Center for Biological Diversity v. Bernhardt,*
    946 F.3d 553 (9th Cir. 2019) ...................................................................20

*Center for Biological Diversity v. Zinke,*
    868 F.3d 1054 (9th Cir. 2017) ..................................................................17

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984)................................................................................18

*Citizens to Save Spencer County v. EPA,*
    600 F.2d 844 (D.C. Cir. 1979)..................................................................32

*Consumers' Research, Cause Based Commerce, Inc. v. Federal Communications Commission,* 88 F.4th 917 (11th Cir. 2023) ........................................................51

*Dona Christa, Valencia, Cal.,*
    138 F.3d 403 (9th Cir. 1998) ...................................................................44

*Epic Systems Corp. v. Lewis*,
584 U.S. 497 (2018) ................................................................33

*Fernandez v. 23676-23726 Malibu Road, LLC*,
74 F.4th 1061 (9th Cir. 2023) ...............................................45

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) ...............................................................47

*John v. United States*,
No. A90-0484-CV (HRH), 1994 WL 487830
(March 30, 1994) ................................... 8, 9, 22, 29, 35, 37, 38

*John v. United States*,
247 F.3d 1032 (9th Cir. 2001) (en banc) ...................... 8, 21

*Johnson v. Barr*,
79 F.4th 996 (9th Cir. 2023) ..................................................42

*Kenaitze Indian Tribe v. Alaska*,
860 F.2d 312 (9th Cir. 1988) .................. 5, 6, 35, 36, 37, 38

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ......................................................... 20, 38

*Kuntz v. Lamar Corp.*,
385 F.3d 1177 (9th Cir. 2004) ...............................................18

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004) ...............................................................32

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ....................... 18, 24, 25, 26, 28, 41

*Louisiana Forestry Ass'n Inc. v. Sec'y of U.S. Dep't of Labor*,
745 F.3d 653 (3d Cir. 2014) ..................................................49

*Magnesystems, Inc. v. Nikken, Inc.*,
933 F. Supp. 944 (C.D. Cal. 1996) .......................................44

iv

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................................48

*McDowell v. State*,
   785 P.2d 1 (Alaska 1989).................................................................6, 9

*Michigan v. EPA*,
   576 U.S. 743 (2015) ............................................................................24

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) ............................................................................30

*National Wildlife Fed'n v. National Marine Fisheries Service*,
   524 F.3d 917 (9th Cir. 2008) ..............................................................25

*Nevada v. Burford*,
   918 F.2d 854 (9th Cir.1990) ...............................................................48

*Ninilchik Traditional Council v. United States*,
   227 F.3d 1186 (9th Cir. 2000) ................................................. 7, 17, 23

*Oklahoma v. United States*,
   62 F.4th 221 (6th Cir. 2023) ...............................................................50

*Perot v. FEC*,
   97 F.3d 553 (D.C. Cir. 1996) .................................................. 49, 50, 51

*Pittston Co. v. United States*,
   368 F.3d 385 (4th Cir. 2004) ..............................................................49

*S. Pac. Transp. Co. v. Watt*,
   700 F.2d 440 (9th Cir. 1983) ..............................................................48

*Safari Club Int'l v. Haaland*,
   31 F.4th 1157 (9th Cir. 2022) .................................................. 24, 38, 39

*Sierra Club v. Lynn*,
   502 F.2d 43 (5th Cir. 1974) ................................................................48

*Smiley v. Citibank (S.D.), N.A.*,
  517 U.S. 735 (1996) ..................................................................39

*Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001) ........................................................... 20, 35

*State v. Rettig*,
  987 F.3d 518 (5th Cir. 2021) ..................................................49

*Sturgeon v. Frost*,
  587 U.S. 28 (2019) ............................................................ 25, 36

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)....................................................... 30, 36, 41

*U.S. Forest Service v. Cowpasture River Preservation Ass'n*,
  590 U.S. 604 (2020)..................................................................20

*United States v. Kellington*,
  217 F.3d 1084 (9th Cir. 2000) .................................................18

*United States v. Thrasher*,
  483 F.3d 977 (9th Cir. 2007) ............................... 42, 43, 44, 45

*United States v. Viltrakis*,
  108 F.3d 1159 (9th Cir. 1997) .................................................46

*United States v. Youssef*,
  547 F.3d 1090 (9th Cir. 2008) .................................................18

**Federal Statutes**

5 U.S.C. § 706.............................................................................17

16 U.S.C. § 3101 ................................................................ 3, 4, 21

16 U.S.C. § 3102 ................................................................... 4, 20

16 U.S.C. § 3111 .......................................... 4, 20, 21, 22, 24, 38

16 U.S.C. § 3112 ................................................................... 31, 40

16 U.S.C. § 3113 ...........................................................................4

16 U.S.C. § 3114 ......................................................... 4, 20, 22, 23, 32

16 U.S.C. § 3115 ............................... 4, 5, 15, 21, 22, 28, 29, 30, 35, 36

16 U.S.C. § 3116 ................................................................... 28, 29

16 U.S.C. § 3124 ......................................................... 5, 16, 22, 24, 30, 33

16 U.S.C. § 3202 ......................................................... 5, 17, 38, 39

28 U.S.C. § 1291 ...........................................................................2

28 U.S.C. § 1331 ...........................................................................2

**Federal Regulations**

50 C.F.R. § 100.10 ........................................................................6

50 C.F.R. § 100.14 ........................................................................7

50 C.F.R. § 100.19 ......................................................... 8, 11, 13, 14, 19, 26, 41

50 C.F.R. § 100.25 ................................................................... 7, 26

50 C.F.R. § 100.26 ................................................................... 7, 46

**Legislative History**

H. Rep. No. 95-1045, Part I (1978) ...........................................................32

H. Rep. No. 95-1045, Part II (1978) .....................................................36, 37

vii

S. Rep. No. 95-1300 (1978) ...................................................................32

H. Rep. No. 96-97, Part I (1979)........................................................32

S. Rep. No. 96-413 (1979) ........................................................32, 34, 35

# INTRODUCTION

The Federal Subsistence Board (Board) manages subsistence uses of fish and wildlife on federal lands in Alaska pursuant to the Alaska National Interest Lands Conservation Act (ANILCA).  In 2020, at the outset of the COVID-19 pandemic, the Board authorized the Organized Village of Kake, a federally recognized Indian tribe, to conduct an emergency subsistence hunt on federal land for the safety and food security of the community.  Alaska sued, alleging that the hunt was unlawful because the Board supposedly lacks authority to open federal lands to subsistence hunting.  The district court properly rejected that claim.  ANILCA delegates broad authority to the federal government to manage and prioritize rural subsistence uses of fish and wildlife on federal lands, and the Board's decision to open the Kake hunt fell well within the scope of that authority.

Alaska also contends that even if the Board had authority to approve the hunt, it impermissibly allowed Kake to select the hunters and distribute the yield.  But this Court held that Alaska forfeited that claim by failing to raise it in its first appeal, which left undisturbed the district court's judgment dismissing the claim for lack of jurisdiction.  *See Alaska Department of Fish and Game v. Federal Subsistence Board*, 62 F.4th 1177, 1181 n.3 (9th Cir. 2023).  Alaska thus is barred from pursuing the claim under the mandate rule.  Alaska also lacks standing to pursue the claim because the fact that Kake (rather than the federal government)

1

selected the hunters and distributed the yield did not injure the State. And Alaska's claim lacks merit in any event because the Board did not delegate any substantive regulatory authority to Kake.

The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

(a)     The district court had statutory subject-matter jurisdiction under 28 U.S.C. § 1331 because Alaska's claims arose under ANILCA, 16 U.S.C. §§ 3101-3233, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. However, as demonstrated in the Argument section below, the mandate rule and Alaska's lack of Article III standing deprived the district court of jurisdiction over Alaska's improper-delegation claim.

(b)     The district court's judgment was final because it disposed of all claims against all defendants. 1-ER-2. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     Judgment was entered on November 7, 2023. 1-ER-2. Alaska filed its notice of appeal on January 4, 2024, or 58 days later. 2-ER-94–97. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether ANILCA's broad grant of discretionary authority to the federal government to manage and prioritize rural subsistence uses of fish and

wildlife on federal lands in Alaska includes the power to open an emergency
subsistence hunt for the safety and food security of rural Alaskans.

      2.      Whether the district court's judgment rejecting Alaska's improper-
delegation claim should be affirmed because:

(a) the claim is barred by the mandate rule in light of this Court's prior
ruling that the claim was forfeited;

(b) Alaska lacks Article III standing to pursue the claim because the fact that
Kake, rather than the federal government, selected the hunters and distributed the
yield did not injure the State; and

(c) the claim fails on the merits because the Board did not delegate any
substantive regulatory authority to Kake.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

## I.    Legal background

### A.    The Alaska National Interest Lands Conservation Act

In 1980, Congress enacted Title VIII of ANILCA to ensure that rural
Alaskans could continue practicing their subsistence way of life. *See* 16 U.S.C.
§ 3101(c), 3111-3126.  Title VIII's central objective is "to protect and provide the
opportunity for continued subsistence uses on the public lands by Native and non-

Native rural residents." *Id*. § 3111(4).  To further that objective, Congress invoked "its constitutional authority under the property clause and the commerce clause," *id*., and mandated that "the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes," *id*. § 3114.  "Public lands" generally means federally owned lands.  *See id*. § 3102(1)-(3).  "Subsistence uses" means "the customary and traditional uses by rural Alaska residents of wild, renewable resources" for (among other reasons) "direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation."  *Id*. § 3113.

Congress found that "the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life" required a new "administrative structure" to enable rural residents to "have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands." *Id*. § 3111(5).  Congress therefore directed the "Secretary"—meaning the Secretary of the Interior or, with respect to National Forest lands, the Secretary of Agriculture, *id*. § 3102(12)—to establish subsistence resource regions, local advisory committees, and regional advisory councils.  *Id*. § 3115(a).  Congress also authorized the Secretary to act on each council's "recommendations concerning policies, standards, guidelines, and regulations to implement" a "strategy for the

4

management of fish and wildlife populations within the region to accommodate …
subsistence uses and needs." *Id*. § 3115 (a)(3)(D)(iii)-(iv), (c).  And Congress
broadly authorized the Secretary to "prescribe such regulations as are necessary
and appropriate to carry out his responsibilities under this subchapter." *Id*. § 3124.

In recognition of Alaska's traditional authority over the fish and wildlife
within its borders, Congress gave Alaska the option to enact its own laws in place
of the federal regulatory program envisioned by Title VIII.  *See* 16 U.S.C.
§ 3115(d).  But if the State did not implement a compliant program, Congress
required the Secretaries to "step in and do the job." *Kenaitze Indian Tribe v.
Alaska*, 860 F.2d 312, 316 (9th Cir. 1988); 16 U.S.C. § 3115(d).  Section 1314 of
ANILCA correspondingly provides that nothing in the Act "is intended to enlarge
or diminish the responsibility and authority of the State of Alaska for management
of fish and wildlife on the public lands *except as may be provided in [Title VIII]*, or
to amend the Alaska constitution." 16 U.S.C. § 3202(a) (emphasis added).

## B. Alaska's failed attempt to maintain a compliant rural subsistence management program

Given the choice between a federal subsistence management program "or
self-regulation with federal oversight, Alaska chose the latter." *Kenaitze Indian
Tribe*, 860 F.2d at 314.  Indeed, Alaska "enacted the necessary statutes in 1978,
while Congress was still working on the final version of ANILCA." *Id*.  In 1982,

the Secretary of the Interior certified that the State's legislative program complied with ANILCA and, as a result, federal regulations were withheld.  *See id*.

However, in 1989, the Alaska Supreme Court held that state laws limiting eligibility for subsistence hunting to *rural* residents, as required by ANILCA, violated the Alaska Constitution.  *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989). The Court stayed its decision to give the state legislature an opportunity to amend the constitution, but the legislature failed to act.  *See Alaska v. Babbitt*, 72 F.3d 698, 701 (9th Cir 1995).  The Secretaries therefore stepped in and promulgated federal regulations establishing the rural subsistence management program required by ANILCA.  *See* 55 Fed. Reg. 27,114 (June 29, 1990) (temporary regulations); 57 Fed. Reg. 22,940 (May 29, 1992) (permanent regulations).[1]

### C.    The federal regulatory program

The federal regulations created the Board to "administer[] the subsistence taking and uses of fish and wildlife on public lands" in Alaska.  50 C.F.R. § 100.10(a).[2]  The Board issues biennial regulations establishing the "seasons,

---

[1] The Secretary of the Interior's regulations are codified at 50 C.F.R. Part 100.  The Secretary of Agriculture's identical regulations are codified at 36 C.F.R. Part 242. For simplicity, this brief refers only to Interior's regulations.

[2] The Board consists of a chair and two members of the public appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture, and the Alaska state or regional directors of the U.S. Fish and Wildlife Service, National Park Service, Bureau of Land Management, Bureau of Indian Affairs, and United States Department of Agriculture – Forest Service.  *Id*. § 100.10(b).

harvest limits, and methods and means related to the taking of wildlife for subsistence uses" on public lands.  *E.g.*, 85 Fed. Reg. 74,796 (Nov. 23, 2020) (regulations for 2020-2022 regulatory cycle).  Subsistence hunting seasons on public lands "are closed unless opened by Federal regulation."  50 C.F.R. §§ 100.25(b), 100.26(a).  State hunting regulations also apply, but only if "they are not inconsistent with, or superseded by," federal regulations.  *Id*. § 100.14.  To prioritize opportunities for rural subsistence harvests, as required by ANILCA, the Board sometimes establishes open seasons for subsistence hunting on federal lands outside the general hunting seasons set by the State.  *See*, *e.g.*, SER-42 (advanced caribou season for subsistence hunters "to provide more opportunity to Federally qualified subsistence users"); SER-43–44 (advanced moose season for subsistence hunters "to provide additional opportunity for Federally qualified subsistence users without interference from" certain state hunters); *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1195 (9th Cir. 2000) (upholding Board's determination that a ten-day advance moose season provided a meaningful preference for subsistence users); 55 Fed. Reg. at 17,115 (preamble to temporary 1990 regulations explaining that "changes were made in subsistence bag limits or seasons after a review revealed that existing State regulations may not provide adequate opportunity for subsistence uses on public lands by rural residents").

7

The Board may also approve "[e]mergency special actions" and [t]emporary special actions" outside its normal two-year regulatory cycle.  50 C.F.R. § 100.19. "In an emergency situation," the Board "may immediately open or close public lands for the taking of fish and wildlife for subsistence uses" if "necessary to ensure the continued viability of a fish or wildlife population, to continue subsistence uses … , or for public safety reasons."  *Id*. § 100.19(a).  The Board must first consult with Alaska and with the appropriate regional council, and the term of special action may not exceed 60 days.  *Id*. § 100.19(a)(2).  This regulatory authority is not new; although the special action regulation was amended in 2010, it has authorized the Board to make "a temporary change to open or adjust" subsistence hunting seasons since 1992.  *See* 57 Fed. Reg. at 22,957.

### D.     Prior litigation regarding the Secretaries' regulatory authority under Title VIII.

After the federal regulations were promulgated in 1992, Alaska sued, alleging that the regulations were unlawful because the Secretaries lack authority under ANILCA "to adopt a comprehensive scheme for fish and wildlife management on 'public lands.'"  *John v. United States*, No. A90-0484-CV (HRH), 1994 WL 487830, at *5 (March 30, 1994), *rev'd on other grounds Alaska v. Babbitt*, 72 F.3d 698 (9th Cir. 1995) (*Katie John I*), *adhered to sub nom. John v. United States*, 247 F.3d 1032 (9th Cir. 2001) (en banc) (*Katie John II*).  A key question in that case was "who is entitled to regulate the taking of fish and game

8

on public lands in Alaska for subsistence purposes?"  1994 WL 487830, at *2.  The State argued that it alone retained that privilege—even though its constitution prevented it from implementing ANILCA's rural subsistence priority—and that Congress did not vest the Secretaries "with authority to assume day-to-day management of fish and game for subsistence purposes on public lands."  *Id*. at *5.

The district court in *Katie John* disagreed.  The court held that under ANILCA, if the State does not adopt a compliant program, "the Secretary, not the State of Alaska, is entitled to manage fish and game on public (federal) lands in Alaska for purposes of Title VIII," *id*. at *8, and "has the authority to adopt regulations for the purpose of implementing" Title VIII, *id*. at *5.

Alaska appealed the district court's ruling that "Title VIII of ANILCA authorizes the federal government to manage subsistence fishing and hunting on public lands in the absence of Alaska laws implementing the subsistence priority." *Katie John I*, 72 F.3d at 700 n.2.  After briefing was completed, however, "the parties, including the [State], stipulated to the dismissal with prejudice of that issue," and this Court "accepted the stipulation."  *Id*.  "In light of the dismissal with prejudice on that issue, the district court's holding on this issue stands."  *Id*.[3]

---

[3] The private plaintiffs in *Katie John* challenged the Secretaries' interpretation of the "public lands" subject to ANILCA's rural subsistence preference.  The district court held that the Secretaries' definition was too narrow and adopted its own expansive definition.  Alaska and the federal government appealed, and this Court reversed the district court's judgment on that issue.  *See id.* at 700-04.

9

## II.    **Factual background**

In spring 2020, at the outset of the COVID-19 pandemic, rural Alaska communities began requesting permission from the Board to conduct emergency subsistence hunts on federal lands to address food shortages and food insecurity resulting from supply chain disruptions.  *See* SER-60–63.

In April 2020, the Organized Village of Kake requested permission to conduct an emergency subsistence hunt for moose and deer on adjacent National Forest lands.  SER-46, 71.  Although Kake is a federally recognized Indian tribe, the community includes both tribal and nontribal residents, and the request was submitted for the benefit of the entire community.  *See* 1-ER-58.

Kake's request was initially processed by the local Forest Service district ranger under a special delegation of authority from the Board "to respond to requests for the taking of deer and moose for reasons of public safety and food security during the COVID-19 pandemic."  SER-47, 55–58.  The delegation authorized the district ranger to take emergency actions related to food security "for reasons of public safety, and when doing so will not threaten the continued viability of the wildlife resource."  SER-48–49, 55–56.  But after unsuccessfully attempting to secure the State's views on Kake's request, the district ranger referred the matter back to the Board for decision in accordance with the terms of the special delegation.  SER-47, 70–73.

10

In June 2020, after conducting a telephonic public hearing that State representatives attended, SER-64–90, the Board granted Kake's emergency request, SER-52–53.  Pursuant to 50 C.F.R. § 100.19(a), the Board authorized a community harvest of up to two moose and five black-tailed deer per month for two months on National Forest land.  *Id*.  The special harvest season was outside the state-approved moose and deer seasons for the area.  *See id*.  The Board approved the action "for reasons of public safety related to food security concerns in Kake due to intermittent and unreliable food deliveries caused by the COVID-19 pandemic and limited ferry Service."  SER-53.  The Board also found that the action raised no conservation concerns "for the growing population of moose and stable population of Sitka black-tailed deer in the harvest area."  SER-52.

The Board directed the local Forest Service district ranger to administer the hunt and limited the participants to "Federally qualified subsistence users selected by the Organized Village of Kake."  SER-52.  The district ranger issued Kake an initial 30-day community harvest permit that resulted in the harvest of two moose and five deer.  SER-45.  The yield was distributed to 135 households in Kake.  *Id*. In addition to allowing Kake to select the federally qualified subsistence users to conduct the hunt, the permit allowed Kake to distribute the yield to members of the community.  However, The Forest Service confirmed with Kake in advance of the

11

hunt that all community residents in need could benefit from the harvest, regardless of race or tribal status.  2-ER-57–58.

The 30-day community harvest permit expired in July 2020.  No additional permits were issued.  SER-45, 52.

## III.  Procedural history

In August 2020, Alaska sued the Board challenging its decision to authorize the Kake hunt and a separate decision (not at issue in this appeal) to temporarily close certain federal lands to non-subsistence hunting.  2-ER-70–93.

Alaska pursued three claims relating to the Kake hunt.  The State first alleged that the hunt was unlawful because the Board allegedly lacks authority to open federal lands to subsistence hunting for any reason.  The State also alleged that the Board improperly delegated authority to open the hunt to local Forest Service officials.  And the State alleged that even if the Board had authority to approve the hunt, it impermissibly delegated to Kake the responsibility to decide which federally qualified subsistence users could participate and to oversee distribution of the yield.  *See* 1-ER-4, 16; SER-28–41.

The district court held that the State's claims relating to the Kake hunt were moot because the hunt had expired.  SER-16–22.  The court also rejected on the merits Alaska's separate challenge to the temporary closure.  SER-23–24.  The court therefore entered final judgment that it lacked jurisdiction over all issues

associated with the Kake hunt, and that the Board's temporary closure was not arbitrary or capricious.  *Id.*

Alaska appealed.  With respect to the Kake hunt, Alaska raised only two issues on appeal:  (1) whether the Board has authority under ANILCA to open federal lands to subsistence hunting; and (2) whether that issue was moot.  Alaska did not pursue its claim that the Board impermissibly allowed Kake to select the hunters and to distribute the yield.  *See* Alaska's Opening Brief, *Alaska Dep't of Fish and Game v. Federal Subsistence Board*, No. 22-35097, Doc. 11 at 3, 24-37 (9th Cir. filed June 13, 2022).

This Court reversed the district court's judgment in part, vacated in part, and remanded.  *See* 62 F.4th at 1181-85.  With respect to the Kake hunt, the Court noted that "Alaska challenges the district court's mootness determination as to only one of its claims related to the … hunt:  that ANILCA does not authorize the federal government to open emergency hunting seasons."  *Id.* at 1181.  The Court then held that "Alaska's other claims for relief related to the Kake hunt are not raised in the opening brief and so are forfeited."  *Id.* at 1181 n.3.

The Court next held that the sole claim that Alaska had preserved with respect to the Kake hunt was not moot, even though the hunt had ended, because the issue of whether the Board has authority to open an emergency hunting season on federal land was capable of repetition yet evading review.  *Id.* at 1181-83.  The

13

Court therefore reversed the district court's judgment of dismissal with respect to "Alaska's claim that the FSB did not have authority to open the Kake hunt" and remanded "that claim" to the district court for a decision on the merits. *Id*. at 1183. The Court also held that Alaska's separate challenge to the temporary closure (which had expired during the appeal) was moot. *Id*. at 1183-85.

On remand, Alaska pursued both its claim that ANILCA does not authorize the Board to open federal lands to subsistence hunting and its forfeited claim that the Board had impermissibly delegated aspects of hunt administration to Kake. SER-4–5; 1-ER-3–4, 16–17.[4]  The Board argued that the latter claim was beyond the scope of the remand, *id*., but the district court disagreed.  The court held that Alaska could pursue that claim on remand because this Court's mandate in the first appeal did not expressly or impliedly dispose of the claim.  1-ER-17–19.  The district court further held that the improper-delegation claim was not moot because the claim was capable of repetition yet evading review.  1-ER-19–20.

The district court then rejected both claims on the merits.  The court held that the special action regulation, 50 C.F.R. § 100.19(a), and the Board's use of it to authorize the Kake hunt, fell within the scope of the federal government's

_____

[4] Alaska also attempted to revive its claim that the Board impermissibly delegated authority to open the hunt to local federal land managers. *See* 1-ER-4, 38–40.  But because Alaska did not advance that claim in its Opening Brief in this Court, the claim is forfeited. *See Alaska Dep't of Fish and Game*, 62 F.4th at 1181 n.3.

authority under ANILCA.  1-ER-29–38.  The court further held that the Board did not impermissibly delegate any regulatory authority to Kake because the federal government controlled all aspects of the hunt except for the selection of hunters and the distribution of the yield.  1-ER-42.  And the court held that to the extent any limited administrative responsibilities were delegated to Kake, which is a sovereign tribal entity, the delegation was permissible.  1-ER-42–43.

## SUMMARY OF ARGUMENT

1.     The district court correctly held that the Board has authority under ANILCA to open an emergency subsistence hunt on federal land to ensure the safety and food security of rural Alaskans.  Alaska's contrary reading of the statute should be rejected because it would effectively nullify several of Title VIII's key provisions, including the rural subsistence priority itself.

When the State became unable to implement the subsistence management program required by ANILCA, that responsibility passed to the Secretaries.  Under the required statutory program, the Secretaries oversee regional advisory councils that recommend to the Secretaries strategies "for the management of fish and wildlife populations … to accommodate" subsistence uses and needs, along with "policies, standards, guidelines, and regulations to implement" those strategies.  16 U.S.C. § 3115(a)(D)(iii)-(iv).  The Secretaries determine which policies, standards, guidelines, and regulations to adopt.  And Congress vested the

15

Secretaries with broad authority to "prescribe such regulations as are necessary and appropriate to carry out" their responsibilities.  16 U.S.C. § 3124.

The special action regulation, and the Board's use of it to authorize the Kake hunt, do not exceed any statutory boundary on the Secretaries' delegated ANILCA authority.  To the contrary, the Board's decision properly prioritized rural subsistence takings, as ANILCA requires, for permissible reasons.  That conclusion not only follows from the statute's text and structure, but it is also consistent with the Secretaries' longstanding interpretation reflected in the federal subsistence regulations and with the interpretation provided by Alaska's own former Attorney General shortly after ANILCA's enactment.

Alaska's argument that the Secretaries' authority is confined to restricting takings in limited circumstances fails because the Secretaries already had that authority *before* the responsibility for implementing ANILCA's subsistence management program passed from the State to the federal government.  Alaska's position that nothing changed after it became unable to implement the required statutory program is untenable because it would effectively nullify ANILCA's rural subsistence preference and several other key provisions of the statute.  The legislative history, to the extent relevant, further contradicts Alaska's overly restrictive view of the Secretaries' authority.  And although the Secretaries' assumption of subsistence management responsibilities under ANILCA partially

16

displaced the State's traditional authority to manage the wildlife within its borders, Congress expressly intended that result.  *See* 16 U.S.C. § 3202(a).

2.　　The district court lacked jurisdiction to review Alaska's improper-delegation claim, which fails on the merits in any event.  The claim is barred by the rule of mandate in light of this Court's prior ruling that the claim was forfeited, which left undisturbed the district court's judgment dismissing the claim for lack of jurisdiction.  Alaska also lacks Article III standing to pursue the claim because the State was not injured by the fact that Kake—rather than the federal government—selected the hunters and distributed the yield.  Even if the district court had jurisdiction, the claim fails on the merits because the Board and the Forest Service set all substantive terms of the hunt and did not delegate any substantive regulatory authority to Kake.

The district court's judgment should therefore be affirmed.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo, *Center for Biological Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017), applying the APA's standard of review to determine whether the Board's authorization of the Kake hunt was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see also Ninilchik Traditional Council*, 227 F.3d at 1193-94.

17

This appeal turns on whether the Board acted within the scope of its authority under ANILCA, a question of law that is reviewed de novo. *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008). In resolving that issue, the district court applied the interpretive framework established in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which called for deference to an agency's reasonable interpretation of a statute that it is charged with administering if the statute is ambiguous. *See* 1-ER-15–16. The Supreme Court subsequently overturned *Chevron* and held that courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). The Court instructed that "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." *Id*. And when the statute "delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id*.

The district court's compliance with the mandate rule is reviewed de novo. *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000). Questions of Article III standing, which may be raised at any time, are also reviewed de novo. *See Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1181 (9th Cir. 2004).

## ARGUMENT

**I.     The Board acted well within its delegated ANILCA authority when it approved the Kake hunt.**

Alaska argues that the special action regulation, 50 C.F.R. § 100.19(a), and the Board's use of it to authorize the Kake hunt, are unlawful because the federal government lacks authority under Title VIII of ANILCA to open federal lands to subsistence hunting for any reason.  Opening Br. 23-38.  The State contends that it alone decides when federal lands will be open to hunting, and that the Board's authority is confined to *restricting* state-authorized hunting on federal lands in narrow circumstances.  *Id*.  The district court properly rejected Alaska's argument.

Because the State failed to maintain a compliant program, the federal government became responsible under ANILCA for managing the taking of fish and wildlife on federal lands for subsistence uses and for prioritizing such uses over the taking of fish and wildlife for other purposes.  Congress delegated broad discretionary authority to the federal government to decide how best to implement the statutory mandates.  And opening an emergency subsistence hunt on federal lands to ensure the safety and food security of rural Alaskans, as the Board did here, falls well within the scope of that authority.

## A. ANILCA grants the federal government authority to open a subsistence hunt on federal land.

The best reading of Title VIII of ANILCA is that it gives the federal government the basic power to open federal lands to subsistence hunting when doing so advances the statutory objectives, as the Board's decision did in this case.

At the outset, it bears repeating that Title VIII governs subsistence takings on *federal public lands* in Alaska. *See* 16 U.S.C. §§ 3102(1)-(3), 3111(4), 3114. Accordingly, this is not a case where Congress or the Board is attempting to expand federal power "over private property," *U.S. Forest Service v. Cowpasture River Preservation Ass'n*, 590 U.S. 604, 622 (2020), or to regulate at "the outer limits of Congress' power," *Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001). The Property Clause grants Congress broad authority "to 'make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.'" *Center for Biological Diversity v. Bernhardt*, 946 F.3d 553, 557-58 (9th Cir. 2019) (quoting U.S. Const. art. IV, § 3, cl. 2). "The 'complete power' that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there." *Kleppe v. New Mexico*, 426 U.S. 529, 540-41 (1976). And when Congress enacts legislation governing wildlife management on federal lands, such legislation "necessarily overrides conflicting state laws under the Supremacy Clause." *Id*. at 543 (citing U.S. Const., art. VI, cl. 2).

20

In enacting Title VIII, Congress invoked "its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on [Alaska's] public lands." 16 U.S.C. § 3111(4). Congress determined that "the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by residents of rural Alaska" required a new "administrative structure" for "the management of fish and wildlife and of subsistence uses on the public lands in Alaska." *Id*. § 3111(5).

Congress therefore required the creation of regional councils to recommend strategies for managing the taking of fish and wildlife on federal lands for rural subsistence uses, *see id*. §§ 3101(c), 3111(5), 3112-3114, 3115(a)-(c); it directed the Secretaries to implement those strategies in the absence of a compliant state program, *see id*. § 3115(c)-(d); and it mandated that subsistence takings on public lands be "accord[ed] priority" over the taking of fish and wildlife for other purposes, *id*. § 3114. ANILCA, read as a whole, thus "clearly expresses Congress's intent to create a federal regulatory scheme 'to protect the resources related to subsistence needs' and 'to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.'" *Katie John II*, 247 F.3d at 1036 (Tallman, J., concurring) (quoting 16 U.S.C. § 3101(b)-(c)).

21

In recognition of Alaska's traditional authority over the fish and wildlife within its borders, Congress gave the State the option to enact its own laws in place of the federal program envisioned by Title VIII.  *See* 16 U.S.C. § 3115(d).  But because Alaska's constitution prohibits the State from implementing the required program, that responsibility and authority passed to the Secretaries.  *See* 16 U.S.C. § 3115(d); *Katie John*, 1994 WL 487830, at *5-8.  And Congress authorized the Secretaries to "prescribe such regulations as are necessary and appropriate to carry out [their] responsibilities" under the statute.  16 U.S.C. § 3124.  The Secretaries' broad responsibility and authority under the statute plainly includes the basic power to open an emergency subsistence hunt on federal land when appropriate.

Deciding when federal lands will be *open* to subsistence takings of fish and wildlife is a basic component of "the proper regulation" and "management of fish and wildlife and of subsistence uses on the public lands in Alaska," 16 U.S.C. § 3111(5), which are the Board's responsibility in light of the State's inability to maintain a compliant program, *see Katie John*, 1994 WL 487830, at *5-9.  And temporarily opening federal lands to subsistence hunting outside of the general hunting seasons established by the State properly "accord[s] priority" to subsistence users, as ANILCA requires.  16 U.S.C. § 3114.

To draw an analogous example from the air travel context referenced by the State, *see* Opening Br. 25, the Board's decision to temporarily open federal lands

to subsistence hunting when those lands remain closed to the taking of wildlife for other purposes is comparable to priority boarding conducted by a commercial airline; in both cases, a particular user group is accorded a "priority," i.e., "precedence in order, rank, privilege, etc," or "the right to take precedence in obtaining certain supplies, services, facilities, etc." *The Randomhouse College Dictionary* 1053 (rev. ed. 1980).  Opening federal lands to rural subsistence users outside of state seasons also qualifies as a "*[p]reference* for subsistence users," 16 U.S.C. § 3114 (emphasis added), i.e., "a practical advantage given to one over others." *The Randomhouse College Dictionary* 1045 (rev. ed. 1980); *see also Ninilchik Traditional Council*, 227 F.3d at 1195 (upholding Board's determination that a ten-day advance moose season "reserved for subsistence hunters qualifies as a meaningful preference within the meaning of § 3114").

The conclusion that the Board may open subsistence harvest seasons on federal lands outside of state seasons thus accords with the plain language and purpose of Title VIII.  That is particularly true given the absence of any express statutory limit on the manner in which the Board may prioritize subsistence takings, *see* 16 U.S.C. § 3114, and the fact that state seasons (and state hunting regulations generally) cannot grant any priority or preference to rural subsistence users as a matter of state constitutional law.  *See McDowell*, 785 P.2d at 9.

Ensuring the safety and food security of the rural residents of Kake during the early stages of the COVID-19 pandemic was also a permissible reason for the Board to open the Kake hunt.  Congress recognized that "the continuation of the opportunity for subsistence uses by rural residents of Alaska" is "essential" to their "physical … existence," 16 U.S.C. § 3111(1), and that "in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses," *id*. § 3111(2).  Thus, as the district court correctly observed, "ANILCA's priority for rural subsistence uses aims, among other things, to ensure the physical well-being of rural residents of Alaska in an emergency." 1-ER-32. The Board's decision to open the Kake hunt properly advanced that objective.

To be sure, ANILCA does not specifically state that the federal government may open subsistence hunting seasons on federal lands as a means of prioritizing subsistence uses.  But Congress authorized the Secretaries to promulgate all "necessary and appropriate" regulations to carry out their subsistence management responsibilities.  16 U.S.C. § 3124.  "[N]ecessary and appropriate" signifies a "capacious[]" grant of power that "leaves agencies with flexibility" in deciding how best to implement the statutory objectives. *Michigan v. EPA*, 576 U.S. 743, 751 (2015); *Loper*, 144 S. Ct. at 2263 & n.6; *see also Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1169 (9th Cir. 2022) (noting that "ANILCA vests the Secretary of

24

the Interior with plenary authority 'to protect—if need be, through expansive regulation—'the national interest in the scenic, natural, cultural and environmental values on the public lands''") (quoting *Sturgeon v. Frost*, 587 U.S. 28, 58 (2019) (in turn quoting 16 U.S.C. § 3101(d))), *cert. denied*, 143 S. Ct. 1002 (2023).  Such a delegation gives an agency the power "to fill up the details," *Loper*, 144 S. Ct. at 2262 (cleaned up), so long as the agency stays within "the outer statutory boundaries" of the delegation and exercises its discretion "consistent with the APA," *id*. at 2268; *see also National Wildlife Fed'n v. National Marine Fisheries Service*, 524 F.3d 917, 929 (9th Cir. 2008) (where Congress imposes broad mandates on agencies but does not direct specific implementing actions, "the agencies retain considerable discretion in choosing what specific actions to take in order to implement" those mandates).  And, as explained above, the Board's decision to open the Kake hunt was reasonable and well within the outer boundaries of its delegated authority under ANILCA.

Finally, in determining the meaning of a statute, courts may "seek aid from the interpretations of those responsible for implementing particular statutes." *Loper*, 144 S. Ct. at 2262.  "And interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Id*.  Here, shortly after ANILCA's enactment, Alaska's own Attorney General recognized that if the State failed to

25

implement a compliant subsistence program, ANILCA would authorize the Secretaries to assert "federal control over subsistence management" and to implement "substantive fish and game management regulations, *including such subjects as seasons*, bag limits, and methods and means, controlling the subsistence taking of fish and wildlife on all federal lands in Alaska." *Office of the Attorney General, State of Alaska*, File No. 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, 1981 WL 38891, at *4 (April 23, 1981) (emphasis added). Federal regulations also have consistently stated since 1992 that subsistence hunting seasons on public lands "are closed *unless opened by Federal regulation*," 50 C.F.R. §§ 100.25(b), 100.26(a); 57 Fed. Reg. 22,530, 22534, 22536 (May 28, 1992) (emphasis added), and have authorized the Board to open an emergency subsistence hunt on federal lands for public safety reasons, 50 C.F.R. § 100.19(a); 57 Fed. Reg. at 22,957.

Considering the statutory text and structure, and according "due respect," *Loper*, 144 S. Ct. at 2267, to the Secretaries' longstanding interpretation (which is consistent with the Alaska Attorney General's contemporaneous interpretation), the best reading of ANILCA is that in the absence of a compliant State program, the Board has authority to open an emergency subsistence hunt on federal lands to ensure the safety and food security of rural Alaskans, as the Board did here.

Although Alaska advances various contrary arguments, none has merit.

B.    **The federal government's authority under Title VIII is not limited to imposing closures or other hunting restrictions.**

Alaska argues that Board's decision to open the Kake hunt was unlawful because the federal government's authority is confined to *restricting* takings under Sections 815 and 816 of ANILCA when necessary to protect fish and wildlife populations, to ensure the continuation of subsistence uses, or to ensure public safety.  Opening Br. 25-27.  That argument might have some merit if the State were still implementing a compliant rural subsistence management program.  But in the absence of a compliant state program, the argument is untenable.

Section 804 of ANILCA, which establishes the rural subsistence priority, *also* explains how that priority must be implemented when it is "necessary to restrict the taking of populations of fish and wildlife on [public] lands for subsistence uses." *Id*. § 3114.  And Section 816 limits the circumstances in which the Secretaries may close public lands to subsistence uses. *Id*. § 3126(b).  But the Secretaries' mandate to prioritize subsistence uses is not limited to restricting such uses.  Congress separately specified when the Secretaries may restrict subsistence uses not because that is the full extent of their authority, but because excessive restrictions would undermine Title VIII's central purpose:  "to protect and provide the opportunity for continued subsistence uses." *Id*. § 3111(4).

Nor is the Secretaries' authority limited to restricting *non*subsistence hunting under Section 815(3).  That savings clause states only that nothing in Title VIII is

27

to be construed as "authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses unless necessary" for specified reasons. *Id*. § 3125(3). Section 815(3) does not purport to prohibit the Secretaries from *opening* federal lands to the taking of fish and wildlife *for subsistence uses*. *See id*.

Section 806 of ANILCA confirms that the Secretaries' authority to restrict takings under Sections 815 and 816 is distinct from their affirmative obligation under Sections 804 and 805 to prioritize subsistence uses in the management of fish and wildlife on federal lands. As discussed, Congress assumed throughout the legislative process that Alaska would implement the required subsistence management program, *Katie John I*, 72 F.3d at 700-01, and several provisions of ANILCA reflect that assumption, *e.g*., 16 U.S.C. §§ 3115(c)-(d), 3116. Section 806 directs the Secretaries to "monitor the provisions by the State of the subsistence preference set forth in section 3114" and to report "on the effectiveness of the implementation of this subchapter, including" four *separate* items: "the State's provision of such preference, any exercise of [the Secretaries'] closure or other administrative authority to protect subsistence resources or uses, the views of the State, and any recommendations [the Secretaries] may have." *Id*. § 3116.

Section 806 thus makes clear that the Secretaries' "closure or other administrative authority to protect subsistence resources or uses" is *distinct* from the "provision … of the subsistence preference" required under Section 804, *id*.,

which Congress assumed the State would implement through "laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in," Sections 803, 804, and 805, *id*. § 3115(d).  Section 806 also makes clear that the Secretaries would possess their distinct "closure or other administrative authority to protect subsistence resources or uses" *even if* the State were providing "such preference."  *Id*. § 3116; *see also Katie John*, 1994 WL 487830 at *3 (explaining that when the State was implementing the required subsistence management program, the Secretaries' role was limited to monitoring the state program and carrying out their closure and other administrative authority over the public lands).

But according to Alaska, nothing changed after it became unable to implement laws of general applicability that are consistent with, and that provide for the definition, preference, and participation specified in, Sections 803, 804, and 805 of ANILCA; the Secretaries' authority remained confined to the distinct "closure or other administrative authority to protect subsistence resources or uses," *id*. § 3116, that they already possessed.  *See* Opening Br. 21, 25-27.

That reading of Title VIII is untenable because it would effectively nullify several of its key provisions.  Section 804's requirement to prioritize rural subsistence uses in the management of fish and wildlife on federal lands would become inoperative because (a) the State cannot implement that requirement and

29

(b) the Secretaries' powers (according to the State) remain confined to their distinct, preexisting authority to implement closures or other restrictions under Section 815 and 816.  The State's reading would also nullify Sections 805(a), (b), and (c) of ANILCA, which require the creation of a new administrative structure and federal subsistence program in the absence of a compliant state program.  *See id*. § 3115(d).  Those detailed provisions were clearly triggered following the *McDowell* decision, but according to the State, they have no effect because the Secretaries' powers remain limited to the closure authority that they had when the State was implementing the required program.  Section 814 would also become largely superfluous; if the Secretaries' authority remains limited to implementing closures or other restrictions under Sections 815 and 816—even when the State fails to implement the subsistence program required by Sections 803, 804, and 805—then no additional federal "regulations" are "necessary" for the Secretaries to carry out their (nonexistent) "responsibilities under this subchapter."  *Id*. § 3124.

A statute should be construed whenever possible such that "no clause, sentence, or word" is rendered "superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted).  And ANILCA must be given "the breadth and scope sufficient to achieve Congress's express purpose."  *Katie John II*, 247 F.3d at 1037-38 (Tallman, J., concurring); *see also N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973) (holding that courts "cannot

30

interpret federal statutes to negate their own stated purposes"). Because Alaska's reading of Title VIII renders several of its key provisions inoperative and undermines the statutory objectives, the State's interpretation is unreasonable.

Alaska resists that conclusion by pointing to Congress's policy statement in Section 802 that subsistence uses "shall be the priority consumptive uses of all such resources on the public lands of Alaska when it is necessary to restrict taking …" 16 U.S.C. § 3112(2). The State interprets that language to mean that subsistence uses may be prioritized on federal lands only by restricting subsistence or non-subsistence takings when permissible under Sections 815 and 816. *See* Opening Br. 9, 21, 25-27. But that argument is flawed not only because it is inconsistent with ANILCA's operative provisions, as explained above, but also because the statutory text and context indicate that Section 802(2) inadvertently omitted the conjunction "and" between "Alaska" and "when."

The policy statement in Section 802(2) as a whole provides:

> [N]onwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska when it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses;

16 U.S.C. § 3112(2). That statement makes grammatical sense only if the term "and" is inserted between "Alaska" and "when," signifying that the requirement to

31

prioritize rural subsistence uses—and how that priority should be implemented when it becomes necessary to restrict takings—are separate considerations.  That reading also appropriately aligns the policy statement with Section 804, the relevant operative provision, which addresses each distinct issue in a separate sentence.  *See id*. § 3114.  In fact, the word "and" was consistently included in prior versions of the policy statement.  *See* H. Rep. No. 95-1045, Part I at 27-28 (1978) (26a-27a); S. Rep. No. 95-1300, at 26, 220 (1978) (40a-41a); H. Rep. No. 96-97, Part I at 48 (1979) (43a); S. Rep. No. 96-413, at 34 (1979) (45a).

Where (as here) the text and context indicate that a term was inadvertently omitted, "an appellate court may interpret statutes to correct such obvious mistakes."  *Bohac v. Dep't of Agric.*, 239 F.3d 1334, 1338 (Fed. Cir. 2001); *see also Citizens to Save Spencer Cty. v. EPA*, 600 F.2d 844, 871-72 (D.C. Cir. 1979) (in "legislative (as in judicial) affairs, allowance must be made for human error and inadvertence").  That principle is particularly applicable here because a missing conjunction is not uncommon in federal statutes, *see Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (noting the government's reference to "numerous federal statutes that inadvertently lack a conjunction"), and because the grammatical error occurs in a policy statement rather than in any of ANILCA's operative provisions.

In any event, the grammatical error in Section 802(2) is irrelevant to the outcome here.  ANILCA's operative provisions make clear that the Secretaries'

closure authority under Section 815 and 816 is distinct from their authority under Section 804 and 805 to prioritize subsistence uses of fish and wildlife in the management of federal public lands. *See supra* pp. 20-30. On that basis alone, Alaska's unduly restrictive view of the Secretaries' authority should be rejected.

### C.    The legislative history contradicts Alaska's position.

Lacking support for its position in the statutory text and structure, Alaska turns to the legislative history. But there is no need to resort to legislative history here because the Board's authorization of the Kake hunt falls comfortably within the broad scope of its delegated authority under ANILCA. *See* 16 U.S.C. § 3124; *see also Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (recognizing that legislative history "is not the law," and that courts do not "inquire what the legislature meant; [they] ask only what the statute means").

Title VIII's legislative history is also of limited utility because Congress assumed that the State would implement a compliant program and "could not have anticipated" that the Alaska Supreme Court would hold that the State's laws establishing the required program violated the Alaska state constitution. *Katie John I*, 72 F.3d at 700-01. The legislative history thus gives no extended consideration to the current situation in which the State is prohibited as a matter of state constitutional law from implementing the required program.

In any event, the legislative history does not support Alaska's position. Alaska argues that a Senate committee report shows that the Secretaries may prioritize subsistence hunting only when it becomes necessary to restrict hunting. *See* Opening Brief 28-29. That is incorrect. The report's discussion of the provision that became Section 804 does describe how the subsistence priority is to be implemented when it becomes necessary to restrict hunting on public lands due to conservation concerns. *See* S. Rep. No. 96-413, at 269 (46a). But the report *also* states that the bill "envisions that governmental action affecting subsistence resources and uses shall be undertaken in a manner which adequately provides for the preference *on an ongoing basis* and *not only* when critical allocation decisions may be necessary because a particular subsistence resource may be threatened with depletion." *Id*. (emphasis added).

Moreover, the report shows that the State understood that in its presumed role of manager of the subsistence program, the regional councils required under Section 805 of ANILCA would "have a major role in the State rulemaking authority's *establishment of seasons*, bag limits and the provision of the preference for subsistence uses in their respective areas." S. Rep. No. 96-413, at 270 (47a) (emphasis added). The report also indicates that if a court determined that the State was not adequately implementing the preference in a particular area, the court could order the State to issue an emergency regulation *either* closing a portion of

34

the public lands to the taking of the relevant wildlife population, except for subsistence uses by local residents of the affected area, *or* "opening the harvest of such population to such residents." *Id*. at 272-73 (49a-50a).

Because the State cannot implement the required program, the Secretaries (acting through the Board) are now the "rulemaking authority" responsible for "the establishment of seasons, bag limits and the provision of the preference for subsistence uses" on federal lands. *Id*. at 270; 16 U.S.C. § 3115(d); *Kenaitze Indian Tribe*, 860 F.2d at 316-18; *Katie John*, 1994 WL 487830, at *9; *Office of the Alaska Attorney General*, 1981 WL 38891, at *4; *see also* 55 Fed. Reg. at 27,188 (preamble to 1990 regulations explaining that the Board would "function similarly to the State Boards of Fisheries and Game" and "broadly execute the Secretaries' subsistence responsibilities which include … setting Federal subsistence seasons and bag limits"). And the cited Senate report confirms that the preference may be implemented when appropriate by "opening the harvest" of fish and wildlife on federal lands to rural Alaskans. S. Rep. No. 96-413, at 273 (50a).

Alaska next argues that "Congress rejected a version of the bill [H.R. 39] that gave the Secretaries authority to *open* seasons" in certain circumstances, which allegedly proves that Congress did not intend to grant the Secretaries such authority. Opening Brief 28-30. That argument is misguided, as the district court correctly explained, because the final legislation significantly *expanded* the

35

Secretaries' management authority in a situation where the State failed to maintain a compliant program.  *See* 1-ER-36–37.

The version of H.R. 39 Alaska cites "authorize[d] the State to regulate the taking of fish and wildlife on public lands for subsistence uses" as long as the State developed a "subsistence management program" that met certain requirements. H. Rep. No. 95-1945, Part II, at 89-91 (34a-36a); *see also id*. at 23-25 (29a-31a). Importantly, the bill did *not* allow the Secretaries to "suspend the State's authority to manage subsistence resources or to take over the management of those resources on the public lands" if Alaska failed to maintain a compliant program.  *Id*. at 91 (36a).  "Rather, the Secretary's discretion would be limited to closing the public lands to subsistence and nonsubsistence uses under certain circumstances and opening the lands to subsistence uses by local residents under very extraordinary circumstances."  *Id*.; *see also id*. at 25-27 (31a-33a), 91-93 (36a-38a).

The enacted statute is fundamentally different because the State "is delegated no authority."  *Kenaitze Indian Tribe*, 860 F.2d at 315.  The statute "only provides that if the state wishes to regulate in a manner consistent with federal law, federal regulations will be withheld."  *Id*.  And crucially, if the State does not implement a compliant program, the enacted legislation requires the Secretaries to "step in and do the job."  *Id*.; *see* 16 U.S.C. § 3115(d).

36

In comparison to the early version of H.R. 39, therefore, the enacted law represents a significant expansion—not a restriction—of the Secretaries' authority if the State failed to maintain a compliant program:  instead of being "limited to closing the public lands … under certain circumstances and opening the lands to subsistence uses" in extraordinary circumstances, H. Rep. 95-1045, Part II, at 91 (36a), the Secretaries assume responsibility for managing the entire program.  *See Katie John*, 1994 WL 487830, at *8-9; *Kenaitze Indian Tribe*, 860 F.2d at 315. And the "program" required by the enacted statute includes "the establishment of seasons" for rural subsistence hunting on federal lands.  S. Rep. No. 96-413, at 270 (47a); *Office of the Attorney General, State of Alaska*, 1981 WL 38891, at *4.

## D.  Title VIII is explicitly preemptive.

Alaska next argues that ANILCA should not be read to implicitly preempt the State's traditional authority to manage the wildlife within its borders.  *See* Opening Br. 33-38.  That argument fails because "Congress was clear in ANILCA's text that enforcement of the subsistence priority would entail altering the traditional balance of power between the State of Alaska and the federal government," *Katie John II*, 247 F.3d at 1037 (Tallman, J., concurring)—a point that Alaska itself appears to concede, *see* Opening Br. 21, 23, 36.

As discussed, in enacting Title VIII, Congress expressly invoked its authority under the Property Clause "to protect and provide the opportunity for continued subsistence uses on [Alaska's] public lands." 16 U.S.C. § 3111(4). When Congress enacts legislation pursuant to its "complete power" under the Property Clause, that legislation "necessarily overrides conflicting state laws under the Supremacy Clause." *Kleppe*, 426 U.S. at 540-41. That is "but the necessary consequence of valid legislation under the Property Clause." *Id*. at 545.

Congress then delegated its Property Clause authority to the Secretaries by directing them to manage fish and wildlife populations on the public lands for subsistence uses in the absence of a compliant State program. *See supra*, pp. 20-30; *Katie John*, 1994 WL 487830, at *9; *Kenaitze Indian Tribe*, 860 F.2d at 315. And precisely because that delegation displaced the State's traditional authority to manage the wildlife within its borders, Section 1314(a) of ANILCA expressly acknowledges that shift: it states that nothing in the statute "is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands *except as may be provided in [Title VIII]*, or to amend the Alaska constitution." 16 U.S.C. § 3202(a) (emphasis added).

Indeed, *all* hunting on federal public lands in Alaska is "subject to federal law, including any regulations imposed by the [Secretaries] under [their] delegated statutory authority to manage federal lands." *Safari Club*, 31 F.4th at 1168; *see*

38

*also* 16 U.S.C. § 3202(c) (providing that hunting on public lands in Alaska "shall be carried out in accordance with the provisions of this Act and other applicable State *and Federal* law") (emphasis added). "And, if Alaska state law conflicts with federal hunting regulations, the latter control under standard principles of conflict preemption." *Safari Club*, 31 F.4th at 1168. "Not only do the cited legal principles and laws tell us that federal law has primacy over federal lands, but also common sense tells us the same. The federal government, and not a single state, has control over federal lands which benefit the entire country." *Id*.

Alaska's contrary arguments confuse "the question of the substantive (as opposed to pre-emptive) *meaning* of a statute with the question of *whether* a statute is pre-emptive." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 (1996). Title VIII is clearly preemptive. *See* 28 U.S.C. § 3202(a), (c); Opening Br. 23, 36. Whether Title VIII's management and prioritization mandates, *id*. §§ 3114-3115, and its delegation of discretionary authority to the Secretaries, *id*. §§ 3115(d), 3124, give the Secretaries the basic power to open federal lands to subsistence hunting goes to the substantive meaning of those provisions, which is resolved under the principles set forth in *Loper*. And under those principles, the best reading of ANILCA is that it authorizes the Secretaries to open seasons for rural subsistence hunting on federal lands, outside of the general hunting seasons

established by the State, when doing so advances the statutory objectives, as the Board's decision did in here.

### E. The Board's subsistence management actions are designed to conserve healthy populations of fish and wildlife.

Alaska also argues that the Board's authorization of the Kake hunt "upended the State's conservation of resources" and had the potential to create "a conservation concern." Opening Br. 36. That argument fails as a factual matter. The Board determined that the modest hunt raised no conservation concerns "for the growing population of moose and stable population of Sitka black-tailed deer in the harvest area." SER-53. Alaska cites no contrary record evidence. The Board has also opened federal lands exclusively to subsistence hunting in the past as a means of prioritizing subsistence uses, *see supra* p. 7, and Alaska does not contend that any of those actions raised any conservation concerns.

Any future action of the Board to prioritize, protect, or provide the opportunity for continued subsistence uses of fish and wildlife on federal lands also must be "consistent with sound management principles" and with "the conservation of healthy populations of fish and wildlife." 16 U.S.C. § 3112(1). As the Secretaries explained when promulgating the federal regulations in 1992, their responsibilities under Title VIII are "two-fold:  To conserve healthy fish and wildlife populations and to ensure that non-wasteful subsistence uses of fish and wildlife populations are accorded priority over other consumptive uses on public

40

lands." 57 Fed. Reg. at 22,940.  The "conservation of healthy fish and wildlife populations" thus is "the standard by which subsistence taking and uses will be managed" under the federal regulatory scheme.  *Id*. at 22,942.

Therefore, no basis exists for concluding that the Board's continued administration of the subsistence management program, including its authorization of a future emergency subsistence hunt under 50 C.F.R. § 100.19(a) if necessary, will preclude the State from achieving its wildlife conservation objectives.

*    *    *    *

The text, structure, and history of ANILCA demonstrate that the Board acted well within the "outer statutory boundaries" of its discretionary authority when it authorized the Kake hunt, and the record shows that the Board's decision was "consistent with the APA." *Loper*, 144 S. Ct. at 2268.  The Court should therefore affirm the district court's judgment upholding the Board's decision and the special action regulation on which it was based.

## II.     The district court lacked jurisdiction over Alaska's improper-delegation claim, which has no merit in any event.

Alaska next claims that even if the Board possessed authority under ANILCA to authorize the Kake hunt, the Board improperly delegated to Kake the responsibility to select the hunters and to distribute the yield.  Opening Br. 38-43.  That claim is barred by the mandate rule, Alaska lacks Article III standing to pursue the claim, and the claim lacks merit in any event.

### A.     Alaska's improper-delegation claim is barred by the mandate rule.

Alaska is barred from pursuing its improper-delegation claim by the mandate rule in light of this Court's prior ruling that the claim was forfeited and by the Court's reversal of the district court's judgment of dismissal *only* with respect to "Alaska's claim that the [Board] did not have authority to open the Kake hunt." 62 F.4th at 1185.  Although the district court held otherwise before rejecting Alaska's claim on the merits, 1-ER-16–20, this Court may "affirm on any ground supported by the record," *Johnson v. Barr*, 79 F.4th 996, 1003 (9th Cir. 2023).

Under the mandate rule, when a case has been decided by this Court and remanded, "whatever was before this [C]ourt, and disposed of by its decree, is considered as finally settled."  *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (citation omitted).  The mandate rule is related to the law of the case doctrine, which provides that "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case."  *Id.* (citation omitted).  Both doctrines "serve an interest in consistency, finality and efficiency," and the mandate rule "also serves an interest in preserving the hierarchical structure of the court system."  *Id.* at 982.  Although the law of the case doctrine "is a judicial invention designed to aid in the efficient operation of court affairs," *id.* at 981 (citation omitted), "if a district court errs by violating the rule of

42

mandate, the error is a jurisdictional one," *id*. at 982.  The rule of mandate applies here and bars Alaska from pursuing its improper-delegation claim.

Alaska pursued that claim in the first round of litigation, SER-35–41, and the district court held that all claims relating to the Kake hunt, including the improper-delegation claim, were moot, SER-16–22.  The district court thus entered final judgment dismissing those claims for lack of jurisdiction.  SER-23–24.  On appeal, "Alaska challenge[d] the district court's mootness determination as to only one of its claims related to the Kake hunt:  that ANILCA does not authorize the federal government to open emergency hunting seasons." 62 F.4th at 1181.  This Court therefore held that "Alaska's other claims for relief related to the Kake hunt are not raised in the opening brief, and so are forfeited." *Id*. at 1181 n.3.

That ends the matter:  this Court addressed and disposed of the improper-delegation claim, holding that it was forfeited, *id*., and reversed the district court's judgment only with respect to "Alaska's claim that the [Board] did not have authority to open the Kake hunt," *id*. at 1185.  Accordingly, under the rule of mandate, the district court lacked jurisdiction to review the merits of that claim on remand.  *See Thrasher*, 483 F.3d at 981-82.

Contrary to the district court's suggestion, 1-ER-16–18, this Court did not hold that the improper-delegation claim was only temporarily forfeited for purposes of the prior appeal, with Alaska retaining the option to revive the claim

on remand and then to pursue it in a second appeal down the road.  The Court held

that the claim was forfeited, period.  And the district court was bound by that

ruling.  *See Thrasher*, 483 F.3d at 981-82; *see also United States v. Real Prop.*

*Located at 25445 via Dona Christa, Valencia, Cal*., 138 F.3d 403, 409 (9th Cir.

1998), *as amended by* 170 F.3d 1161, 1162 (9th Cir. 1999) (where the Court had

concluded in a prior appeal that the claimant's due process argument was waived,

"the law of the case doctrine forecloses review of the issue" in a subsequent

appeal); *Magnesystems, Inc. v. Nikken, Inc*., 933 F. Supp. 944, 949-50 (C.D. Cal.

1996) (an issue or argument "waived at the trial level before a particular order is

appealed, or subsequently waived on appeal, cannot be revived on remand.").

This Court also specifically "reverse[d] the district court's dismissal of

Alaska's claim that the [Board] did not have authority to open the Kake hunt and

remand[ed] *that claim* to the district court for further proceedings consistent with

[its] opinion."  62 F.4th at 1185 (emphasis added).  A "district court is limited by

this [C]ourt's remand in situations where the scope of the remand is clear."

*Thrasher*, 483 F.3d at 982 (citation omitted).  Because this case was "remanded for

a single purpose"—to allow for review of Alaska's claim that the Board lacked

authority to open the Kake hunt—the "plain language of the disposition precluded

the district court from considering any other arguments concerning" the hunt, *see*

*id*. at 983, particularly in light of this Court's express ruling that Alaska had forfeited any other claims relating to the hunt, 62 F.4th at 1181 n.3.

The district court therefore erred by permitting Alaska to revive its improper-delegation claim on remand.  Allowing Alaska to pursue the claim impermissibly expanded the scope of the remand, exceeded the district court's jurisdiction, nullified this Court's prior ruling that the claim was forfeited, and contravened the interests of "consistency, finality and efficiency" that underlay both the mandate rule and the law of the case doctrine.  *Thrasher*, 483 F.3d at 982.

### B.  Alaska lacks Article III standing to pursue its improper-delegation claim.

Even if the mandate rule did not deprive the district court of jurisdiction to reach the merits of Alaska's improper-delegation claim, the court lacked jurisdiction because Alaska does not have Article III standing to pursue the claim.

To demonstrate standing, "a plaintiff must show (1) that he has suffered an injury in fact, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury would likely be redressed by a favorable judicial decision."  *Fernandez v. 23676-23726 Malibu Road*, LLC, 74 F.4th 1061, 1063 (9th Cir. 2023).  "As a fundamental tenet of the Constitution's case-or-controversy requirement, the failure to establish standing deprives the court of subject matter jurisdiction, without which a court lacks authority to adjudicate the claim."  *Id*. And a plaintiff "must establish standing for each claim he asserts."  *Id*.  Although

45

the Board did not challenge Alaska's standing to pursue its improper-delegation claim in district court, "the jurisdictional issue of standing can be raised at any time." *United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997).

Alaska's improper-delegation claim is distinct from its claim that the Board lacked authority under ANILCA to open the Kake hunt. The improper-delegation claim assumes that the Board acted within the scope of its authority, but then unlawfully delegated two aspects of hunt administration to Kake: the authority to decide which qualified federal subsistence users could participate and the authority to decide which Kake residents could share in the yield. *See* Opening Br. 38-43. Because the Board's decision to allow Kake to make those ministerial decisions did not inflict any cognizable injury on State of Alaska, the State lacks Article III standing to pursue its claim.

As discussed above, all substantive terms of the hunt were set by the federal government, not by the Organized Village of Kake. The federal government identified the lands on which the hunt could occur, established the timeframe and maximum duration of the hunt, and set the number, sex, and species of animals that could be taken. SER-52–53. The federal government also prescribed the allowable means and methods of conducting the hunt, 50 C.F.R. § 100.26; restricted the use of the yield, *id*. § 100.7; and dictated that eligibility to participate was limited to federally qualified subsistence users, SER-52. The federal

government also confirmed with Kake in advance of the hunt that all community residents in need could benefit from the harvest, regardless of race or tribal status. 2-ER-57–58.  And the federal government confirmed after the hunt that the yield was in fact distributed to 135 households in the community.  SER-45.

That Kake—rather than the Board or the Forest Service—determined *which* federally qualified subsistence users would do the harvesting and *which* needy residents could share in the yield did not infringe on the State's sovereignty or otherwise injure the State.  And although Alaska may have a general desire to ensure that the Board always acts in accordance with law, "such a 'generalized grievance,' no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013).  Standing "is not to be placed in the hands of concerned bystanders, who will use it simply as a vehicle for the vindication of value interests."  *Id*. (cleaned up).

There is also no evidence that Kake improperly denied any federally qualified subsistence hunters the opportunity to participate in the hunt.  Nor is there any evidence that Kake improperly denied any needy residents a share of the yield.  And even if there were such evidence, any resulting harm to individual members of the community would not give *the State* standing to sue because a state "does not have standing as *parens patriae* to bring an action against the Federal Government."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,

458 U.S. 592, 610 n.16 (1982).  A state lacks the power to enforce the rights of its citizens "in respect of their relations with the Federal Government" because in "that field it is the United States, and not the State, which represents [the citizens of the State] as *parens patriae*."  *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *accord Nevada v. Burford*, 918 F.2d 854, 858 (9th Cir.1990), *cert. denied*, 500 U.S. 932 (1992); *Alaska v. National Parks and Conservation Ass'n, Inc*., No. 91-36297, 1992 WL 361253, at *1 (9th. Cir. Dec. 7, 1992).

Alaska thus lacks Article III standing to pursue its forfeited improper-delegation claim.  The district court's judgment rejecting the claim may also be affirmed on that alternative basis.

### C.     Alaska's improper-delegation claim fails on the merits.

Even if Alaska has standing to pursue its improper-delegation claim, and the claim is not barred by the mandate rule, the claim lacks merit because the Board did not delegate any substantive regulatory authority to Kake.

A federal agency may not "abdicate its statutory duties" by delegating them to a private entity.  *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974).[5]  But the

---

[5]  Kake, of course, is not a private entity, but a sovereign, federally recognized Indian tribe.  As the district court explained, in some circumstances, federal regulatory authority may be delegated to tribes because they are "'unique aggregations possessing attributes of sovereignty over both their members and their territory.'"  1-ER-42 (quoting *S. Pac. Transp. Co. v. Watt*, 700 F.2d 440, 556 (9th Cir. 1983).  The federal government does not rely on that principle (and this

48

"prohibition against subdelegation to an outside entity … is applicable only if an agency actually delegated its power in the first place." *Louisiana Forestry Ass'n Inc. v. Sec'y of U.S. Dep't of Labor*, 745 F.3d 653, 671 (3d Cir. 2014).  No delegation occurs when an agency "reasonably conditions" its action "on an outside party's determination of some issue," *State v. Rettig*, 987 F.3d 518, 531 (5th Cir. 2021); when a private entity "merely carried out … ministerial tasks," *Pittston Co. v. United States*, 368 F.3d 385, 396 (4th Cir. 2004); or when the powers given to a nonfederal entity "are of an administrative or advisory nature," *id*.; *see also Perot v. FEC*, 97 F.3d 553, 556, 559-60 (D.C. Cir. 1996) (per curiam).

The D.C. Circuit's analysis in *Perot* is instructive.  There, the court upheld an agency regulation that permitted nonprofit organizations to stage political candidacy debates so long as those organizations "use[d] pre-established objective criteria" to determine which candidates could participate.  97 F.3d at 556, 559-60. The regulation gave the private entities "the latitude to choose their own 'objective criteria,'" although the entities acted at their peril, and at the risk of incurring penalties, if they did not first secure an advisory opinion from the agency that the chosen criteria were satisfactory.  *Id*. at 560.

The court held that the regulation did not delegate legislative authority to the private organizations.  *Id*. at 559.  The court acknowledged that the regulation

---

Court need not address whether it applies) because—as demonstrated below— there was no delegation here in the first place.

could be viewed as a delegation because the organizations had to "use their discretion to formulate objective criteria that they think will conform with the agency's definition of that term." *Id*. at 559-60.  But in that respect, the court explained, "virtually any regulation of a private party could be described as a 'delegation' of authority, since the party must normally exercise some discretion in interpreting what actions it must take to comply." *Id*. at 560.  And "a regulation's use of a term that may be susceptible to differing interpretations does not automatically result in a delegation of authority to the entities that it governs." *Id*.

Here, the alleged "delegation" does not go nearly as far as the regulation upheld in *Perot* because in this case, the federal government set all substantive terms of the hunt—including the criteria governing Kake's ministerial decisions. Specifically, the Board dictated that any participants in the hunt must be federally qualified subsistence users, SER-52, and the Forest Service clarified in advance of the hunt that the yield must be shared with any needy members of the community "regardless of race or tribal status," 2-ER-58.  Accordingly, this is not a case where a nonfederal entity was "the principal decisionmaker in the use of federal power," "create[d] federal law," "wield[ed] equal power with a federal agency," or "regulate[d] unilaterally."  *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (describing circumstances in which courts have found an improper sub-delegation of statutory authority).  And the mere fact that Kake may have exercised

50

some discretion in deciding which federal qualified subsistence users could

conduct the harvest, and which members of the community were most in need,

does not give rise to unlawful sub-delegation of statutory authority.  *See Perot*,

97 F.3d at 559-60; *see also Consumers' Research, Cause Based Commerce, Inc. v.*

*Federal Communications Commission*, 88 F.4th 917, 926 (11th Cir. 2023) (noting

that "a statute does not violate the private nondelegation doctrine if it imposes a

standard to guide the private party").

Moreover, Alaska cites no provision of ANILCA mandating that the Board

select the individual federally qualified subsistence users to conduct a limited and

clearly defined community subsistence harvest.  Nor does Alaska cite any statutory

provision mandating that the Board micromanage the distribution of the harvest

among members of that community.  And because there is no indication that

Congress imposed those obligations on the Board in the first place, "it follows that

the [Board] has not unlawfully delegated any congressionally imposed duty to a

private party."  *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1349 (Fed. Cir. 2003).

\*     \*     \*     \*

To the extent the district court had jurisdiction to review Alaska's improper-

delegation claim, the claim fails on the merits.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

51

Respectfully submitted,

/s/ *Kevin W. McArdle*
TODD KIM
Assistant Attorney General
RACHEL HERON
Of Counsel:                      PAUL A. TURCKE
                                 SHANNON BOYLAN
KENNETH M. LORD                  KEVIN W. McARDLE
*Attorney*                       *Attorneys*
U.S. Department of the Interior  Environment and Natural Resources Division
                                 U.S. Department of Justice
July 26, 2024
DJ 90-1-1-16106

## Form 8.  Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**        24-179

I am the attorney or self-represented party.

**This brief contains 12,149 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/ Kevin W. McArdle

**Date**        July 26, 2024

# ADDENDUM

Alaska National Interest Lands Conservation Act

    16 U.S.C. § 3101 ................................................................... 1a

    16 U.S.C. § 3102 ................................................................... 3a

    16 U.S.C. § 3111 ................................................................... 4a

    16 U.S.C. § 3113 ................................................................... 5a

    16 U.S.C. § 3114 ................................................................... 6a

    16 U.S.C. § 3115 ................................................................... 7a

    16 U.S.C. § 3116 ................................................................. 11a

    16 U.S.C. § 3124 ................................................................. 12a

    16 U.S.C. § 3202 ................................................................. 13a

Federal Subsistence Regulations

    50 C.F.R. § 100.10 .............................................................. 14a

    50 C.F.R. § 100.14 .............................................................. 19a

    50 C.F.R. § 100.19 .............................................................. 21a

    50 C.F.R. § 100.25 .............................................................. 23a

    50 C.F.R. § 100.26 .............................................................. 24a

Legislative History - Alaska National Interest Lands Conservation Act

    H. Rep. No. 95-1045, Part I (1978) ................................... 25a

    H. Rep. No. 95-1045, Part II (1978) .................................. 28a

    S. Rep. No. 95-1300 (1978) ............................................... 39a

H. Rep. No. 96-97, Part I (1979) ................................................................42a

S. Rep. No. 96-413 (1979)...........................................................................44a

## 16 U.S.C. § 3101 - Congressional statement of purpose

(a) Establishment of units

In order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the State of Alaska that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values, the units described in the following titles are hereby established.

(b) Preservation and protection of scenic, geological, etc., values

It is the intent of Congress in this Act to preserve unrivaled scenic and geological values associated with natural landscapes; to provide for the maintenance of sound populations of, and habitat for, wildlife species of inestimable value to the citizens of Alaska and the Nation, including those species dependent on vast relatively undeveloped areas; to preserve in their natural state extensive unaltered arctic tundra, boreal forest, and coastal rainforest ecosystems; to protect the resources related to subsistence needs; to protect and preserve historic and archeological sites, rivers, and lands, and to preserve wilderness resource values and related recreational opportunities including but not limited to hiking, canoeing, fishing, and sport hunting, within large arctic and subarctic wildlands and on freeflowing rivers; and to maintain opportunities for scientific research and undisturbed ecosystems.

(c) Subsistence way of life for rural residents

It is further the intent and purpose of this Act consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded by or pursuant to this Act, to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.

(d) Need for future legislation obviated

This Act provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska, and at the same time provides adequate opportunity for satisfaction of the economic

**1a**

and social needs of the State of Alaska and its people; accordingly, the designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.

## 16 U.S.C. § 3102 - Definitions

As used in this Act (except that in titles IX and XIV the following terms shall have the same meaning as they have in the Alaska Native Claims Settlement Act, and the Alaska Statehood Act)—

(1) The term "land" means lands, waters, and interests therein.

(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.

(3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except—

(A) land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law;

(B) land selections of a Native Corporation made under the Alaska Native Claims Settlement Act which have not been conveyed to a Native Corporation, unless any such selection is determined to be invalid or is relinquished; and

(C) lands referred to in section 19(b) of the Alaska Native Claims Settlement Act.

* * * *

(12) The term "Secretary" means the Secretary of the Interior, except that when such term is used with respect to any unit of the National Forest System, such term means the Secretary of Agriculture.

* * * *

**3a**

### 16 U.S.C. § 3111 – Congressional declaration of findings

The Congress finds and declares that—

(1) the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on Native lands is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence;

(2) the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses;

(3) continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;

(4) in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents; and

(5) the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by residents of rural Alaska require that an administrative structure be established for the purpose of enabling rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

**4a**

## 16 U.S.C. § 3113 - Definitions

As used in this Act, the term "subsistence uses" means the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade. For the purposes of this section, the term--

    (1) "family" means all persons related by blood, marriage, or adoption, or any person living within the household on a permanent basis; and

    (2) "barter" means the exchange of fish or wildlife or their parts, taken for subsistence uses--

        (A) for other fish or game or their parts; or

        (B) for other food or for nonedible items other than money if the exchange is of a limited and noncommercial nature.

**5a**

### 16 U.S.C. § 3114 – Preference for subsistence uses

Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:

    (1) customary and direct dependence upon the populations as the mainstay of livelihood;

    (2) local residency; and

    (3) the availability of alternative resources.

## 16 U.S.C. § 3115 - Local and regional participation

(a) Establishment of subsistence resources regions, local advisory committees, and regional advisory councils; membership, duties, and authority of regional advisory councils

Except as otherwise provided in subsection (d) of this section, the Secretary in consultation with the State shall establish--

(1) at least six Alaska subsistence resource regions which, taken together, include all public lands. The number and boundaries of the regions shall be sufficient to assure that regional differences in subsistence uses are adequately accommodated;

(2) such local advisory committees within each region as he finds necessary at such time as he may determine, after notice and hearing, that the existing State fish and game advisory committees do not adequately perform the functions of the local committee system set forth in paragraph (3)(D)(iv) of this subsection; and

(3) a regional advisory council in each subsistence resource region.

Each regional advisory council shall be composed of residents of the region and shall have the following authority:

(A) the review and evaluation of proposals for regulations, policies, management plans, and other matters relating to subsistence uses of fish and wildlife within the region;

(B) the provision of a forum for the expression of opinions and recommendations by persons interested in any matter related to subsistence uses of fish and wildlife within the region;

(C) the encouragement of local and regional participation pursuant to the provisions of this subchapter in the decisionmaking process affecting the taking of fish and wildlife on the public lands within the region for subsistence uses;

**7a**

(D) the preparation of an annual report to the Secretary which shall contain—

(i) an identification of current and anticipated subsistence uses of fish and wildlife populations within the region;

(ii) an evaluation of current and anticipated subsistence needs for fish and wildlife populations within the region;

(iii) a recommended strategy for the management of fish and wildlife populations within the region to accommodate such subsistence uses and needs; and

(iv) recommendations concerning policies, standards, guidelines, and regulations to implement the strategy. The State fish and game advisory committees or such local advisory committees as the Secretary may establish pursuant to paragraph (2) of this subsection may provide advice to, and assist, the regional advisory councils in carrying out the functions set forth in this paragraph.

(b) Assignment of staff and distribution of data

The Secretary shall assign adequate qualified staff to the regional advisory councils and make timely distribution of all available relevant technical and scientific support data to the regional advisory councils and the State fish and game advisory committees or such local advisory committees as the Secretary may establish pursuant to paragraph (2) of subsection (a).

(c) Consideration of reports and recommendations of regional advisory councils

The Secretary, in performing his monitoring responsibility pursuant to section 3116 of this title and in the exercise of his closure and other administrative authority over the public lands, shall consider the report and recommendations of the regional advisory councils concerning the taking of fish and wildlife on the public lands within their respective regions for subsistence uses. The Secretary may choose not to follow any recommendation which he determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of

**8a**

subsistence needs. If a recommendation is not adopted by the Secretary, he shall set forth the factual basis and the reasons for his decision.

(d) Supersedure by enactment and implementation of State laws governing State responsibility; consideration of recommendations by State rulemaking authority

The Secretary shall not implement subsections (a), (b), and (c) of this section if the State enacts and implements laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in, sections 3113, 3114, and 3115 of this title, such laws, unless and until repealed, shall supersede such sections insofar as such sections govern State responsibility pursuant to this subchapter for the taking of fish and wildlife on the public lands for subsistence uses. Laws establishing a system of local advisory committees and regional advisory councils consistent with this section shall provide that the State rulemaking authority shall consider the advice and recommendations of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses. The regional councils may present recommendations, and the evidence upon which such recommendations are based, to the State rulemaking authority during the course of the administrative proceedings of such authority. The State rulemaking authority may choose not to follow any recommendation which it determines is not supported by substantial evidence presented during the course of its administrative proceedings, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs. If a recommendation is not adopted by the State rulemaking authority, such authority shall set forth the factual basis and the reasons for its decision.

(e) Reimbursement to State; limitation; report to Congress

(1) The Secretary shall reimburse the State, from funds appropriated to the Department of the Interior for such purposes, for reasonable costs relating to the establishment and operation of the regional advisory councils established by the State in accordance with subsection (d) and the operation of the State fish and game advisory committees so long as such committees are not superseded by the Secretary pursuant to paragraph (2) of subsection (a). Such reimbursement may not exceed 50 per centum of such costs in any fiscal year. Such costs shall be verified in a statement which the Secretary determines to be adequate and accurate. Sums paid under this subsection shall be in addition to

**9a**

any grants, payments, or other sums to which the State is entitled from appropriations to the Department of the Interior.

(2) Total payments to the State under this subsection shall not exceed the sum of $5,000,000 in any one fiscal year. The Secretary shall advise the Congress at least once in every five years as to whether or not the maximum payments specified in this subsection are adequate to ensure the effectiveness of the program established by the State to provide the preference for subsistence uses of fish and wildlife set forth in section 3114 of this title.

## 16 U.S.C. § 3116 - Federal monitoring; reports to State and Congressional committees

The Secretary shall monitor the provisions by the State of the subsistence preference set forth in section 3114 of this title and shall advise the State and the Committees on Natural Resources and on Merchant Marine and Fisheries of the House of Representatives and the Committees on Energy and Natural Resources and Environment and Public Works of the Senate annually and at such other times as he deems necessary of his views on the effectiveness of the implementation of this subchapter including the State's provision of such preference, any exercise of his closure or other administrative authority to protect subsistence resources or uses, the views of the State, and any recommendations he may have.

### 16 U.S.C. § 3124 - Regulations

The Secretary shall prescribe such regulations as are necessary and appropriate to carry out his responsibilities under this subchapter.

## 16 U.S.C. § 3202 – Taking of fish and wildlife

**(a) Responsibility and authority of State of Alaska**

Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter, or to amend the Alaska constitution.

**(b) Responsibility and authority of Secretary**

Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the management of the public lands.

**(c) Areas controlled; areas closed, exceptions**

The taking of fish and wildlife in all conservation system units, and in national conservation areas, national recreation areas, and national forests, shall be carried out in accordance with the provisions of this Act and other applicable State and Federal law. Those areas designated as national parks or national park system monuments in the State shall be closed to the taking of fish and wildlife, except that--

    (1) notwithstanding any other provision of this Act, the Secretary shall administer those units of the National Park System, and those additions to existing units, established by this Act and which permit subsistence uses, to provide an opportunity for the continuance of such uses by local rural residents; and

    (2) fishing shall be permitted by the Secretary in accordance with the provisions of this Act and other applicable State and Federal law.

**13a**

## 50 C.F.R. § 100.10 - Federal Subsistence Board

(a) The Secretary of the Interior and Secretary of Agriculture hereby establish a Federal Subsistence Board, and assign it responsibility for administering the subsistence taking and uses of fish and wildlife on public lands, and the related promulgation and signature authority for regulations of subparts C and D of this part. The Secretaries, however, retain their existing authority to restrict or eliminate hunting, fishing, or trapping activities which occur on lands or waters in Alaska other than public lands when such activities interfere with subsistence hunting, fishing, or trapping on the public lands to such an extent as to result in a failure to provide the subsistence priority.

(b) Membership.

  (1) The voting members of the Board are: A Chair to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; two public members who possess personal knowledge of and direct experience with subsistence uses in rural Alaska to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; Alaska Regional Director, National Park Service; Alaska Regional Forester, U.S. Forest Service; the Alaska State Director, Bureau of Land Management; and the Alaska Regional Director, Bureau of Indian Affairs. Each Federal agency member of the Board may appoint a designee.

  (2) [Reserved]

(c) Liaisons to the Board are: a State liaison, and the Chairman of each Regional Council. The State liaison and the Chairman of each Regional Council may attend public sessions of all Board meetings and be actively involved as consultants to the Board.

(d) Powers and duties.

  (1) The Board shall meet at least twice per year and at such other times as deemed necessary. Meetings shall occur at the call of the Chair, but any member may request a meeting.

**14a**

(2) A quorum consists of five members.

(3) No action may be taken unless a majority of voting members are in agreement.

(4) The Board is empowered, to the extent necessary, to implement Title VIII of ANILCA, to:

(i) Issue regulations for the management of subsistence taking and uses of fish and wildlife on public lands;

(ii) Determine which communities or areas of the State are rural or non-rural;

(iii) Determine which rural Alaska areas or communities have customary and traditional subsistence uses of specific fish and wildlife populations;

(iv) Allocate subsistence uses of fish and wildlife populations on public lands;

(v) Ensure that the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes;

(vi) Restrict the taking of fish and wildlife on public lands for nonsubsistence uses or close public lands to the take of fish and wildlife for nonsubsistence uses when necessary for the conservation of healthy populations of fish or wildlife, to continue subsistence uses of fish or wildlife, or for reasons of public safety or administration. The Board may also reopen public lands to nonsubsistence uses if new information or changed conditions indicate that the closure is no longer warranted;

(vii) Restrict the taking of a particular fish or wildlife population on public lands for subsistence uses, close public lands to the take of fish and wildlife for subsistence uses, or otherwise modify the requirements for take from a particular fish or wildlife population on public lands for subsistence uses when necessary to ensure the continued viability of a fish or wildlife population, or for reasons of public safety or administration. As soon as

**15a**

conditions warrant, the Board may also reopen public lands to the taking of a fish and wildlife population for subsistence users to continue those uses;

(viii) Establish priorities for the subsistence taking of fish and wildlife on public lands among rural Alaska residents;

(ix) Restrict or eliminate taking of fish and wildlife on public lands;

(x) Determine what types and forms of trade of fish and wildlife taken for subsistence uses constitute allowable customary trade;

(xi) Authorize the Regional Councils to convene;

(xii) Establish a Regional Council in each subsistence resource region and recommend to the Secretaries, appointees to the Regional Councils, pursuant to the FACA;

(xiii) Establish Federal Advisory Committees within the subsistence resource regions, if necessary, and recommend to the Secretaries that members of the Federal Advisory Committees be appointed from the group of individuals nominated by rural Alaska residents;

(xiv) Establish rules and procedures for the operation of the Board, and the Regional Councils;

(xv) Review and respond to proposals for regulations, management plans, policies, and other matters related to subsistence taking and uses of fish and wildlife;

(xvi) Enter into cooperative agreements or otherwise cooperate with Federal agencies, the State, Native organizations, local governmental entities, and other persons and organizations, including international entities to effectuate the purposes and policies of the Federal subsistence management program;

(xvii) Develop alternative permitting processes relating to the subsistence taking of fish and wildlife to ensure continued opportunities for subsistence;

**16a**

(xviii) Evaluate whether hunting, fishing, or trapping activities which occur on lands or waters in Alaska other than public lands interfere with subsistence hunting, fishing, or trapping on the public lands to such an extent as to result in a failure to provide the subsistence priority, and after appropriate consultation with the State of Alaska, the Regional Councils, and other Federal agencies, make a recommendation to the Secretaries for their action;

(xix) Identify, in appropriate specific instances, whether there exists additional Federal reservations, Federal reserved water rights or other Federal interests in lands or waters, including those in which the United States holds less than a fee ownership, to which the Federal subsistence priority attaches, and make appropriate recommendation to the Secretaries for inclusion of those interests within the Federal Subsistence Management Program; and

(xx) Take other actions authorized by the Secretaries to implement Title VIII of ANILCA.

(5) The Board may implement one or more of the following harvest and harvest reporting or permit systems:

(i) The fish and wildlife is taken by an individual who is required to obtain and possess pertinent State harvest permits, tickets, or tags, or Federal permit (Federal Subsistence Registration Permit);

(ii) A qualified subsistence user may designate another qualified subsistence user (by using the Federal Designated Harvester Permit) to take fish and wildlife on his or her behalf;

(iii) The fish and wildlife is taken by individuals or community representatives permitted (via a Federal Subsistence Registration Permit) a one-time or annual harvest for special purposes including ceremonies and potlatches; or

(iv) The fish and wildlife is taken by representatives of a community permitted to do so in a manner consistent with the community's customary and traditional practices.

**17a**

(6) The Board may delegate to agency field officials the authority to set harvest and possession limits, define harvest areas, specify methods or means of harvest, specify permit requirements, and open or close specific fish or wildlife harvest seasons within frameworks established by the Board.

(7) The Board shall establish a Staff Committee for analytical and administrative assistance composed of members from the U.S. Fish and Wildlife Service, National Park Service, U.S. Bureau of Land Management, Bureau of Indian Affairs, and USDA Forest Service. A U.S. Fish and Wildlife Service representative shall serve as Chair of the Staff Committee.

(8) The Board may establish and dissolve additional committees as necessary for assistance.

(9) The U.S. Fish and Wildlife Service shall provide appropriate administrative support for the Board.

(10) The Board shall authorize at least two meetings per year for each Regional Council.

(e) Relationship to Regional Councils.

(1) The Board shall consider the reports and recommendations of the Regional Councils concerning the taking of fish and wildlife on public lands within their respective regions for subsistence uses. The Board may choose not to follow any Regional Council recommendation which it determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, would be detrimental to the satisfaction of subsistence needs, or in closure situations, for reasons of public safety or administration or to assure the continued viability of a particular fish or wildlife population. If a recommendation is not adopted, the Board shall set forth the factual basis and the reasons for the decision, in writing, in a timely fashion.

(2) The Board shall provide available and appropriate technical assistance to the Regional Councils.

**18a**

### 50 C.F.R. § 100.14 - Relationship to State procedures and regulations

(a) State fish and game regulations apply to public lands and such laws are hereby adopted and made a part of the regulations in this part to the extent they are not inconsistent with, or superseded by, the regulations in this part.

(b) The Board may close public lands to hunting, trapping, or fishing, or take actions to restrict the taking of fish and wildlife when necessary to conserve healthy populations of fish and wildlife, continue subsistence uses of such populations, or pursuant to other applicable Federal law. The Board may review and adopt State openings, closures, or restrictions which serve to achieve the objectives of the regulations in this part.

(c) The Board may enter into agreements with the State in order to coordinate respective management responsibilities.

(d) Petition for repeal of subsistence rules and regulations.

(1) The State of Alaska may petition the Secretaries for repeal of the subsistence rules and regulations in this part when the State has enacted and implemented subsistence management and use laws which:

(i) Are consistent with sections 803, 804, and 805 of ANILCA; and

(ii) Provide for the subsistence definition, preference, and participation specified in sections 803, 804, and 805 of ANILCA.

(2) The State's petition shall:

(i) Be submitted to the Secretary of the Interior, U.S. Department of the Interior, Washington, D.C. 20240, and the Secretary of Agriculture, U.S. Department of Agriculture, Washington, D.C. 20240;

(ii) Include the entire text of applicable State legislation indicating compliance with sections 803, 804, and 805 of ANILCA; and

**19a**

(iii) Set forth all data and arguments available to the State in support of legislative compliance with sections 803, 804, and 805 of ANILCA.

(3) If the Secretaries find that the State's petition contains adequate justification, a rulemaking proceeding for repeal of the regulations in this part will be initiated. If the Secretaries find that the State's petition does not contain adequate justification, the petition will be denied by letter or other notice, with a statement of the ground for denial.

**20a**

## 50 C.F.R. § 100.19 – Special actions

(a) Emergency special actions.  In an emergency situation, if necessary to ensure the continued viability of a fish or wildlife population, to continue subsistence uses of fish or wildlife, or for public safety reasons, the Board may immediately open or close public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for take for subsistence uses, or close public lands to take for nonsubsistence uses of fish and wildlife, or restrict the requirements for take for nonsubsistence uses.

(1) If the timing of a regularly scheduled meeting of the affected Regional Council so permits without incurring undue delay, the Board may seek Council recommendations on the proposed emergency special action. Such a Council recommendation, if any, will be subject to the requirements of § 100.18(a)(4).

(2) The emergency action will be effective when directed by the Board, may not exceed 60 days, and may not be extended unless the procedures for adoption of a temporary special action, as set forth in paragraph (b) of this section, have been followed.

(b) Temporary special actions. After adequate notice and public hearing, the Board may temporarily close or open public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for subsistence take, or close public lands for the taking of fish and wildlife for nonsubsistence uses, or restrict take for nonsubsistence uses.

(1) The Board may make such temporary changes only after it determines that the proposed temporary change will not interfere with the conservation of healthy fish and wildlife populations, will not be detrimental to the long-term subsistence use of fish or wildlife resources, and is not an unnecessary restriction on nonsubsistence users. The Board may also reopen public lands to nonsubsistence uses if new information or changed conditions indicate that the closure is no longer warranted.

(i) Prior to implementing a temporary special action, the Board will consult with the State of Alaska and the Chairs of the Regional Councils of the affected regions.

**21a**

(ii) If the timing of a regularly scheduled meeting of the affected Regional Council so permits without incurring undue delay, the Board will seek Council recommendations on the proposed temporary special action. Such Council recommendations, if any, will be subject to the requirements of § 100.18(a)(4).

(2) The length of any temporary action will be confined to the minimum time period or harvest limit determined by the Board to be necessary under the circumstances. In any event, a temporary opening or closure will not extend longer than the end of the current regulatory cycle.

(c) The Board may reject a request for either an emergency or a temporary special action if the Board concludes that there are no time-sensitive circumstances necessitating a regulatory change before the next regular proposal cycle. However, a special action request that has been rejected for this reason may be deferred, if appropriate and after consultation with the proponent, for consideration during the next regular proposal cycle. The Board will consider changes to customary and traditional use determinations in subpart C of this part only during the regular proposal cycle.

(d) The Board will provide notice of all regulatory changes adopted via special action by posting the change on the Office of Subsistence Management Web site (http://alaska.fws.gov/asm/index.cfml). When appropriate, notice may also include distribution of press releases to newspapers, local radio stations, and local contacts, as well as direct notification to the proponent and interested parties. The Board will publish notice and reasons justifying the special action in the Federal Register as soon as practicable.

(e) The decision of the Board on any proposed special action will constitute its final administrative action.

(f) Regulations authorizing any individual agency to implement closures or restrictions on public lands managed by the agency remain unaffected by the regulations in this part.

(g) Fish and wildlife may not be taken in violation of any restriction, closure, or change authorized by the Board.

**22a**

**50 C.F.R. § 100.25 - Subsistence taking of fish,
wildlife, and shellfish:  general regulations.**

\*      \*      \*      \*

(b) Taking fish, wildlife, or shellfish for subsistence uses by a prohibited method is a violation of this part. Seasons are closed unless opened by Federal regulation. Hunting, trapping, or fishing during a closed season or in an area closed by this part is prohibited. You may not take for subsistence fish, wildlife, or shellfish outside established Unit or Area seasons, or in excess of the established Unit or Area harvest limits, unless otherwise provided for by the Board. You may take fish, wildlife, or shellfish under State regulations on public lands, except as otherwise restricted at §§ 100.26 through 100.28. Unit/Area-specific restrictions or allowances for subsistence taking of fish, wildlife, or shellfish are identified at §§ 100.26 through 100.28.

\*      \*      \*      \*

### 50 C.F.R. § 100.26 - Subsistence taking of wildlife.

(a) General taking prohibitions. You may take wildlife for subsistence uses by any method, except as prohibited in this section or by other Federal statute. Taking wildlife for subsistence uses by a prohibited method is a violation of this part. Seasons are closed unless opened by Federal regulation. Hunting or trapping during a closed season or in an area closed by this part is prohibited.

\*       \*       \*       \*

95th Congress, 2d Session   - -    House Report No. 95–1045, Part I

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT OF 1978

## REPORT

OF THE

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS
## HOUSE OF REPRESENTATIVES

together with

## ADDITIONAL, DISSENTING, AND SUPPLEMENTAL VIEWS AND ADDITIONAL COMMENTS

TO ACCOMPANY

## H.R. 39

(Including the cost estimate of the Congressional Budget Office)



APRIL 7, 1978.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON   1978

25–830 O

25a

27

(b) TIMBER CONTRACTS.—The Secretary of Agriculture is hereby directed to modify any existing national forest timber sale contracts applying to lands designated by this Act as wilderness by substituting, to the extent practicable, timber on other national forest lands approximately equal in volume, species, grade, and accessibility for timber on relevant lands within such units.

ACQUISITION AUTHORITY

SEC. 609. The Secretary of Agriculture is authorized, in accordance with the provisions of section 1201, to acquire privately owned land within the boundary of any area designated as wilderness within the national forest by this Act.

TITLE VII—SUBSISTENCE

FINDINGS

SEC. 701. The Congress finds and declares that—
(1) the continuation of the opportunity for subsistence uses by Natives of Alaska on the public lands and on their Native lands is essential to their physical, economic, and cultural existence;
(2) the continuation of the opportunity for subsistence uses by some other residents of the State of Alaska on the public lands is essential to their physical, economic, and traditional existence;
(3) the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply persons dependent on subsistence uses;
(4) continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;
(5) in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act, and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and over management of the public lands to protect and provide for continued subsistence uses on public lands by Alaska Natives and other Alaska residents; and
(6) the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by the inhabitants of Alaska require that an administrative structure be established for the purpose of enabling people who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

POLICY

SEC. 702. It is hereby declared to be the policy of Congress that—
(1) management policies on the public lands in Alaska are to cause the least adverse impact possible on rural people who traditionally and consistently depend upon subsistence uses of the resources of such lands; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded by or pursuant to this Act, the purpose of this title is to provide the opportunity for people engaged in a genuinely subsistence-oriented life style to continue to do so if they desire and to allow such people to decide for themselves their own degree of subsistence dependency and the rate at which acculturation or adjustment to a nonsubsistence way of life may take place;
(2) nonwasteful subsistence use of wildlife and other renewable resources shall be the first priority consumptive use of all such resources on the public lands of Alaska, and where it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife resource or the continuation

26a

28

of subsistence uses of such resource, the taking of such resource for non-wasteful subsistence uses shall be given preference on the public lands over recreational, sport, or other consumptive uses; and

(3) except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska, shall cooperate with adjacent landowners and land managers, including Native corporations, appropriate State and Federal agencies, and other nations.

DEFINITION

SEC. 703. As used in this Act, the term "subsistence uses" means customary and traditional uses in Alaska of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles (including clothing) out of nonedible by-products of fish and wildlife resources taken for personal or family consumption, or for the customary trade or barter among subsistence users for personal or family consumption.

STATE REGULATION

SEC. 704. (a) INTERIM REGULATION.—Except as otherwise provided by this Act and other Federal laws, during an interim period of eighteen months beginning on the date of the enactment of this Act, the State of Alaska is authorized to regulate, in a manner not inconsistent with the policies set forth in section 702 and the definition set forth in section 703, the taking of fish and wildlife for subsistence uses on the public lands in Alaska. If the State fails to accept such authority, the Secretary shall regulate such taking during the eighteen-month interim period in a manner not inconsistent with such policies and definition.

(b) STATE AUTHORITY.—At the end of the eighteen-month interim period, the State of Alaska is authorized to regulate, in a manner consistent with the provisions of this Act, the taking of fish and wildlife for subsistence uses on the public lands in Alaska. If the State fails to accept such authority, the Secretary shall regulate such taking in a manner consistent with the provisions of this Act, including applicable provisions of this section concerning State regulation.

(c) STATE PROGRAM.—If the State wishes to exercise the authority conferred under subsection (b) of this section, then within eighteen months after the date of the enactment of this Act, the Governor of the State of Alaska shall submit to the Secretary a State program which shall include at least the following elements:

(1) A subsistence management plan which has as its central elements (A) the maintenance of the continued viability of the populations of fish and wildlife species on the public lands which are the subject of subsistence uses, (B) a system capable of monitoring and regulating subsistence and other consumptive uses of such species to ensure that timely and appropriate State action will be taken to carry out the purposes and policies of this title, and (C) a grievance procedure whereby a local or regional council referred to in paragraph (4) of this subsection which determines that the State is not in compliance, in whole or in part, with the State program or with the requirements, purposes, or policies of this title, can obtain timely review of its determination by, and appropriate relief from, the State agency referred to in paragraph (3) (A) or any other State rulemaking authority.

(2) The establishment of not less than five or more than twelve fish and game management regions which, taken together, shall include all public lands where the State is exercising regulatory authority under this title. After consultation with the Secretary, the Native Corporations, rural residents, and other interested persons and organizations, the State shall, from time to time, determine the number and boundaries of such regions taking into account the exterior boundaries of Native Corporations, State fish and game management unit boundaries, ecosystems, the migration and movement of fish and wildlife utilized for subsistence purposes, the boundaries of conservation system units, boroughs, cities, town, and unincorporated municipalities, and other relevant factors.

(3) A State law or regulation which—

(A) provides for the regulation of the taking of fish and wildlife on the public lands by a professionally staffed State agency which has an

95th Congress, 2d Session         House Report No. 95–1045, Part II

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT OF 1978

## REPORT

OF THE

## COMMITTEE ON MERCHANT MARINE AND FISHERIES HOUSE OF REPRESENTATIVES

together with

## ADDITIONAL AND SUPPLEMENTAL VIEWS

TO ACCOMPANY

## H.R. 39

(Including the cost estimate of the Congressional Budget Office)



MAY 4, 1978.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1978

27-343 O

**28a**

23

On page 110, after line 10, insert the following:

(2) Those fish incubator sites identified on the map of Kenai Wilderness as "Potential Wilderness Areas" are designated as wilderness effective ten years after the date of enactment of this Act, unless during the ten-year period the Secretary authorizes development of a fish incubator in any such potential wilderness area. The Secretary shall manage each such area pursuant to the Wilderness Act until he authorizes such development or until the end of the ten-year period specified in the preceding sentence. Any fish incubator authorized for any such area shall be constructed, managed, and operated in a manner that minimizes any adverse impacts on the wilderness character of the adjacent wilderness.

On page 115, line 24, after the word "of" insert "fish and".

On page 116, line 3, strike out "continued viability", and insert "natural stability and continued productivity".

On page 116, delete all of lines 17 through 24, and all that follows through line 9 on page 133, and insert the following in lieu thereof:

### DEFINITION

Sec. 703. As used in this Act, the term "subsistence uses" means the noncommercial (except as provided under paragraph (2)) customary and traditional utilization within the State of wild, renewable resources for—

(1) direct personal or family use for food, shelter, fuel, clothing, tools, or transportation;

(2) the making and selling of handicraft articles (including clothing), but only out of nonedible byproducts of fish and wildlife taken for such personal or family use; or

(3) customary trade, barter, or sharing among subsistence users for personal or family use.

### STATE REGULATION

Sec. 704. In General.—Except as otherwise provided by this Act and other Federal laws, the State may regulate, in a manner consistent with the policies set forth in section 702, the taking of fish and wildlife on public lands for subsistence uses by developing and implementing a subsistence management program which meets the requirements set forth in subsection (b).

(b) State Program Requirements.—The subsistence management program of the State shall include at least the following elements:

(1) The maintenance of the natural stability and continued productivity of fish and wildlife populations which are on public lands and which are the subject of subsistence uses.

(2) A system capable of regulating and monitoring subsistence uses and other consumptive uses of such

**29a**

24

populations to ensure that timely and appropriate State action will be taken to carry out the purposes and policies of this title.

(3) A grievance procedure whereby any local council or regional council, required to be established under paragraph (6), which determines that the State is not in compliance, in whole or in part, with the State subsistence management program can obtain timely review of such determination by, and obtain appropriate relief from, the State agency referred to in paragraph (5) (A) or any other State rulemaking authority.

(4) The establishment of not less than five management regions which, taken together, shall include all public lands where the State is exercising regulatory authority under this title. The number and boundaries of the management regions shall be sufficient to assure that regional differences in subsistence uses are adequately accommodated.

(5) State laws or regulations which—

(A) provide for the regulation by a professionally staffed agency of the taking of fish and wildlife populations on the public lands for subsistence uses, provide that such agency have an administrative structure compatible with the provisions of this section, and provide for an agency which has adequate enforcement authority;

(B) provide preference for nonwasteful subsistence uses by local residents over other consumptive uses of fish and wildlife populations on the public lands; and

(C) provide, whenever it is necessary to restrict the taking of such populations on public lands for subsistence uses in order to protect their natural stability and continued productivity, or to continue such uses, for the establishment of appropriate restrictions and limitations on, and preferences for, such uses which shall be based on—

(i) customary and direct dependence upon the populations as the mainstay of livelihood,

(ii) local residency, and

(iii) the availability of alternative resources.

(6) A system of local and regional fish and wildlife councils within each management region established pursuant to paragraph (4). Each regional council shall be composed of residents of the region concerned and shall have the following functions:

(A) The review, development, and evaluation of proposals for regulations, policies, management plans, and other matters relating to the conservation and utilization of fish and wildlife within such region.

(B) The provision of a forum for the expression of opinions and recommendations by persons in-

25

terested in any phase of fish and wildlife conservation and utilization.

(C) The taking of appropriate action to ensure local and regional participation in the decision-making process affecting the taking of fish and wildlife populations on public lands within the region for subsistence uses.

(D) The preparation of a recommended subsistence management plan for such region which shall be submitted to the State agency referred to in paragraph (5)(A). The plan shall be updated annually and shall contain—

(i) an identification of current and anticipated subsistence uses of fish and wildlife populations within the region;

(ii) an evaluation of current and anticipated subsistence needs for fish and wildlife populations within the region;

(iii) a recommended strategy for the management of fish and wildlife populations to accommodate such subsistence uses and needs; and

(iv) recommendations concerning policies, standards, guidelines, and regulations necessary to implement the plan.

The local councils within each management region shall provide advice to, and shall assist, the regional council with respect to carrying out the functions set forth in this paragraph.

(7) The assignment of adequate and necessary qualified staff to the regional councils and the timely distribution of all available relevant technical and scientific support data to the local councils and regional councils.

(8) A requirement that the State agency referred to in paragraph (5)(A) or any other State rulemaking authority shall be guided by the advice and recommendations of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses and shall implement such recommendations unless the agency or authority, after a public hearing, determines that any such recommendation is not supported by substantial evidence presented at the hearing, violates recognized scientific principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs.

ENFORCEMENT DUTIES OF SECRETARY OF THE INTERIOR

SEC. 705. (a) REVIEW BY THE SECRETARY.—The Secretary shall monitor the State subsistence management program and the implementation of such program. If the Secretary, after notice and hearing, determines that the program or its implementation is not in compliance with this title, the Secre-

26

tary shall so notify the State and shall indicate changes in the program or its implementation which he considers necessary to bring the State into compliance.

(b) REVIEW BY LOCAL AND REGIONAL COUNCILS.—If a local council or regional council required to be established under section 704(b)(6) determines that the State is not in compliance, in whole or in part, with the State subsistence management program, such council shall notify the Secretary in writing outlining the factual basis for such determination and detailing efforts which have been made to obtain timely relief through the grievance procedure referred to in section 704(b)(3). If the Secretary finds that based upon the representations of the council there is cause to believe that the State is not incompliance, in whole or in part, with the State program and that such council has failed to obtain timely relief through the State grievance procedure, he shall investigate and report publicly on the results of his investigation. If such results support the contention of the council, the Secretary shall so notify the State and shall indicate changes in its program or its implementation which he considers necessary to bring the State into compliance.

(c) HEARINGS AND CLOSURES.—If the State fails—

(1) to implement a subsistence management program within eighteen months after the date of the enactment of this Act or by such later date as the Secretary deems reasonable; or

(2) to make, after a reasonable date, the changes in the subsistence management program or its implementation as indicated by the Secretary under subsection (a) or (b);

and the Secretary determines that such failure threatens the natural stability and continued productivity of the fish and wildlife populations on public lands in the area concerned, or the ability of subsistence-dependent Alaska residents in such area to satisfy their subsistence needs, the Secretary may close the public lands in such area to all consumptive uses except subsistence uses by local residents. The Secretary shall afford the State an opportunity to appeal such closure. Within thirty days after receipt of notice of such appeal, the Secretary shall afford the State a public hearing and, within thirty days after such hearing, shall make his final decision on such appeal. Unless the Secretary affirmatively establishes that the State is not in compliance with this title or with the subsistence management program, and that the resulting threat determined under the preceding sentence exists, the Secretary shall revoke the closure. If the Secretary establishes that the State is not in such compliance, and that such resulting threat does exist, he may continue the closure, in whole or in part, until the State adopts measures complying with the Secretary's determination, or until such threat is otherwise ameliorated.

**32a**

27

(d) EMERGENCY AUTHORITY.—(1) Notwithstanding any other provision of this Act or other law, the Secretary, after consultation with the State and adequate notice and public hearing, may temporarily close any public lands (including those within any conservation system unit), or any portion thereof, to subsistence uses if necessary for reasons of public safety, administration, or to assure the natural stability and continued productivity of one or more fish or wildlife populations on such lands which are subject to such uses. If the Secretary determines that an emergency situation exists and that extraordinary measures must be taken for public safety or to assure the natural stability and continued productivity of one or more fish and wildlife populations on such lands which are subject to such uses, the Secretary may immediately close the public lands, or any portion thereof, to subsistence uses and shall publish the reasons justifying the closure in the Federal Register. Such emergency closure shall be effective when made, shall not extend for a period exceeding sixty days, and may not subsequently be extended unless the Secretary affirmatively establishes, after adequate notice and public hearing, that such closure should be extended.

(2) If such notice to the State under subsection (a) or (b), the Secretary determines that extraordinary measures must be taken to protect public welfare, he may open public lands, or any portion thereof, to subsistence uses by local residents and publish the reasons justifying such action in the Federal Register. Such emergency action shall be effective when made, but shall not extend for a period of time greater than sixty days, or until such time as the threat to the public welfare which necessitated such action has been resolved, whichever time first occurs.

COOPERATIVE ARRANGEMENTS

SEC. 706. The Secretary may enter into cooperative agreements or otherwise cooperate with other Federal agencies, the State, Native Corporations, other appropriate persons and organizations, and, acting through the Secretary of State, other nations to effectuate the purposes and policies of this title.

SUBSISTENCE AND LAND USE DECISIONS

SEC. 707. In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on the subsistence needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation,

89

areas where it has existed in the past. The committee notes that some commercial trappers in Alaska must, by necessity, use snowmachines for access and feels that the Secretary should not prohibit the use of snowmachines by commercial trappers within Refuge wilderness areas where they have been used in the past, but he may regulate their use.

TITLE VII—SUBSISTENCE

The committee adopted a large number of amendments to title VII as reported by the Interior Committee. These amendments adopt the basic structure of title VII as reported by the Interior Committee, but make several important changes designed to ensure a workable administrative structure and a more effective State-Federal relationship in this area.

*Section 703—Definition*

The committee amended the definition of "subsistence uses" to emphasize that, with the exception of handicraft articles made from the nonedible byproducts of fish and wildlife taken for personal or family use, "subsistence uses" should not include commercial uses of fish and wildlife. It is intended with the above noted caveat that legitimate subsistence uses of wild resources shall be those involving the direct personal or family use for food, shelter, fuel, clothing, tools, or transportation.

The committee, however, recognizes that an important part of the subsistence lifestyle in Alaska involves trading, bartering, and sharing among subsistence users. The inclusion of "trade, barter or sharing among subsistence users" within the purview of the definition of accepted subsistence uses of wild, renewable resources recognizes the use of these subsistence resources by members of the traditional Native community who are dependent upon such resources for personal or family consumption, but have not participated in the actual subsistence harvest. In addition, the definition permits the trade or barter of subsistence resources by subsistence users in exchange for nonsubsistence commodities, so long as the person to whom the reserve is traded or bartered himself utilizes the resources for personal or family consumption. Nevertheless, the committee does not intend that the reference to trade or barter in the definition should permit any commercial or quaisi-commercial use of fish and wildlife resources. The reference to "customary" trading and sharing is intended to emphasize that these activities are sanctioned by this section only to the extent that they have been commonly occurring in Alaska.

The committee notes that the commercial exception for the making and selling of handicraft articles out of nonedible byproducts only applies to fish and wildlife taken for personal or family use. In other words, this provision is not intended to cover the commercial sale of articles from fish and wildlife whose edible parts have not been taken for consumption by the subsistence user or his family.

*Section 704—State regulation*

The committee amendments to section 704 authorizes the State to regulate the taking of fish and wildlife on public lands for subsistence uses by developing a subsistence management program meeting the standards specified in section 704(b).

**34a**

90

Section 704(a) authorizes the State to regulate, in a manner consistent with the policies set out in section 702, the taking of fish and wildlife on public lands for subsistence purposes. This regulatory authorization does not, however, override the other provisions of this act or of existing Federal law. The most obvious example of an existing Federal statute which remains unchanged by the language in section 704 would be the National Wildlife Refuge System Administration Act of 1966. The Secretary of the Interior's regulatory jurisdiction over the taking of fish and wildlife within national wildlife refuges would, therefore, remain unaffected by the enactment of this act. Thus, the Secretary would still be empowered to authorize a more restrictive sport hunting season within refuges than is otherwise allowed by State law. Such routine restrictions based upon the authority of the National Wildlife Refuge System Administration Act would not be required to go through the closure process outlined in section 705(c) of this title.

The standards adopted by the committee in section 704(b) parallel those in the Interior Committee version of title VII.

Thus, the State program should include the following elements:

(1) The maintenance of the natural stability and continued productivity of fish and wildlife populations. The committee feels that any State subsistence management program should seek to maintain fish and wildlife populations at healthy levels permitting a sustained yield. The committee recognizes that animal populations tend to fluctuate in the wild naturally, and the reference to "natural stability" recognizes this fact.

(2) A system capable of regulating and monitoring subsistence uses and other consumptive usese of fish and wildlife populations.

(3) A grievance procedure.

(4) The establishment of not less than five management regions. This provision is intended to insure that regional differences in subsistence uses are adequately accommodated. The upper limit of 12 regions adopted by the Interior Committee has been eliminated.

(5) State laws or regulations which—

(a) provide for the regulation of the taking of fish and wildlife by a professionally staffed agency and provide for an enforcement agency. This section recognizes that in Alaska the Department of Fish and Game has primary responsibility for the regulation of fish and game, but the department of public safety has primary enforcement responsibility. This section would permit the continuation of the present arrangement or the transfer of enforcement to the department of fish and game.

(b) provide preference for nonwasteful subsistence uses by local residents over other consumptive uses of fish and wildlife populations. The committee does not intend that this general statement of a preference for local subsistence users should be construed as authorizing different treatment of subsistence versus nonsubsistence users, except as provided in section 704(b)(5)(C).

(c) provide for the establishment of a preference system when necessary in order to reduce hunting or fishing pressure on the resource. Such a system shall be established on the basis of (i) customary and direct dependence upon the resource as the main-

91

stay of livelihood, (ii) local residency, and (iii) the availability of alternative resources. This section is central to the provision of a preference for subsistence users. It recognizes that in Alaska there may be circumstances where it is necessary to restrict the taking of fish and wildlife in order to assure the continued abundance of fish and wildlife populations. This section establishes a method of restricting the taking of fish and wildlife in such circumstances while permitting those most in need of subsistence resources to continue hunting and fishing. The section also recognizes that in some cases it may be necessary to give preference to one subsistence user over another. In such a situation, preference should be given to the local user who has the greatest need for the resource. The transient subsistence user could, therefore, be precluded under a preference system from taking fish and wildlife.

(6) A system of local and regional fish and wildlife councils within each management region.

Section 704(b)(8) requires the State agency to be guided by the advice of the regional councils concerning the taking of fish and wildlife on public land within their respective region. This section makes it clear that the State agency need be guided by the advice of the councils only if such advice is supported by substantial evidence, does not violate a recognized principle of fish and wildlife conservation or is not detrimental to the satisfaction of subsistence needs.

*Section 705—Enforcement Duties of the Secretary of the Interior*

Section 705 authorizes the Secretary to take special actions to protect the fish and wildlife populations on the public lands and the ability of subsistence-dependent Alaska residents to satisfy their subsistence needs. In contrast to the Interior Committee version of title VII, the Secretary would not be authorized to suspend the State's authority to manage subsistence resources or to take over the management of those resources on the public lands. Rather, the Secretary's discretion would be limited to closing the public lands to subsistence and nonsubsistence uses under certain circumstances and opening the lands to subsistence uses by local residents under very extraordinary circumstances.

Section 705(c) authorizes the Secretary to close the public lands to all consumptive uses, except subsistence uses by local residents, if he determines that the State has either failed to develop a subsistence program or has failed to make necessary changes in the program as indicated by the Secretary pursuant to section 705(a). Before the Secretary could close public lands, however, he would have to make the further finding that the State's failure threatens the natural stability and continued productivity of the fish and wildlife populations on public lands or the ability of subsistence dependent Alaska residents to satisfy their subsistence needs. This closure could only be effective for 60 days before the Secretary would have to affirmatively establish that the State is not in compliance with this title or with its subsistence program, and that the threat to wildlife populations or to subsistence users exists.

Section 705(d) authorizes the Secretary to utilize the full extent of his constitutional authority over Native affairs and the public lands

**36a**

92

to close the public lands, including units of the conservation system, or portions thereof, to all consumptive uses, including subsistence uses for one of three reasons. First, the Secretary could close the public lands to subsistence activities for reasons of public safety. As the public's use and enjoyment of the Alaskan parks and refuges increases, so too does the potential danger to human safety resulting from subsistence hunting activities. While recognizing the importance of subsistence uses to rural people in Alaska, units of the conservation system are nevertheless of national importance and the Secretary should be empowered to accommodate subsistence activities to visitor use when warranted for reasons of public safety. Thus, for example, the Secretary might prohibit subsistence hunting within a certain area surrounding public campgrounds or hiking trails. Such restrictions would probably be necessary for as long as the public used the particular park or refuge.

The Secretary would also be authorized to restrict or prohibit subsistence activities for reasons of administration. The committee does not expect this broad authorization to be frivolously used, yet it was felt necessary to give the Secretary sufficient discretion to respond to the needs of a developing park and refuge system in Alaska. This is in addition to his regular authority to protect parks and refuges under existing law.

Finally, the Secretary would be authorized to prohibit subsistence activities in order to ensure the natural stability and continued productivity of one or more populations of fish and wildlife. This authorization merely reflects the obvious: that the subsistence needs of rural people can only be satisfied if healthy and productive populations of fish and wildlife species can be maintained. While according subsistence a priority over sport hunting and other consumptive uses, the committee recognizes that this may not always be enough to maintain a distinct population of a particular species. In such a situation, subsistence users could be required to diminish or halt their consumption of that species. This approach reflects the fact that healthy populations of fish and wildlife on public lands are a national resource of great significance and that all Americans, whether subsistence user or not, must be prepared to contribute to their preservation. This is consistent with the major purposes for the refuge system set forth in section 302.

Two final points need to be stressed concerning Secretarial closures for one of the three enumerated reasons. First, this section recognizes that any total ban on subsistence uses can have a disastrous effect on the well-being of rural Alaskans. Thus, the Secretary could only close the public lands to subsistence uses for 60 days without affirmatively establishing the need for continued closure. The committee notes that the Secretary could initially close the public lands only after providing notice of his intended action to the State and after conducting a public hearing.

Second, although located in a subsection entitled "Emergency Authority", it is not the intent of the committee that an emergency exist before the Secretary may exercise his closure authority. The prudent management of fish and wildlife resources and national parks and refuges would dictate that the Secretary be allowed to act prior to the existence of an actual emergency.

93

Section 705 (d) (2), however, authorizes the Secretary to open public land to subsistence uses in certain very limited circumstances. In order to take this extraordinary action, the Secretary would first have to provide notice to the State. After providing the requisite notice to the State, the Secretary could open the public lands to subsistence uses by local residents if he determines that extraordinary measures must be taken to protect the public welfare. This extraordinary action could not be extended for greater than 60 days under any circumstances. The committee anticipates that this section would only be employed in very unusual situations.

It should be noted that section 705 gives the Secretary certain oversight responsibilities. Recognizing that a deficient State program can have a significant adverse impact upon subsistence users and upon populations of fish and wildlife, the committee believes that time may be of the essence in the exercise of the Secretary's responsibilities. It is, therefore, the committee's view that formal hearings on the record under the Administrative Procedure Act will be too time-consuming and cumbersome. Therefore, wherever section 705 requires the Secretary to hold a "hearing" before taking a certain action, the committee intends it to be an informal public hearing and not a formal hearing on the record under 5 USC § 556.

*Section 706—Cooperative Agreements*

Section 706 authorizes the Secretary to enter into cooperative agreements or to otherwise cooperate with other Federal agencies, the State, Native corporations, or other appropriate persons or organizations to protect subsistence resources and uses.

*Section 707—Subsistence and Land-Use Decisions*

Section 707 directs the Federal land-managing agencies to consider potential impacts on subsistence of various land-use decisions which may be taken in the future.

*Section 708—Access*

Section 708 directs the Secretary to ensure that persons engaged in traditional or customary subsistence activities shall have appropriate access to subsistence resources on the public land.

*Section 709—Snowmobiles and Motorboats*

Section 709 requires the Secretary to permit the appropriate use of snowmobiles and motorboats for subsistence purposes on the public lands, subject to reasonable regulations which are necessary to protect the natural values of those lands.

*Section 710—Research*

Section 710 recognizes the importance of research in the effective management and protection of fish and wildlife resources and subsistence uses. The committee feels that the United States Fish and Wildlife Service is best suited to coordinate the wildlife research activities of the Federal Government, the Alaska Department of Fish and Game, the University of Alaska and other State agencies. The committee also expects both the Federal Government and the State to engage in additional research pursuant to their expanded responsi-

**38a**

| 95TH CONGRESS 2d Session | SENATE | REPORT No. 95–1300 |
| --- | --- | --- |

# DESIGNATING CERTAIN LANDS IN THE STATE OF ALASKA AS UNITS OF THE NATIONAL PARK, NATIONAL WILDLIFE REFUGE, NATIONAL WILD AND SCENIC RIVERS, AND NATIONAL WILDERNESS PRESERVATION SYSTEMS, AND FOR OTHER PURPOSES

## REPORT

OF THE

## COMMITTEE ON ENERGY AND NATURAL RESOURCES UNITED STATES SENATE

together with

MINORITY, ADDITIONAL, AND SUPPLEMENTAL VIEWS

TO ACCOMPANY

## H.R. 39



OCTOBER 9 (legislative day, SEPTEMBER 28), 1978.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1978
34–309

39a

26

ADMINISTRATION

Sec. 709. Except as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness, except that any reference in such provisions to the effective date of the Wilderness Act shall be deemed to be a reference to the effective date of this Act, and any reference to the Secretary of Agriculture for areas designated in sections 701 and 702 shall, as applicable, be deemed to be a reference to the Secretary.

## TITLE VIII—SUBSISTENCE MANAGEMENT AND USE

FINDINGS

Sec. 801. The Congress finds and declares that—

(1) the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on their Native lands is essential to their physical, economic, traditional, and Native cultural existence;

(2) the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply persons dependent on subsistence uses;

(3) continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;

(4) in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents;

(5) the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by the inhabitants of Alaska require that an administrative structure be established for the purpose of enabling people who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

POLICY

Sec. 802. It is hereby declared to be the policy of Congress that—

(1) consistent with sound management principles, the utilization of the public lands in Alaska is to cause the least adverse impact possible on residents who depend upon subsistence uses of the resources of such lands; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this title is to provide the opportunity for people engaged in a subsistence-oriented lifestyle to continue to do so;

(2) nonwasteful subsistence use of fish and wildlife and other renewable resources shall be the first priority consumptive use of all such resources on the public lands of Alaska, and where it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses; and

(3) except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska, shall cooperate with adjacent landowners and land managers,

**40a**

220

other rural residents, and is based upon the constitutional authority of Congress over Native affairs and its authority under the Property Clause and the Commerce Clause. The committee also has determined that the protection of the subsistence way of life and the fish and wildlife populations upon which that lifestyle depends necessitates the establishment of an administrative structure which enables rural subsistence-dependent residents with personal knowledge of local conditions and requirements to have a meaningful role in the regulations and management of fish and wildlife and subsistence uses on the public lands.

*Section 802: Policy*

Based upon the findings in the preceding section, three basic policies have been established which shall guide the activities of the Federal government and the State on the public lands: that the utilization of the public lands is to cause the least adverse impact possible upon rural residents who depend upon subsistence uses for their economic and physical well-being and cultural vitality; that nonwasteful subsistence uses of fish, wildlife and other renewable resources, e.g. berries, timber, grasses, shall be the first priority consumptive use of such resources on the public lands, and when or where it is necessary to restrict the taking of such resources, taking for nonwasteful subsistence uses shall be given preference over other consumptive uses; and that the successful management of subsistence resources and activities requires long term cooperation between adjacent landowners and managers, including appropriate State and Federal agencies, Native corporations, and other nations.

*Section 803: Definition*

The committee has adopted a definition of "subsistence uses" based on the definition of that term set forth in section 15, ch. 151 SLA 1978 (A.S. 16.05.940) of the Alaska Statutes. In turn, the State definition was modeled on section 703 of the House bill. "Subsistence uses" are defined as the customary and traditional use in Alaska of fish, wildlife and other renewable resources for direct personal or family consumption, for the making and selling of handicraft articles from the nonedible by-products of fish and wildlife taken for direct personal and family consumption, and for customary trade, barter, or sharing for personal or family consumption. The definition of "family" recognizes extended family patterns common to all of Alaska's Native cultures. "Family" includes any person living in a household on a permanent basis as well as those persons living outside the household who are related by blood, marriage or adoption (legal or equitable). "Barter" means the exchange or trade of fish or wildlife, or their parts, for other fish or wildlife, or their parts, or for other food or nonedible items other than money if the exchange is of a limited and noncommercial nature. This definition of "barter" recognizes that in many rural villages the subsistence diet must be supplemented with other foods which may be available from the village store and other sources, and that the limited noncommercial barter of subsistence resources for nonedible items is an essential element of the rural subsistence lifestyle. The definition of "subsistence uses" is intended to include all Alaska residents who utilize renewable resources for direct personal or family consumption.

**41a**

96th Congress, 1st Session         House Report No. 96–97, Part I

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT OF 1979

---

# REPORT

OF THE

## COMMITTEE ON INTERIOR AND INSULAR AFFAIRS

## HOUSE OF REPRESENTATIVES

together with

## DISSENTING, SUPPLEMENTAL, AND SEPARATE VIEWS

TO ACCOMPANY

## H.R. 39

(Including the cost estimate of the
Congressional Budget Office)



APRIL 18, 1979.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1979

62–079 O—81——1  (Pt. 1)  BLR

**42a**

48

depend upon subsistence uses of the resources of such land; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each unit established, designated, or expanded by or pursuant to this Act, the purpose of this title is to provide the opportunity for people engaged in a subsistence-oriented lifestyle to continue to do so;

(2) nonwasteful subsistence use of fish and wildlife and other renewable resources shall be the first priority consumptive use of all such resources on the public lands of Alaska, and where it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses; and

(3) except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska shall cooperate with adjacent landowners and land managers including Native corporations appropriate State and Federal agencies and other nations.

### DEFINITIONS

SEC. 703. As used in this Act the term "subsistence uses" means the customary and traditional uses in Alaska of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal or family consumption. For the purposes of this section, the term—

(1) "family" means all persons related by blood, marriage, or adoption, or any person living within the household on a permanent basis; and

(2) "barter" means the exchange or trade of fish or wildlife or their parts, taken for subsistence uses—

(A) for other fish or game or their parts; or
(B) for other food or for nonedible items other than money if the exchange is of a limited and noncommercial nature.

### PREFERENCE FOR SUBSISTENCE USES

SEC. 704. Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded

**43a**

| 96TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 96–413 |
|---|---|---|

# ALASKA NATIONAL INTEREST LANDS

## REPORT

OF THE

## COMMITTEE ON ENERGY
## AND NATURAL RESOURCES
## UNITED STATES SENATE

together with

## ADDITIONAL VIEWS

TO ACCOMPANY

## H.R. 39



NOVEMBER 14 (legislative day, NOVEMBER 5), 1979.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1979

53–448 O

**44a**

34

the Wilderness Act governing areas designated by that Act as wilderness, except that any reference in such provisions to the effective date of the Wilderness Act shall be deemed to be a reference to the effective date of this Act, and any reference to the Secretary of Agriculture for areas designated in sections 701 and 702 shall, as applicable, be deemed to be a reference to the Secretary of the Interior.

## TITLE VIII—SUBSISTENCE MANAGEMENT AND USE

### FINDINGS

SEC. 801. The Congress finds and declares that—

(1) the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on their Native lands is essential to their physical, economic, traditional, and Native cultural existence;

(2) the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply persons dependent on subsistence uses;

(3) continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;

(4) in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents;

(5) the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by the inhabitants of Alaska require that an administrative structure be established for the purpose of enabling people who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

### POLICY

SEC. 802. It is hereby declared to be the policy of Congress that—

(1) consistent with sound management principles, and the conservation of healthy populations of fish and wildlife, the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this title is to provide the opportunity for rural residents engaged in a subsistence way of life to do so;

(2) nonwasteful subsistence use of fish and wildlife and other renewable resources shall be the priority consumptive use of all such resources on the public lands of Alaska, and where it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses; and

(3) except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska, shall cooperate with adjacent landowners and land managers, including Native corporations, appropriate State and Federal agencies, and other nations.

**45a**

269

Alaska residents who utilize renewable resources for direct personal or family consumption.

However, the phrase "customary and traditional" is intended to place particular emphasis on the protection and continuation of the taking of fish, wildlife, and other renewable resources in areas of, and by persons (both Native and non-Native) resident in, areas of Alaska in which such uses have played a long established and important role in the economy and culture of the community and in which such uses incorporate beliefs and customs which have been handed down by word of mouth or example from generation to generation. The factors of local residency, economic dependence, and availability of alternative resources have been included in section 804 rather than in the definition. Although a truly comprehensive definition of "subsistence uses" must include a mix of those factors, the committee has determined that they should be incorporated through appropriate action by the State rulemaking authority in conjunction with the recommendations of the regional councils established pursuant to section 805 to implement the subsistence preference set forth in section 804. Sections 803–805 are intended to establish a dynamic process for the regulation of subsistence resources and uses which will enable rural people to participate in the decisionmaking process of the State rulemaking authority in the inclusion of the local residency, economic dependence, and availability of alternative resources factors into the definition of "subsistence uses" on a case-by-case basis to meet the needs of a particular management situation in a particular area.

*Section 804: Preference for Subsistence Uses*

This section requires both the State and the Federal government to accord nonwasteful subsistence uses a preference over the taking of such resources for other purposes on the public lands. Although the committee recognizes that only rarely will the failure to adequately provide for the preference result in the threat of literal starvation, in many instances the failure to obtain fish to dry for winter use or fresh meat to supplement other foods can engender considerable individual, community and cultural trauma and hardship. Consequently, this section envisions that governmental action affecting subsistence resources and uses shall be undertaken in a manner which adequately provides for the preference on an ongoing basis and not only when critical allocation decisions may be necessary because a particular subsistence resource may be threatened with depletion, so long as such action is conducted in a manner which is consistent with the protection of the continued viability of fish and wildlife populations which may be affected by such action. If a particular fish or wildlife population (e.g. salmon, moose or caribou) in a particular area is sufficient to sustain a harvest by all persons engaged in subsistence and other uses, the implementation of restrictions on taking set forth in this section need not be imposed by the State rulemaking authority. However, if the continued viability of a particular population or the ability of rural subsistence-dependent residents to satisfy their subsistence needs would be threatened by a harvest by all such persons, the State rulemaking authority, in conjunction with the recommendations of the regional council representing the affected area, is required by this section

**46a**

270

to establish regulations which restrict the taking of such population to Alaska residents engaged in subsistence uses.

If "subsistence uses" must be further restricted to protect the continued viability of the population or to ensure the satisfaction of rural subsistence needs, the State rulemaking authority, in conjunction with the recommendations of the regional council, must limit such uses to local residents of the affected area, or, if necessary, only those local residents with the most customary and direct dependence on the population as the mainstay of livelihood and with the least access to alternative food supplies. In the latter situation, the committee believes that in making such difficult allocation decisions, the State rulemaking authority, in conjunction with the recommendations of the regional council, should endeavor to utilize the special knowledge of local conditions and requirements of the local advisory committees within the affected region. This section also requires the Secretary of the Interior and the Secretary of Agriculture to give subsistence uses preferential consideration in their management activities on the public lands which directly relate to the taking of fish and wildlife, and to take appropriate action to protect such uses and the continued viability of fish and wildlife populations upon which the continuation of such uses depend.

*Section 805 : Local and Regional Participation*

The committee has determined that the opportunity for rural residents of Alaska with personal knowledge of local conditions and requirements to participate effectively in the management and regulation of subsistence resources on the public is important in order to assure both the continued viability of fish and wildlife populations of national importance and the ability of rural people engaged in a subsistence lifestyle to continue to do so. Although the State has indicated that it intends to provide greater support to its existing local advisory committees and establish a system of regional councils throughout the rural areas of the state which will have a major role in the State rulemaking authority's establishment of seasons, bag limits and the provision of the preference for subsistence uses in their respective areas, the State still is in the process of establishing such a system. Section 805 implements section 801(5) by requiring the Secretary of the Interior to establish a regional council, and if necessary a local committee, system on the public lands if within one year from the date of enactment of this Act the State has not yet established a system for local and regional participation which satisfies the requirement of this section.

The State system of local and regional participation shall be in compliance with the requirements of this section and the Secretary shall not establish local committees or regional councils if the State: (1) divides the public lands into at least six regions. The number and boundaries of the regions must be sufficient to assure that regional differences in subsistence uses are adequately accommodated.

However, it is the intent of the Committee that the number and boundaries of the regions be established in a manner which does not permit the large urban population centers to dominate the regional council system and exercise control over the regulation of subsistence resources in the rural areas; (2) strengthens the existing State local

**47a**

271

fish and game advisory committee system by adequately funding committee activities, assigning appropriate staff and distributing available support data to the committees, and encouraging the committees to work closely with the regional councils to develop a recommended strategy for the management of subsistence resources within each region and recommendations concerning policies, standards, guidelines, and regulations to implement the strategy; (3) establishes a regional council within each region composed of residents of the region with duties and responsibilities analoguous to those set forth in section 805 (a) (3), and asigns staff and distributes available support data to the councils; and (4) provides by statute or regulation that recommendations made by the regional councils to the State rulemaking authority concerning the taking of fish and wildlife populations on the public lands within their respective regions for subsistence uses shall be considered by the authority during the course of its administrative proceedings.

The rulemaking authority may choose not to follow a recommendation if it determines that based on the evidence presented during the course of the administrative proceedings of the board the recommendation is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs. If the authority makes such a determination and chooses not to follow the recommendation it shall set forth the factual basis and the reasons for its decision.

So long as the State is in full compliance with the requirements of this section, the Secretary of the Interior shall reimburse the State for reasonable costs relating to the operation of the local committees and the establishment and operation of the regional councils. Such reimbursement may not exceed 50 per centum of such costs in any fiscal year, and total payments to the State shall not exceed the sum of $5,000,000 in any one fiscal year.

If the Secretary determines, one year after the date of this Act and after notice and hearing, that the State is not in full compliance with the requirements of this section, he shall establish a regional council system, and if necessary a local committee system, on the public lands pursuant to the requirements of this section. In performing this monitoring responsibility pursuant to section 806 and in the exercise of his closure and other administrative authority over the public lands the Secretary of the Interior and the Secretary of Agriculture shall be guided by the annual report and advice of the regional councils established by the Secretary of the Interior pursuant to this section, and shall follow such advice unless he determines in writing that such evidence is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs.

*Section 806: Federal Monitoring*

This section requires the Secretary of the Interior to monitor the State's provision of the preference for subsistence uses on the public lands including, in consultation with the Secretary of Agriculture, units of the National Forest System. Such monitoring responsibilities should include ongoing communication and cooperation between Federal land and resources managers and Alaska Department of Fish and

**48a**

272

Game personnel, local fish and game advisory committees, regional councils, the State Board of Game and the State Board of Fisheries. In addition, the Secretary must develop a capability to monitor both the status of fish and wildlife populations on the public lands harvested for subsistence uses and State regulatory and enforcement activities to provide the preference for subsistence uses, particularly in the rural areas of Alaska. The monitoring capability must enable the Secretary to aid in the identification of potential problems before fish or wildlife populations become threatened with depletion with resultant hardship to rural subsistence-dependent residents, and communicate information about, and suggested recommendations for the solutions of, such problems to the State, the local committees, and the regional councils in a timely manner. However, such monitoring capability need not necessarily require the creation of a new or separate administrative structure within the Departmnet of the Interior.

*Section 807: Judicial Enforcement*

In addition to his monitoring responsibilities set forth in section 806, this section requires the Secretary of the Interior to investigate any allegation made by a local committee or regional council established by the Secretary or the State pursuant to section 805 that the State is not adequately providing for the preference for subsistence uses within a particular area of the public lands, as to the taking of a particular fish or wildlife population on such lands, or in some other manner. The Secretary shall investigate and report publicly on the results of his investigation. After communicating the results of his investigation to the State, if the Secretary determines that the State still is not adequately providing for the preference after having had a reasonable opportunity to do so, he shall file a civil action against the State in the District Court on behalf and at the request of the local committee or regional council which made the allegation to require the State to take such actions as are necessary to adequately and timely provide such preference.

The failure to adequately restrict the harvest of a particular fish or wildlife population by persons engaged in subsistence or other uses in a particular area (e.g. salmon on the Copper River, moose on the lower Yukon, or caribou in the northwest arctic) pursuant to the criteria set forth in section 804 may threaten such population with immediate and irreparable harm and engender considerable hardship among residents of rural communities which are depndent upon such populations. Consequently, the committee believes that in many situations time may be of the essence to prevent such threat of harm to subsistence resources or human hardship and that temporary judicial relief may be necessary.

The committee also recognizes that because of the location of the Federal courts, inclement weather, poor communication and transportation systems, and the geographical, and in many instances cultural, isolation of many rural communities, timely and effective temporary relief may not be possible under normal judicial procedures. In recognition of these unusual circumstances, this section requires that upon the filing of the complaint, if the District Court makes appropriate findings based upon the pleadings as set forth in this section it shall issue an order to the State to show cause why relief requested in the

**49a**

273

complaint should not be granted, and also requires the court to expedite the action in every way. However, no order granting temporary relief shall be issued until the State has been provided an opportunity for hearing. Temporary relief may not be necessary in every case and should terminate upon the alleviation of the circumstances which required such relief. Based upon the circumstances of each situation, the court should endeavor to give due deference to the expertise of the Alaska Department of Fish and Game in regulating and conserving fish and wildlife populations in Alaska which are the subject of subsistence uses. Temporary relief should be limited to an order directing the State to issue an emergency regulation either closing a portion of the public lands to the taking of a particular fish or wildlife population except for subsistence uses by local residents of the affected area (or the most subsistence dependent residents of the area), or, less frequently, opening the harvest of such population to such residents. The taking of fish or wildlife for subsistence uses as directed in the order shall be conducted in conformance with applicable State regulations governing such taking which are not directly related to the regulations which have been superseded by the order, or are not in conflict with such order.

To the extent practicable the court should endeavor to fashion a temporary order which draws upon the expertise and special knowledge of the Alaska Department of Fish and Game. Permanent relief shall be limited to directing the State to submit new regulations to the court which adequately provide for the preference for subsistence uses in the situation which gave rise to the action. When, and if, the court determines that such regulations adequately provide for the preference such regulations shall be incorporated as part of the final order. Such final order shall terminate upon the expiration of the normal period of validity under State law (generally one year) of the regulations which were superseded by the regulations incorporated in the order. Although local committee or regional council may obtain immediate judicial review in State court of a determination of the Board of Game or Board of Fisheries that a regional recommendation should not be adopted because it is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs, this section shall be the sole Federal judicial remedy created by this title for a local committee or regional council which determines that the preference for subsistence uses has not been adequately provided by the State in its region. Consequently, such board or council could simultaneously seek judicial review in State court of the refusal of the Board of Game or Board of Fisheries to adopt a regional recommendation and request an investigation by the Secretary, and potentially the filing of a civil action, pursuant to this section.

*Section 808: Park and Monument Resources Commissions*

This section establishes a subsistence resources commission for each national park or monument within which subsistence uses are permitted by this Act. Each council shall be composed of nine members: Three members appointed by the Secretary of the Interior, three members appointed by the the Governor of Alaska, and three members

**50a**