No. 24-179

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

STATE OF ALASKA, DEPARTMENT OF FISH AND GAME,

*Plaintiff-Appellant,*

v.

FEDERAL SUBSISTENCE BOARD, et al.,

*Defendants-Appellees,*

and

ORGANIZED VILLAGE OF KAKE,

*Defendant-Intervenor-Appellee.*

---

On Appeal from the United States District Court
for the District of Alaska
Hon. Sharon L. Gleason
No. 3:20-cv-00195-SLG

---

## INTERVENOR-APPELLEE ORGANIZED VILLAGE OF KAKE
## ANSWERING BRIEF

---

Megan R. Condon
Erin C. Dougherty Lynch
Heather Kendall Miller
NATIVE AMERICAN RIGHTS FUND
745 West 4th Ave., Suite 502
 Anchorage, AK 99501
Telephone: (907) 276-0680

Whitney A. Leonard
Nathaniel H. Amdur-Clark
Lloyd B. Miller
SONOSKY, CHAMBERS, SACHSE,
 MILLER & MONKMAN, LLP
510 L Street, Suite 310
Anchorage, AK 99501
Telephone: (907) 258-7388

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ...........................................................2

ISSUES PRESENTED................................................................................2

STATUTES AND REGULATIONS..........................................................4

STATEMENT OF THE CASE...................................................................4

    I.    Federal Subsistence Management in Alaska..........................................5

    II.    The Kake Hunt .......................................................................9

SUMMARY OF ARGUMENT .................................................................13

STANDARD OF REVIEW ......................................................................14

ARGUMENT ...........................................................................................16

    I.    AS THE TITLE VIII MANAGER, THE BOARD HAS THE
        AUTHORITY TO OPEN AND CLOSE SEASONS. ........................16

        A.    ANILCA provides authority for the federal government
            to open subsistence hunts on federal public lands...................16

        B.    Authority to close federal lands to hunting and fishing
            necessarily includes authority to open them. ...........................17

        C.    Congress twice ratified the federal government's
            interpretation of its authority. ..................................................20

    II.    THE STATE'S IMPROPER-DELEGATION CLAIM FAILS..........29

        A.    The State's improper-delegation claim is barred both by
            the mandate rule and because the State lacks Article III
            standing to pursue it.................................................................29

        B.    The State's improper-delegation claim fails on the merits.......29

CONCLUSION ...................................................................................................31

STATUTORY ADDENDUM

<u>**TABLE OF AUTHORITIES**</u>

**Federal Cases**

*Alaska Dep't of Fish and Game v. Fed. Subsistence Bd.*, 62 F.4th 1177
(9th Cir. 2023) ................................................................. 9, 12, 18

*Arizona State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003
(9th Cir. 2006) ...................................................................19

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)....................28

*Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884 (9th Cir. 2017) ................. 21, 27

*John v. United States*, 720 F.3d 1214 (9th Cir. 2013) ............................... 5, 6, 7, 27

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ..................... 15, 16

*N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ...............................28

*Ninilchik Traditional Council v. United States*, 227 F.3d 1186 (9th Cir.
2000) ................................................................................ 15, 17

*S. Pac. Transp. Co. v. Watt*, 700 F.2d 550 (9th Cir. 1983).......................30

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project,
Inc.*, 576 U.S. 519 (2015) ................................................................28

**State Cases**

*McDowell v. Alaska*, 785 P.2d 1 (Alaska 1989) ......................................... 7, 21, 23

**Federal Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701–706..................................2

Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101–
3233...................................................................................2

    16 U.S.C. § 805.....................................................................25

    16 U.S.C. § 3101....................................................................2, 6

    16 U.S.C. § 3111................................................................. *passim*

    16 U.S.C. § 3112....................................................................1, 3

    16 U.S.C. § 3114.....................................................................6

iv

16 U.S.C. § 3115.................................................................... 6, 21, 25

16 U.S.C. § 3124...................................................................... 3, 5, 25

28 U.S.C. § 1291 ............................................................................2

28 U.S.C. § 1331 ............................................................................2

Department of Interior and Related Agencies Appropriations Act,1998,
    Pub. L. No. 105-83, § 316, 111 Stat. 1543 (1997) ............................... *passim*

Omnibus Consolidated and Emergency Supplemental Appropriations
    Act, 1999, Pub. L. No. 105-277, § 339, 112 Stat. 2681 (1998) ...............8, 26

**Federal Regulations**

36 C.F.R. § 242.19 .......................................................................10

50 C.F.R. § 100.10 .......................................................................22

50 C.F.R. § 100.19 .......................................................... 10, 22, 28

50 C.F.R. § 100.23 .........................................................................9

50 C.F.R. § 100.25 ............................................................... 18, 22

50 C.F.R. § 100.26 ............................................................... 18, 22

Indian Entities Recognized by and Eligible To Receive Services From the
    United States Bureau of Indian Affairs, 89 Fed. Reg. 944 (Jan. 8,
    2024) .........................................................................................9

Rural Determinations, Nonrural List, 80 Fed. Reg. 68,245 (Nov. 4, 2015).............9

Subsistence Management Regulations for Public Lands in Alaska,
    Subparts A, B, and C, 57 Fed. Reg. 22,940 (May 29, 1992). ............ 7, 21, 22

Subsistence Management Regulations for Public Lands in Alaska,
    Subparts A, B, C, and D, Redefinition to Include Waters Subject to
    Subsistence Priority, 64 Fed. Reg. 1,276 (Jan. 8, 1999) ...............................27

Subsistence Management Regulations for Federal Public Lands in
    Alaska, Subpart D—1992-1993 Subsistence Taking of Fish and
    Wildlife Regulations, 57 Fed. Reg. 22,530 (May 28, 1992)................. 18, 22

Subsistence Management Regulations for Public Lands in Alaska—2023-
    24 and 2024-25 Subsistence Taking of Wildlife and Fish and
    Shellfish Regulations, 89 Fed. Reg. 14,746 (Feb. 29, 2024) .......................22

v

**State Regulations**

Alaska Admin. Code tit. 5, § 92.072 ........................................................30

**Other Authorities**

Alaska Dep't of Fish & Game, *Copper Basin MOOSE, Community
    Subsistence Harvest Permit, PROGRAM 2024-2025* 1-2 (2024) ................31

Alaska Dep't of Fish & Game, *Moose Hunting in Alaska: Harvest
    Statistics* ...........................................................................................4

Alaska Dep't of Fish & Game, *Sitka Black-tailed Deer Hunting in
    Alaska: Harvest Statistics* ..................................................................4

## INTRODUCTION

At the center of this case is the Federal Subsistence Board's ("the Board") decision to authorize an emergency hunt, at the request of the Organized Village of Kake ("the Tribe"), to address food insecurity as well as public health and safety concerns at the outset of the COVID-19 pandemic. The Board's decision was made pursuant to a broad grant of authority under the Alaska National Interest Lands Conservation Act ("ANILCA") to manage and prioritize subsistence hunting and fishing on federal public lands in Alaska. In enacting ANILCA, Congress recognized the fundamental importance of rural Alaska's subsistence way of life and sought to provide an opportunity for rural residents to continue practicing this way of life.[1] Specifically, Congress recognized that the continuation of a subsistence-based way of life "is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence."[2] This is true for the Organized Village of Kake's Tribal citizens who depend on subsistence resources for their very existence—the harvest of traditional food provides food security and is a foundational piece of the cultural fabric of Kake.

Here, the hunt the Board authorized for the rural community of Kake sought

---

[1]     16 U.S.C. § 3112(1).

[2]     *Id.* § 3111(1).

1

to provide an opportunity for continued subsistence uses during a time of unprecedented emergency. This decision clearly falls within the Board's authority under ANILCA, a grant of authority that the Board has—for over three decades—consistently interpreted to include the power to open seasons, and an interpretation Congress has twice ratified in subsequent enactments.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arose under ANILCA, 16 U.S.C. §§ 3101–3233, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. However, as the Federal Appellees explain in their Answering Brief, the district court lacked jurisdiction over the State of Alaska's improper delegation claim.[3] This Court's jurisdiction on appeal arises from 28 U.S.C. § 1291. The district court entered final judgment on November 7, 2023, and the State filed a timely notice of appeal on January 4, 2024.

## ISSUES PRESENTED

1.    In enacting ANILCA, Congress declared its policy "to provide the

---

[3]    Federal Appellees' Answering Br. 2, 41–48.

2

opportunity for rural residents engaged in a subsistence way of life to do so."[4] Congress also directed the Secretaries of Interior and Agriculture to promulgate "regulations as are necessary and appropriate to carry out [their] responsibilities" under Title VIII of ANILCA.[5]  Acting under these statutory authorities, the Board approved a limited emergency hunt for the rural community of Kake in response to food insecurity as well as public health and safety concerns arising from the COVID-19 pandemic.  Did the district court correctly conclude that the Board has authority under ANILCA to open emergency hunts on federal public lands for rural subsistence users?

      2.    In carrying out the emergency hunt within parameters set by the Board and local field managers, the Organized Village of Kake made limited decisions about who would participate in the hunt and about the distribution of the meat, without receiving a delegation of any statutorily mandated duties or regulatory authority.  Did the district court lack jurisdiction over the State's improper-delegation claim because the claim is barred by the mandate rule and the State lacks Article III standing to pursue this claim?  Or, if the district court had jurisdiction

---

[4]    16 U.S.C. § 3112(1).

[5]    *Id.* § 3124.

3

over this claim, did the court correctly conclude that the Board did not exceed its authority in allowing the Tribe to make limited decision in conducting the emergency hunt?

## STATUTES AND REGULATIONS

Excerpts of certain pertinent statutes and regulations are set out in an addendum to this brief. The remaining pertinent statutes and regulations are reproduced in the addendum to the Federal Appellees' brief.

## STATEMENT OF THE CASE

Since 2020, Alaska hunters, participating in hunts managed by the Alaska Department of Fish and Game, successfully harvested 26,685 bull moose[6] and 45,736 buck Stika black-tailed deer.[7] The State of Alaska's ire, however, remains fixated on the Board's authorization of a single pandemic-related emergency hunt in 2020 resulting in the harvest of two bull moose and five buck Stika black-tailed

---

[6]      Alaska Dep't of Fish & Game, *Moose Hunting in Alaska: Harvest Statistics*, https://www.adfg.alaska.gov/index.cfm?adfg=moosehunting.harvest (last visited Aug. 6, 2024).

[7]      Alaska Dep't of Fish & Game, *Sitka Black-tailed Deer Hunting in Alaska: Harvest Statistics*, https://www.adfg.alaska.gov/index.cfm?adfg=deerhunting.deerharvest (last visited Aug. 6, 2024).

4

deer.[8]  The Board's decision to authorize Kake's emergency hunt came at the request of the Organized Village of Kake and was conducted under the statutes and regulations providing both authority and procedure for making such decisions.

ANILCA expresses Congress's intent to "provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents"[9] and Congress's directive to the Secretaries of Interior and Agriculture to promulgate "necessary and appropriate" regulations to fulfill their obligations under the statute.[10]  The Secretaries have carried out this responsibility since 1992.[11]  The State of Alaska's case requires accepting a revisionist history as to how the Secretaries came to manage subsistence hunting and fishing on federal public lands, as well as important congressional actions occurring after ANILCA's passage in 1980.

## I.    Federal Subsistence Management in Alaska

While one of ANILCA's primary purposes was setting aside millions of acres

---

[8]     1-SER-45.

[9]     16 U.S.C. § 3111(4).

[10]    *Id*. § 3124.

[11]    *John v. United States*, 720 F.3d 1214, 1221 (9th Cir. 2013).

5

of public lands for conservation,[12] Congress also sought to protect a unique cultural and traditional characteristic of the state: the subsistence way of life practiced by Alaska Native people and rural Alaskan residents.[13]  To further this end, Congress enacted Title VIII of ANILCA, which provides that: "[e]xcept as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes."[14]  Though Congress assigned management authority over the rural subsistence priority to the Secretaries, it also expressed its preference that the Secretaries stay their regulatory hand if the State adopted laws implementing ANILCA's subsistence priority for rural residents.[15]

The State initially did so, and the Secretary of Interior certified the State's subsistence management regime in 1982.[16]  The State's short experiment with implementing ANILCA's Title VIII came to an end, however, in 1989.  That year, the Alaska Supreme Court held the state statute implementing the rural subsistence

---

[12]    16 U.S.C. § 3101(a), (b).

[13]    *Id.* § 3101(c).

[14]    *Id.* § 3114.

[15]    *Id.* § 3115(d).

[16]    *John*, 720 F.3d at 1219.

6

priority violated the provision of Alaska's Constitution requiring that "[w]herever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use."[17]   After the *McDowell* decision, the Alaska Department of Fish and Game could no longer implement ANILCA's rural subsistence priority and "the federal government denied the re-certification Alaska needed under ANILCA to manage its own fish and game."[18]   The Secretaries therefore assumed management authority over the subsistence priority on federal public lands in 1990, promulgating the first permanent implementing regulations in 1992.[19]

The federal government's assumption of subsistence management did not go unnoticed or unaddressed by Congress.  In 1997, in the Department of the Interior and Related Agencies Appropriations Act, Congress amended ANILCA by providing a clearer means for the State to reassume management of subsistence resources on federal public lands.[20]   Congress recognized that after the *McDowell* decision and repeated failed attempts to amend Alaska's Constitution, "in

---

[17]     *McDowell v. Alaska*, 785 P.2d 1, 9 (Alaska 1989) (citing Alaska Const. art. VIII, § 3).

[18]     *John*, 720 F.3d at 1221.

[19]     *Id.* (citing Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22,940, 22,942 (May 29, 1992)).

[20]     Pub. L. No. 105-83, § 316, 111 Stat. 1543, 1592 (1997).

7

accordance with title VIII of [ANILCA], the Secretary of the Interior is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of State law to provide a rural preference."[21]  While Congress again expressed its hope that the State might assume Title VIII's management responsibilities—and included several provisions aimed at enticing the State to do so[22]—the 1997 amendments were contingent on the State adopting laws that enabled it to implement ANILCA's rural subsistence priority. [23]

Nearly one year later, Congress again revisited the federal government's implementation of Title VIII in the Omnibus Consolidated and Emergency Supplemental Appropriations Act, where it sought to halt federal management in favor of the State, but again only if the State could conform its laws to allow a rural subsistence priority in compliance with ANILCA.[24]  On both occasions, the State failed to do so, and as such, both the 1997 and 1998 amendments to ANILCA expired on their own terms, leaving the federal management system in place.[25]  Federal

---

[21]    *Id*. § 316(b)(3)(B) (ANILCA § 801 amended subsections (b)(2)–(4)).

[22]    *Id*. § 316(b)(3)(B), (ANILCA § 801 amended subsection (b)(6)).

[23]    *Id*. § 316(d).

[24]    Pub. L. No. 105-277, § 339, 112 Stat. 2681, 2681-295 (1998).

[25]    Pub. L. No. 105-83, § 316(d); Pub. L. No. 105-277, § 339(b).

subsistence management on federal public lands continues to this day.

## II.    The Kake Hunt

The facts leading to the summer 2020 emergency hunt by rural residents of

Kake, and the subsequent litigation surrounding it, are well known to the Court[26]

and therefore are only briefly summarized here.

Kake is a rural community eligible for the federal subsistence priority under

ANILCA.[27]  The Organized Village of Kake is the federally recognized Tribe for the

small village of Kake.[28]  As supply chains became increasing strained as a result of

the global COVID-19 pandemic, Kake began experiencing shortages of food and

other necessities as bulk delivery of goods delivered by barge began to slow.[29]  Faced

with this unprecedented emergency, the Tribe began interfacing with the U.S. Forest

Service and the Alaska Department of Fish and Game in an effort to address food

---

[26]    *See Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1180–81 (9th Cir. 2023).

[27]    Subsistence Management Regulations for Public Lands in Alaska; Rural Determinations, Nonrural List, 80 Fed. Reg. 68,245, 68,248 (Nov. 4, 2015) (codified at 50 C.F.R. § 100.23) (stating that all communities in Alaska are considered rural except for specific listed urban communities).

[28]    KakeSER-3; s*ee also* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 89 Fed. Reg. 944, 947 (Jan. 8, 2024).

[29]    KakeSER-6.

9

insecurity in the community.[30]

Meanwhile, the Board also took its own steps to address the COVID-19 pandemic.  Recognizing that "[o]ngoing public health concerns" could lead to "risks to public safety" and "challenging circumstances for rural residents to provide food and other necessary items for themselves, their families, and their communities," the Board delegated authority to the federal field managers to issue emergency special actions related to food security arising from the pandemic.[31]  The Board explained that the delegation of authority was "a proactive means of facilitating timely consideration of all emergency special action requests related to food security that may arise in rural Alaska."[32]  Any emergency special actions were required to comply with federal regulations 36 C.F.R. § 242.19 and 50 C.F.R. § 100.19 and could "not threaten the continued viability of the wildlife resource."[33]  This delegation took effect in early June 2020 and expired, per its own terms, on June 1, 2021.[34]

---

[30]    KakeSER-6–7.

[31]    1-SER-48.

[32]    1-SER-48.

[33]    1-SER-49.

[34]    1-SER-48, 50.

10

In April 2020 and then again in June, the Tribe submitted a Special Action Request, WSA 19-14, to the Federal Subsistence Board requesting to harvest wild game on U.S. Forest Service land.[35] After holding a meeting and receiving public testimony, the Board voted to grant the Tribe's special action request and authorized the Petersburg District Ranger to issue a permit detailing its terms.[36] On June 24, 2020, Ted Sandhofer, Forest Service District Ranger for the Petersburg Ranger District, issued Emergency Special Action Permit "COVID-19 Food Security Community Harvest for the Organized Village of Kake," which allowed for a community hunt to harvest up to two antlered bull moose and five buck Sitka black-tailed deer beginning June 24, 2020, with the possible authorization of a second hunt if necessary.[37] The harvests took place from June 24 to July 24, 2020.[38] Community hunters selected by the Tribal government successfully harvested two moose and five deer, and the meat was then processed and distributed to over 100 households in the community, including the households of tribal citizens and non-tribal citizens

---

[35]    KakeSER-7; *see also* 2-ER-64.

[36]    2-ER-62–63.

[37]    2-ER-62–63.

[38]    KakeSER-8.

11

alike.[39]

In August 2020, after the hunt had already concluded, the State filed the present suit for declaratory and injunctive relief against the Board in the U.S. District Court for the District of Alaska.[40]   The Tribe intervened as a defendant.[41]   In two separate orders issued in 2020, the district court denied the State's requested relief and entered judgment in favor of the Board and the Tribe.[42]

On appeal this Court reversed and vacated in part, holding that the district court erred in determining Alaska's claims regarding the Kake hunt were moot because the question of whether the Board may open an emergency hunt was capable of repetition while evading review.[43]   This Court remanded the matter back to the district court for further proceedings.[44]   On remand, the district court again denied the State's request for declaratory and injunctive relief.[45]   This appeal followed.

---

[39]   KakeSER-8.

[40]   *Alaska Dep't of Fish & Game*, 62 F.4th at 1180.

[41]   *Id*.

[42]   *Id*. at 1180–81.

[43]   *Id*. at 1182–83.

[44]   *Id*. at 1183.

[45]   1-ER-43.

## SUMMARY OF ARGUMENT

1.     The district court correctly dismissed the State of Alaska's claim that the Board did not have authority to open an emergency subsistence hunt on federal land.  This conclusion follows directly from the plain language of Title VIII of ANILCA, which (in the context of the State's inability or unwillingness to implement the rural subsistence priority) requires the federal government to manage hunting and fishing on federal lands.  The federal government has done so through a longstanding regulatory framework that sets federal hunting seasons and thereby "provide[s] the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents."[46]  In exercising its management authority under this framework, the Board's actions at issue in this case were well within the authority provided by Congress.

In addition, the State's reading of ANILCA would render any federal closure permanent and unchangeable, thereby rendering meaningless the federal government's unchallenged authority to open lands to hunting and fishing.  Nothing in the statute, the legislative history, or the context of ANILCA's passage suggests Congress intended this absurd result.

---

[46]     16 U.S.C. § 3111(4).

13

And finally, Congress twice ratified the federal government's interpretation of the regulatory authority at issue in this case. In 1992, the Secretaries issued permanent regulations allowing the Board to both open and close hunting seasons. Later, in 1997 and 1998, Congress passed contingent amendments to ANILCA referencing these regulations and specifically leaving them in place unless the State could enact laws implementing the rural subsistence priority. When the State failed to do so, the regulations remained, just as Congress intended.

2.     The district court was without jurisdiction to revive and review the State's improper-delegation claim on remand. The district court found that claim moot in the first round of district court proceedings, and the State waived it on appeal. Because this Court previously ruled that the claim was forfeited, the mandate rule bars the State from reviving that claim on remand. Further, the State has no Article III standing to raise the claim because there is no injury. The State was not injured by the fact that the Tribe decided which hunters would carry out the hunt— within federally imposed parameters—or by the subsequent distribution of the meat (which falls outside the scope of hunt management in any event).

The district court's judgment should therefore be affirmed.

## STANDARD OF REVIEW

This Court reviews the Board's actions, such as its authorization of the Kake

14

emergency hunt, pursuant to the Section 706 of the APA, which instructs courts to set aside agency actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[47] "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires."[48] In exercising their judgment, courts must give "due respect to Executive Branch interpretations of federal statutes."[49] The interpretations of an agency responsible for implementing a particular statute "constitute a body of experience and informed judgment" from which courts may seek aid.[50] "And when a particular statute delegates authority to an agency"—as is the case here[51]—"courts

---

[47]   *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1193 (9th Cir. 2000) (quoting 5 U.S.C. § 706(2)(A)).

[48]   *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

[49]   *Id.* at 2257.

[50]   *Id.* at 2262 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[51]   *Ninilchik Traditional Council*, 227 F.3d at 1191 ("Congress delegated to the Secretar[ies] of the Interior [and Agriculture] the broad authority to 'prescribe such regulations as are necessary and appropriate to carry out [their] responsibilities under [ANILCA].'" (last alteration in original) (quoting 16 U.S.C. § 3124)); *cf. Loper Bright Enterprises*, 144 S. Ct. at 2263 (recognizing that Congress "often" enacts statutes delegating discretionary authority to an agency, including statutes that empower an agency to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable'" (internal citation omitted) (quoting *Michigan v. Env't Prot. Agency*, 576 U.S. 743, 752 (2015))).

15

must respect the delegation, while ensuring that the agency acts within it."[52]

## ARGUMENT

### I.    AS THE TITLE VIII MANAGER, THE BOARD HAS THE AUTHORITY TO OPEN AND CLOSE SEASONS.

The State's argument that ANILCA does not give the federal government authority to open a subsistence hunt on federal public land[53] fails for at least three reasons.  First, as the district court correctly explained, ANILCA "clearly envisions that the Secretary would have authority over more than just closing public lands to the taking of fish and wildlife."[54]  Second, denying the federal government's authority to open subsistence hunts would render useless its authority to close hunting, which cannot be the intent of the statute.  Finally, Congress twice ratified the federal government's interpretation that it has authority to open subsistence hunts on federal public lands under ANILCA.

### A.    ANILCA provides authority for the federal government to open subsistence hunts on federal public lands.

As this Court previously explained, "Congress delegated to the Secretary of the Interior the broad authority to 'prescribe such regulations as are necessary and

---

[52]    *Loper Bright Enterprises*, 144 S. Ct. at 2273.

[53]    Appellant's Opening Br. 23–38.

[54]    1-ER-31.

16

appropriate to carry out his responsibilities under [ANILCA].'"[55]  Among those responsibilities is "protect[ing] and provid[ing] the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents."[56] The emergency hunt here was exactly that: an "opportunity for continued subsistence use."  Under the State's cramped reading of ANILCA, Congress both required the Secretaries to provide opportunities for rural Alaskans to access subsistence resources—which can only happen when hunting and fishing seasons are open—while denying them the authority to actually do so.  The Tribe agrees with and fully adopts the Federal Appellees' arguments explaining why this cannot be the best reading of Title VIII and why the State's arguments to the contrary have no merit.[57]  In the interest of judicial economy, the Tribe does not duplicate those arguments here.

### B.    Authority to close federal lands to hunting and fishing necessarily includes authority to open them.

The State's narrow interpretation of Title VIII misses a fundamental point: the Secretaries' authority to close hunting and fishing seasons or otherwise restrict

---

[55]    *Ninilchik Traditional Council*, 227 F.3d at 1191 (alteration in original) (quoting 16 U.S.C. § 3124).

[56]    16 U.S.C. § 3111(4).

[57]    Federal Appellees' Answering Br. 19–41.

17

taking of fish and wildlife cannot function properly in the absence of a corollary authority to open seasons.  For more than three decades, pursuant to the Secretaries' authority under ANILCA, hunting and fishing seasons on federal public lands have been set by federal regulations, which have been published biannually since 1992.[58] These regulations provide that all subsistence hunting on federal lands is "closed unless opened by Federal regulation[,]" and then proceed to specify the opening and closing dates and harvest limits for a long list of wildlife species in regions across Alaska.[59]  The State does not challenge the federal government's authority to manage hunting and fishing seasons in this manner.  Nor could the State do so—this is the underlying mechanism by which the federal government, through the Board, exercises its statutory authority to "manage[] subsistence uses of fish and wildlife on federal public lands in Alaska" pursuant to Title VIII.[60]  Yet the State now argues that the Secretaries do not have "authority to open seasons."[61]     The

---

[58]     *See* Subsistence Management Regulations for Federal Public Lands in Alaska, Subpart D—1992-1993 Subsistence Taking of Fish and Wildlife Regulations, 57 Fed. Reg. 22,530 (May 28, 1992) ("1992 Part D Regulation").

[59]     50 C.F.R. §§ 100.25(b), 100.26(a); *see also* 1992 Part D Regulation.

[60]     *Dep't of Fish & Game*, 62 F.4th at 1180 (citing *Ninilchik Traditional Council*, 227 F.3d at 1189).

[61]     Appellant's Opening Br. 23.

18

straightforward—albeit absurd—result of this reading is that, once the federal government closes federal public lands to hunting or fishing, that closure is final and permanent. Of course, such a reading is foreclosed by the text of ANILCA. How could the federal government implement the rural subsistence priority and provide for "the continuation of the opportunity for subsistence uses"[62] if hunting and fishing seasons on federal public lands are closed and cannot be reopened? Congress did not provide the Secretaries with authority to close a door while simultaneously denying them the opportunity to reopen it.[63]

To the extent that the State narrows its argument (in the face of this absurd result) to say that the federal government does not have "authority to open seasons" if the *State* has closed the season, that argument is equally without merit. If the authority to open seasons flows logically from the authority to close them (which it must, or else seasons will remain permanently closed), and Congress provided the federal government with clear authority to preempt the State's management

---

[62]     16 U.S.C. § 3111(1).

[63]     *See Arizona State Bd. for Charter Sch. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006) (recognizing the "well-accepted rule[] of statutory construction" that "statutory interpretations which would produce absurd results are to be avoided" (quoting *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004))).

19

decisions and close or restrict the taking of fish and wildlife (which it did),[64] then it follows equally as strongly that the federal government's authority to open seasons must also preempt contrary State management decisions.

### C. Congress twice ratified the federal government's interpretation of its authority.

If the language of Title VIII left any doubt, Congress subsequently spoke to the issue and ratified the federal government's interpretation of its authority to open subsistence hunting and fishing seasons.  In both 1997 and 1998, Congress passed contingent amendments to ANILCA in which it affirmatively chose to leave the federal regulatory scheme in place *unless* the State could enact laws implementing the rural subsistence priority.  The State failed to do so.  This is conclusive that the Secretaries' regulations—which have authorized the Board to open and close hunting seasons *since 1992*—are a lawful exercise of the powers Congress delegated to them.  "[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the

---

[64]     *See* Federal Appellees' Answering Br. 37–40.

interpretation is the one intended by Congress."[65]  That standard is amply met here.

When Congress originally enacted ANILCA, it envisioned that the State would manage subsistence hunting and fishing on public lands and would implement ANILCA's rural subsistence priority. But, Congress included a Plan B: if the State did not implement the rural subsistence priority, the federal government would step in.[66] After the Alaska Supreme Court found the rural preference unconstitutional under state law,[67] and the Alaska Legislature failed to approve a corrective constitutional amendment, the federal government promulgated regulations governing subsistence hunting and fishing on public lands.[68]  Among other things, those regulations established the Board and delegated to it "responsibility for[] administering the subsistence taking and uses of fish and wildlife on public lands,

---

[65]    *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 889 (9th Cir. 2017) (alteration in original) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986)).

[66]    16 U.S.C. § 3115(d).

[67]    *McDowell*, 785 P.2d at 9.

[68]    Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22,940 (May 29, 1992) ("1992 Final Rule") (describing this history and the promulgation of temporary regulations in 1990, followed by permanent regulations in the 1992 Final Rule).

21

and the related promulgation . . . [of] regulations."[69]

Importantly, the 1992 Final Rule expressly addressed the authority to open hunts, giving the Board the authority to "make or direct a temporary change to *open or adjust* the seasons or to increase the bag limits for subsistence uses of fish and wildlife populations on public lands."[70]   The concurrently issued Final Rule for Subpart D—which sets hunting seasons and bag limits—also expressly addressed the authority to open hunts.  It provided that "[s]easons are closed unless *opened by Federal regulation*" and then went on to specify the open seasons and bag limits for a wide range of subsistence species in different areas across the state.[71]   That same language remains on the books today,[72] and since 1992 the Board has continued to promulgate biannual seasons and bag limits that open subsistence hunts across the state.[73]

---

[69]     *Id.* subpt. B § __.10(a), 57 Fed. Reg. at 22,953; *see* 50 C.F.R. § 100.10.

[70]     1992 Final Rule subpt. B § __.19(d), 57 Fed. Reg. at 22,957 (emphasis added).  This authority remains intact.  *See* 50 C.F.R. § 100.19(b).

[71]     1992 Part D Regulation, 57 Fed. Reg. at 22,536 (emphasis added).

[72]     50 C.F.R. §§ 100.25(b), 100.26(a).

[73]     50 C.F.R. § 100.26; *see, e.g.*, Subsistence Management Regulations for Public Lands in Alaska—2023-24 and 2024-25 Subsistence Taking of Wildlife and Fish and Shellfish Regulations, 89 Fed. Reg. 14,746 (Feb. 29, 2024).

Congress was aware of this history when, in 1997, it enacted contingent amendments to ANILCA.[74]   In its findings, Congress carefully explained that although the State of Alaska had initially implemented a law "providing subsistence use opportunities for rural residents of Alaska," that "law was challenged in Alaska courts, and the rural preference requirement in the law was found in 1989 by the Alaska Supreme Court in *McDowell v. State of Alaska* . . . to violate the Alaska Constitution."[75]   Therefore, Congress further explained, "in accordance with title VIII of [ANILCA], the Secretary of the Interior *is required to manage fish and wildlife for subsistence uses on all public lands in Alaska* because of the failure of State law to provide a rural preference."[76]

All of this shows that Congress understood the lay of the land—specifically, that the Secretaries were managing subsistence hunting and fishing on public lands in Alaska, including exercising the authority to open hunts on both an annual and temporary basis.  Congress even recognized that ANILCA required the Secretaries to do so.

---

[74]    Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, § 316(b), 111 Stat. 1543, 1592–95 (1997).

[75]    *Id.* § 316(b)(3)(B) (ANILCA § 801 amended subsections (b)(1)–(2)).

[76]    *Id.* (ANILCA § 801 amended subsection (b)(4)) (emphasis added).

23

Finally, Congress explained that it was enacting amendments aimed at restoring the originally contemplated system, in which ANILCA would protect the same rural subsistence uses "through the management of the State of Alaska."[77] Alaska could not implement that priority, however, unless the people amended the Alaska Constitution. Congress therefore chose to make the ANILCA amendments contingent on State action, effectively giving the State a chance to amend its constitution and resume management of subsistence hunting and fishing, but expressly providing that if the State did *not* do so, the amendments would sunset and the existing federal management scheme would remain in place:

> Unless and until laws are adopted in the State of Alaska which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act [i.e., rural subsistence preference], the amendments made by subsection (b) of this section shall be effective only for the purposes of determining whether the State's laws provide for such definition, preference, and participation. The Secretary shall certify before December 1, 1998 if such laws have been adopted in the State of Alaska. Subsection (b) *shall be repealed on such date if such laws have not been adopted*.[78]

In other words, if the State did not adopt a constitutional amendment allowing it to implement a rural subsistence priority, the existing federal regulatory scheme

---

[77] *Id.* (ANILCA § 801 amended subsection (b)(7)).

[78] *Id.* § 316(d) (emphasis added) (internal citation omitted).

24

governing management of subsistence hunting and fishing—which expressly authorized the Board to open hunting seasons—would remain in place.

In the contingent amendments, Congress even specifically addressed the Secretaries' regulatory power: while 16 U.S.C. § 3124 generally gives the Secretaries the authority to promulgate "such regulations as are necessary and appropriate" to implement various responsibilities under Title VIII, Congress temporarily amended this provision to give the *State* regulatory power "at any time the State has complied with [16 U.S.C. § 3115(d)]"—that is, when the State "enacts and implements laws" providing for the rural subsistence priority.[79] The amendments also conditionally prohibited the Secretaries from making or enforcing their own regulations, but this prohibition applied only during such time as the State achieved compliance with § 3115(d) by implementing a rural subsistence priority via constitutional amendment.[80] Ultimately, the State was unable to pass a constitutional amendment allowing it to implement the rural priority by the December 1998 deadline, and so—according to Congress' explicit instruction— these amendments were automatically repealed, leaving the Secretaries' original

---

[79]    *Id.* § 316(b)(8)(A) (ANILCA § 814 amended); *see* ANILCA § 805(d), 16 U.S.C. § 3115(d).

[80]    *Id.* § 316(b)(8)(B) (ANILCA § 814 amended).

25

regulatory authority in place.[81]

Congress gave the State yet another chance the following year. Congress enacted another set of contingent amendments, in which it temporarily froze the regulatory definition of public lands and delayed implementation of a final rule that the Secretaries were preparing to issue regarding a different Title VIII issue.[82] Here again, Congress held the rural subsistence priority paramount: if the State could not implement the rural priority, Congress chose to leave the federal management scheme in place and allow the pending rule to be finalized.[83] Congress also required the Secretary of the Interior to certify whether the Alaska Legislature had passed a resolution to amend the Alaska Constitution to allow a rural preference, and provided that the ANILCA amendments "shall be repealed on October 1, 1999, unless prior to that date the Secretary of the Interior makes such a certification."[84] Again the State failed to act. So again, in accordance with Congress's direction, the amendments were automatically repealed, and Congress allowed the Secretaries to

---

[81]     *Id.* § 316(d).

[82]     Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 339 (a), 112 Stat. 2681, 2681-295 (1998).

[83]     *Id.* § 339(b).

[84]     *Id.* § 339 (b)(1)–(2).

26

continue with implementation of their regulations.[85]

That Congress *twice* revisited ANILCA and affirmatively chose to leave the federal regulatory scheme in place serves as a double ratification of the Secretary's interpretation of Title VIII. In this Court's words, "Congress revisit[ed] a statute giving rise to a longstanding administrative interpretation without pertinent change."[86] This congressional choice to leave the agency's interpretation undisturbed "is persuasive evidence that the interpretation is the one intended by Congress."[87] "Where 'an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably

---

[85]    *See* Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition to Include Waters Subject to Subsistence Priority, 64 Fed. Reg. 1,276, 1,276 (Jan. 8, 1999) (reciting the regulatory timeline specified by Congress and providing that the 1999 updates to the regulations would only be implemented if the State failed to adopt a conforming constitutional amendment); *John v. United States*, 720 F.3d 1214, 1245 (9th Cir. 2013) (upholding the 1999 regulations, which ultimately went into effect October 1, 1999).

[86]    *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 889 (9th Cir. 2017) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986)).

[87]    *Id.*

27

the legislative intent has been correctly discerned.'"[88]

Here, the Secretaries had promulgated and implemented regulations managing subsistence hunting, including provisions giving the Board express authority to open hunting seasons on both a temporary and annual basis.[89] Congress looked directly at the Secretaries' management authority—even considering the scope of their authority to promulgate regulations—and then *twice* chose to leave the status quo in place. Indeed, when Congress acts by "positive legislation," the agency interpretation that Congress ratified is "virtually conclusive."[90] Such is the case here. Contrary to the State's suggestion that the Secretaries are acting beyond the scope of power that Congress intended for them, Congress twice ratified the

---

[88]     *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (quoting *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979)); *see also Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536–37 (2015) (where a term has been interpreted by the courts, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012)).

[89]     Although the 1992 provision for *emergency* special actions included only closure authority, the authority to open hunts via both temporary actions and regular seasons indicates beyond a doubt that the Secretaries had the authority to open hunts as early as 1992. *Supra* at 22. Against that backdrop, the later expansion of that authority to emergency special actions was a rational, and unexceptional, exercise of the Secretaries' regulatory power. *See* 50 C.F.R. § 100.19(a).

[90]     *Commodity Futures Trading Comm'n*, 478 U.S. at 846.

28

Secretaries' exercise of their authority to open hunting seasons.

## II.    THE STATE'S IMPROPER-DELEGATION CLAIM FAILS.

### A.    The State's improper-delegation claim is barred both by the mandate rule and because the State lacks Article III standing to pursue it.

As the Federal Appellees ably explain, the mandate rule bars the State from arguing its improper-delegation claim at this juncture.[91]  Indeed, it follows that this claim falls outside the scope of the remanded issues because any delegation that occurred here was specific to this hunt and thus is not capable of repetition or evading review such that the mootness exception would apply.  In addition, the State does not have Article III standing to raise this claim in the first place.[92]  In the interest of reducing duplicative argument, the Tribe adopts the Federal Appellees' arguments on these points.

### B.    The State's improper-delegation claim fails on the merits.

Similarly, the Tribe agrees with and adopts the Federal Appellees' arguments with respect to the merits of the improper delegation claim.  The Board did not delegate any statutorily mandated duties or powers to the Tribe, and there was nothing improper about the Tribe exercising limited discretion—within parameters

---

[91]    *See* Federal Appellees' Answering Br. 42–45.

[92]    *Id*. at 45–48.

set by federal field managers—in carrying out the hunt.[93]    The State argues

strenuously that the federal government is unable to allow the local community to

exercise even the smallest amount of administrative discretion (in this case, choosing

the hunters and distributing the meat—again, under specific criteria imposed by the

federal managers)[94] without "express authorization" from Congress.[95]    But, to the

extent that this allowance of discretion was a subdelegation at all, this Court has

denied that a subdelegation to a Tribe "must… rest on express statutory authority."[96]

The State's argument is also perplexing given that it regularly permits via

regulation community subsistence hunts where a community or group of 25 or more

persons applies for a hunting permit, chooses its own individual hunters, and

appoints a "group coordinator" to perform all required reporting to the Department

of Fish and Game.[97]    Like the Kake hunt, these community hunts are conducted

pursuant to regulation, not statute, in this case promulgated by the Alaska Board of

Game.  Indeed, this fall the Alaska Department of Fish and Game intends to hold a

---

[93]    *Id*. at 48–51.

[94]    2-ER-62–63.

[95]    Appellant's Opening Br. 39.

[96]    *S. Pac. Transp. Co. v. Watt*, 700 F.2d 550, 556 (9th Cir. 1983).

[97]    Alaska Admin. Code tit. 5, § 92.072(c)(1).

community subsistence hunt for bull moose, whose parameters are strikingly similar to those laid out by the District Ranger for the Kake hunt.[98]  Evidently, in this context, the State does not believe that each community's selection of its own hunters constitutes improper "management" of a hunt by these communities. Rightly so, as the identification of individual hunters to fulfill a community hunting permit is simply not a hunt management function.  The exact same principle applies to the Kake hunt.  No delegation of management authority occurred, let alone an improper delegation.

## CONCLUSION

For the reasons set forth above, the judgment of the district court should be AFFIRMED.

DATED this 9th day of August 2024, at Anchorage, Alaska.

NATIVE AMERICAN RIGHTS FUND

By: */s/Megan R. Condon*
Megan R. Condon
Alaska Bar No. 1810096
Erin C. Dougherty Lynch
Alaska Bar No. 0811067

---

[98]    *Compare* Alaska Dep't of Fish & Game, *Copper Basin MOOSE, Community Subsistence Harvest Permit, PROGRAM 2024-2025* 1–2 (2024), https://www.adfg.alaska.gov/static/license/huntlicense/pdfs/csh_moose_2024_2025.pdf (last visited Aug. 6, 2024), *with* 2-ER-62–63.

31

Heather Kendall Miller
Alaska Bar No. 9211084

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP

By: */s/ Nathaniel Amdur-Clark*
Nathaniel Amdur-Clark
Alaska Bar No. 1411111
Whitney A. Leonard
Alaska Bar No. 1711064
Lloyd B. Miller
Alaska Bar No. 7906040

*Attorneys for Organized Village of Kake*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Cir. R. 32-1 because this brief contains 6,301 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 Times New Roman 14-point font.

NATIVE AMERICAN RIGHTS FUND

DATED: August 9, 2024          By: */s/Megan R. Condon*
                                   Megan R. Condon
                                   Alaska Bar No. 1810096

# CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

NATIVE AMERICAN RIGHTS FUND

DATED: August 9, 2024          By: */s/Megan R. Condon*

Megan R. Condon
Alaska Bar No. 1810096

# STATUTORY ADDENDUM

*Except for the following, all applicable statutes and regulations are contained in the addendum submitted with the Federal Appellees' Answering Brief.*

## TABLE OF CONTENTS

**Federal Statutes**

Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105–83, § 316 (b), 111 Stat. 1543, 1592-95 (1997)

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105–277, Div. A, § 339 (a), 112 Stat. 2681, 2681-295 (1998)

PUBLIC LAW 105–83—NOV. 14, 1997          111 STAT. 1543

*Public Law 105–83
105th Congress

## An Act

Making appropriations for the Department of the Interior and related agencies
for the fiscal year ending September 30, 1998, and for other purposes.

Nov. 14, 1997
[H.R. 2107]

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,* That the
following sums are appropriated, out of any money in the Treasury
not otherwise appropriated, for the fiscal year ending September
30, 1998, and for other purposes, namely:

Department of
the Interior and
Related Agencies
Appropriations
Act, 1998.

### TITLE I—DEPARTMENT OF THE INTERIOR

#### BUREAU OF LAND MANAGEMENT

##### MANAGEMENT OF LANDS AND RESOURCES

For expenses necessary for protection, use, improvement,
development, disposal, cadastral surveying, classification, acquisi-
tion of easements and other interests in lands, and performance
of other functions, including maintenance of facilities, as authorized
by law, in the management of lands and their resources under
the jurisdiction of the Bureau of Land Management, including the
general administration of the Bureau, and assessment of mineral
potential of public lands pursuant to Public Law 96–487 (16 U.S.C.
3150(a)), $583,270,000, to remain available until expended, of which
$2,043,000 shall be available for assessment of the mineral potential
of public lands in Alaska pursuant to section 1010 of Public Law
96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived
from the special receipt account established by the Land and Water
Conservation Act of 1965, as amended (16 U.S.C. 460l–6a(i)); and
of which $1,500,000 shall be available in fiscal year 1998 subject
to a match by at least an equal amount by the National Fish
and Wildlife Foundation, to such Foundation for challenge cost
share projects supporting fish and wildlife conservation affecting
Bureau lands; in addition, $27,650,000 for Mining Law Administra-
tion program operations, to remain available until expended, to
be reduced by amounts collected by the Bureau and credited to
this appropriation from annual mining claim fees so as to result
in a final appropriation estimated at not more than $583,270,000;
and in addition, not to exceed $5,000,000, to remain available
until expended, from annual mining claim fees; which shall be
credited to this account for the costs of administering the mining
claim fee program, and $2,000,000 from communication site rental
fees established by the Bureau for the cost of administering commu-
nication site activities: *Provided,* That appropriations herein made

---

*Note: This law contains items that were cancelled by the President pursuant to the Line
Item Veto Act. For more information, see the **Federal Register** entry under "LEGISLATIVE
HISTORY" at the end of this law.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

1a

111 STAT. 1592     PUBLIC LAW 105–83—NOV. 14, 1997

16 USC 3102
note.

SEC. 316. SUBSISTENCE HUNTING AND FISHING IN ALASKA. (a) MORATORIUM ON FEDERAL MANAGEMENT.—None of the funds made available to the Department of the Interior or the Department of Agriculture by this or any other Act hereafter enacted may be used prior to December 1, 1998 to issue or implement final regulations, rules, or policies pursuant to title VIII of the Alaska National Interest Lands Conservation Act to assert jurisdiction, management, or control over the navigable waters transferred to the State of Alaska pursuant to the Submerged Lands Act of 1953 or the Alaska Statehood Act of 1959.

(b) AMENDMENTS TO ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—

(1) AMENDMENT OF ANILCA.—Except as otherwise expressly provided, whenever in this subsection an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3101 et seq.).

(2) DEFINITIONS.—Section 102(2) (16 U.S.C. 3102(2)) is amended to read as follows:

"(2) The term 'Federal land' means lands the title to which is in the United States after December 2, 1980. 'Federal land' does not include lands the title to which is in the State, an Alaska Native corporation, or other private ownership.".

(3) FINDINGS.—Section 801 (16 U.S.C. 3111) is amended—

(A) by inserting "(a)" immediately before "The Congress finds and declares"; and

(B) by inserting at the end the following new subsection:

"(b) The Congress finds and declares further that—

"(1) subsequent to the enactment of this Act in 1980, the subsistence law of the State of Alaska (AS 16.05) accomplished the goals of Congress and requirements of this Act in providing subsistence use opportunities for rural residents of Alaska, both Alaska Native and non-Alaska Native;

"(2) the Alaska subsistence law was challenged in Alaska courts, and the rural preference requirement in the law was found in 1989 by the Alaska Supreme Court in McDowell v. State of Alaska (785 P.2d 1, 1989) to violate the Alaska Constitution;

"(3) since that time, repeated attempts to restore the validity of the State law through an amendment to the Alaska Constitution have failed, and the people of Alaska have not been given the opportunity to vote on such an amendment;

"(4) in accordance with title VIII of this Act, the Secretary of the Interior is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of State law to provide a rural preference;

"(5) the Ninth Circuit Court of Appeals determined in 1995 in State of Alaska v. Babbitt (73 F.3d 698) that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the Interior;

"(6) management of fish and wildlife resources by State governments has proven successful in all 50 States, including Alaska, and the State of Alaska should have the opportunity

2a

PUBLIC LAW 105-83—NOV. 14, 1997     111 STAT. 1593

to continue to manage such resources on all lands, including public lands, in Alaska in accordance with this Act, as amended; and

"(7) it is necessary to amend portions of this Act to restore the original intent of Congress to protect and provide for the continued opportunity for subsistence uses on public lands for Alaska Native and non-Alaska Native rural residents through the management of the State of Alaska.".

(4) TITLE VIII DEFINITIONS.—Section 803 (16 U.S.C. 3113) is amended—

(A) by striking "and" at the end of paragraph (1);

(B) by striking the period and inserting a semicolon at the end of paragraph (2); and

(C) by inserting at the end the following new paragraphs:

"(3) 'customary and traditional uses' means the noncommercial, long-term, and consistent taking of, use of, or reliance upon fish and wildlife in a specific area and the patterns and practices of taking or use of that fish and wildlife that have been established over a reasonable period of time, taking into consideration the availability of the fish and wildlife;

"(4) 'customary trade' means, except for money sales of furs and furbearers, the limited noncommercial exchange for money of fish and wildlife or their parts in minimal quantities; and

"(5) 'rural Alaska resident' means a resident of a rural community or area. A 'rural community or area' means a community or area substantially dependent on fish and wildlife for nutritional and other subsistence uses.".

(5) PREFERENCE FOR SUBSISTENCE USES.—Section 804 (16 U.S.C. 3114) is amended—

(A) by inserting "(a)" immediately before the first sentence; and

(B) by inserting at the end the following new subsection:

"(b) The priority granted by this section is for a reasonable opportunity to take fish and wildlife. For the purposes of this subsection, the term 'reasonable opportunity' means an opportunity, consistent with customary and traditional uses (as defined in section 803(3)), to participate in a subsistence hunt or fishery with a reasonable expectation of success, and does not mean a guarantee that fish and wildlife will be taken.".

(6) LOCAL AND REGIONAL PARTICIPATION.—Section 805 (16 U.S.C. 3115) is amended—

(A) in subsection (a) by striking "one year after the date of enactment of this Act,"; and

(B) by amending subsection (d) to read as follows:

"(d)(1) Upon certification by the Secretary that the State has enacted and implemented laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in sections 803, 804, and 805, the Secretary shall not implement subsections (a), (b), and (c) of this section, and the State may immediately assume management for the taking of fish and wildlife on the public lands for subsistence uses pursuant to this title. Upon assumption of such management by the State, the Secretary shall not implement subsections (a), (b), and (c) of this section unless a court of competent jurisdiction

3a

111 STAT. 1594          PUBLIC LAW 105–83—NOV. 14, 1997

determines that such laws have been repealed, modified, or imple-
mented in a way that is inconsistent with, or does not provide
for, the definition, preference, and participation specified in sections
803, 804, and 805, or that the State has failed to cure any such
inconsistency after such determination. The State laws shall other-
wise supercede such sections insofar as such sections govern State
responsibility pursuant to this title for the taking of fish and wildlife
on the public lands for subsistence uses. The Secretary may bring
a judicial action to enforce this subsection.

"(2)(A) Laws establishing a system of local advisory committees
and regional advisory councils consistent with section 805 shall
provide that the State rulemaking authority shall consider the
advice and recommendations of the regional councils concerning
the taking of fish and wildlife populations on public lands within
their respective regions for subsistence uses. The regional councils
may present recommendations, and the evidence upon which such
recommendations are based, to the State rulemaking authority
during the course of the administrative proceedings of such author-
ity. The State rulemaking authority may choose not to follow any
recommendation which it determines is not supported by substantial
evidence presented during the course of its administrative proceed-
ings, violates recognized principles of fish and wildlife conservation
or would be detrimental to the satisfaction of rural subsistence
needs. If a recommendation is not adopted by the State rulemaking
authority, such authority shall set forth the factual basis and the
reasons for its decision.

"(B) The members of each regional advisory council established
under this subsection shall be appointed by the Governor of Alaska.
Each council shall have ten members, four of whom shall be selected
from nominees who reside in the region submitted by tribal councils
in the region, and six of whom shall be selected from nominees
submitted by local governments and local advisory committees.
Three of these six shall be subsistence users who reside in the
subsistence resource region and three shall be sport or commercial
users who may be residents of any subsistence resource region.
Regional council members shall have staggered terms of three years
in length, with no limit on the number of terms a member may
serve. A quorum shall be a majority of the members of the council.".

(7) JUDICIAL ENFORCEMENT.—Section 807 (16 U.S.C. 3117)
is amended by inserting the following as subsection (b):

"(b) State agency actions may be declared invalid by the court
only if they are arbitrary, capricious, or an abuse of discretion,
or otherwise not in accordance with law. When reviewing any
action within the specialized knowledge of a State agency, the
court shall give the decision of the State agency the same deference
it would give the same decision of a comparable Federal agency.".

(8) REGULATIONS.—Section 814 (16 U.S.C. 3124) is
amended—

(A) by inserting ", and the State at any time the
State has complied with section 805(d)" after "Secretary";
and

(B) by adding at the end the following new sentence:
"During any time that the State has complied with section
805(d), the Secretary shall not make or enforce regulations
implementing section 805(a), (b), or (c).".

(9) LIMITATIONS, SAVINGS CLAUSES.—Section 815 (16 U.S.C.
3125) is amended—

4a

PUBLIC LAW 105–83—NOV. 14, 1997      111 STAT. 1595

(A) by striking "or" at the end of paragraph (3);

(B) by striking the period at the end of paragraph (4) and inserting in lieu thereof a semicolon and "or"; and

(C) by inserting at the end the following new paragraph:

"(5) prohibiting the Secretary or the State from entering into co-management agreements with Alaska Native organizations or other local or regional entities when such organization or entity is managing fish and wildlife on public lands in Alaska for subsistence uses.".

(c) SAVINGS CLAUSE.—No provision of this section, amendment made by this section, or exercise of authority pursuant to this section may be construed to validate, invalidate, or in any way affect—

16 USC 3102 note.

(1) any assertion that an Alaska Native organization (including a federally recognized tribe, traditional Alaska Native council, or Alaska Native council organized pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq.), as amended) has or does not have governmental authority over lands (including management of, or regulation of the taking of, fish and wildlife) or persons within the boundaries of the State of Alaska;

(2) any assertion that Indian country, as defined in section 1151 of title 18, United States Code, exists or does not exist within the boundaries of the State of Alaska;

(3) any assertion that the Alaska National Interest Lands Conservation Act, as amended (16 U.S.C. 3101 et seq.) is or is not Indian law; or

(4) the authority of the Secretary of the Interior under section 1314(c) of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3202(c)).

(d) EFFECTIVE DATE.—Unless and until laws are adopted in the State of Alaska which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3111 et seq.), the amendments made by subsection (b) of this section shall be effective only for the purposes of determining whether the State's laws provide for such definition, preference, and participation. The Secretary shall certify before December 1, 1998 if such laws have been adopted in the State of Alaska. Subsection (b) shall be repealed on such date if such laws have not been adopted.

16 USC 3102 note.

Certification. Alaska.

SEC. 317. Section 909(b)(2) of division II, title IX of Public Law 104–333 is amended by striking the following: "For technical assistance pursuant to section 908, not more than $50,000 annually.".

16 USC 461 note.

SEC. 318. No part of any appropriation contained in this Act shall be expended or obligated to fund the activities of the western director and special assistant to the Secretary within the Office of the Secretary of Agriculture that exceeds the funding provided for these activities from this Act during fiscal year 1997.

SEC. 319. Notwithstanding any other provision of law, for fiscal year 1998 the Secretaries of Agriculture and the Interior are authorized to limit competition for watershed restoration project contracts as part of the "Jobs in the Woods" component of the President's Forest Plan for the Pacific Northwest to individuals and entities in historically timber-dependent areas in the States of Washington,

PUBLIC LAW 105–277—OCT. 21, 1998          112 STAT. 2681

*Public Law 105–277
105th Congress

## An Act

Making omnibus consolidated and emergency appropriations for the fiscal year
ending September 30, 1999, and for other purposes.

Oct. 21, 1998
[H.R. 4328]

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

Omnibus
Consolidated and
Emergency
Supplemental
Appropriations
Act, 1999.

### DIVISION A—OMNIBUS CONSOLIDATED APPROPRIATIONS

That the following sums are appropriated, out of any money
in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the
Government for the fiscal year 1999, and for other purposes, namely:
SEC. 101. (a) For programs, projects or activities in the Agriculture, Rural Development, Food and Drug Administration, and
Related Agencies Appropriations Act, 1999, provided as follows,
to be effective as if it had been enacted into law as the regular
appropriations Act:

AN ACT Making appropriations for Agriculture, Rural Development, Food and Drug
Administration, and Related Agencies programs for the fiscal year ending September 30, 1999, and for other purposes.

Agriculture,
Rural
Development,
Food and Drug
Administration,
and Related
Agencies
Appropriations
Act, 1999.

### TITLE I

### AGRICULTURAL PROGRAMS

#### PRODUCTION, PROCESSING, AND MARKETING

#### OFFICE OF THE SECRETARY

#### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of the Office of the Secretary of Agriculture, and not to exceed $75,000 for employment under 5 U.S.C.
3109, $2,836,000: *Provided*, That not to exceed $11,000 of this
amount, along with any unobligated balances of representation
funds in the Foreign Agricultural Service, shall be available for
official reception and representation expenses, not otherwise provided for, as determined by the Secretary: *Provided further*, That
none of the funds appropriated or otherwise made available by
this Act may be used to pay the salaries and expenses of personnel
of the Department of Agriculture to carry out section 793(c)(1)(C)
of Public Law 104–127: *Provided further*, That none of the funds
made available by this Act may be used to enforce section 793(d)
of Public Law 104–127.

---

*Note: This is a typeset print of the original hand enrollment as signed by the President on
October 21, 1998. The text is printed without corrections.



112 STAT. 2681–295     PUBLIC LAW 105–277—OCT. 21, 1998

(c) PRESERVATION OF EXISTING RIGHTS OF ACCESS.—Nothing in this section shall impair any existing rights of access in favor of the public or any owner of adjacent lands over, under or across the lands which are referred to in subsection (a).

(d) MINERALS.—The United States disclaims any and all right of surface entry to the mineral estate of lands described in subsection (b).

16 USC 3503
note.

SEC. 335. The final set of maps entitled "Coastal Barrier Resources System", dated "October 24, 1990, revised November 12, 1996", and relating to the following units of the Coastal Barrier Resources System: P04A, P05/P05P; P05A/P05AP, FL–06P; P10/P10P; P11; P11AP; P11A; P18/P18P; P25/P25P; and P32/P32P (which set of maps were created by the Department of the Interior to comply with section 220 of Public Law 104–333, 110 Stat. 4115, and notice of which was published in the Federal Register on May 28, 1997) shall have the force and effect of law and replace and substitute for any other inconsistent Coastal Barrier Resource System map in the possession of the Department of the Interior. This provision is effective immediately upon enactment of this Act and the Secretary of the Interior or his designee shall immediately make this ministerial substitution.

25 USC 1645.

SEC. 336. Section 405(c)(2) of the Indian Health Care Improvement Act (42 U.S.C. 1645(c)(2)) is amended by striking "September 30, 1998" and inserting "September 30, 2000".

SEC. 337. Section 3003 of the Petroleum Overcharge Distribution and Restitution Act of 1986 (15 U.S.C. 4502) is amended by adding after subsection (d) the following new subsection:

"(e) Subsections (b), (c), and (d) of this section are repealed, and any rights that may have arisen are extinguished, on the date of the enactment of the Department of the Interior and Related Agencies Appropriations Act, 1999. After that date, the amount available for direct restitution to current and future refined petroleum product claimants under this Act is reduced by the amounts specified in title II of that Act as being derived from amounts held in escrow under section 3002(d). The Secretary shall assure that the amount remaining in escrow to satisfy refined petroleum product claims for direct restitution is allocated equitably among the claimants.".

SEC. 338. Section 123(a)(2)(C) of the Department of the Interior and Related Agencies Appropriations Act, 1998 (111 Stat. 1566),

25 USC 2717
note.

is amended by striking "self-regulated tribes such as".

16 USC 3102
note.

SEC. 339. (a) RESTRICTION ON FEDERAL MANAGEMENT UNDER TITLE VIII OF THE ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—

(1) Notwithstanding any other provision of law, hereafter neither the Secretary of the Interior nor the Secretary of Agriculture may, prior to December 1, 2000, implement or enforce any final rule, regulation, or policy pursuant to title VIII of the Alaska National Interest Lands Conservation Act to manage and to assert jurisdiction, authority, or control over land, water, and wild, renewable resources, including fish and wildlife, in Alaska for subsistence uses, except within—

(A) areas listed in 50 C.F.R. 100.3(b) (October 1, 1998) and

(B) areas constituting "public land or public lands" under the definition of such term found at 50 C.F.R. 100.4 (October 1, 1998).

7a

PUBLIC LAW 105–277—OCT. 21, 1998     112 STAT. 2681–296

(2) The areas in subparagraphs (A) and (B) of paragraph (1) shall only be construed to mean those public lands which as of October 1, 1998, were subject to federal management for subsistence uses pursuant to Title VIII of the Alaska National Interest Lands Conservation Act.

(b) SUBSECTION (a) REPEALED.—

(1) The Secretary of the Interior shall certify before October 1, 1999, if a bill or resolution has been passed by the Alaska State Legislature to amend the Constitution of the State of Alaska that, if approved by the electorate, would enable the implementation of state laws of general applicability consistent with, and which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act.

(2) Subsection (a) shall be repealed on October 1, 1999, unless prior to that date the Secretary of the Interior makes such a certification described in paragraph (1).

(c) TECHNICAL AMENDMENTS TO THE ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—Section 805 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3115) is amended—

(1) in subsection (a) by striking "one year after the date of enactment of this Act,"

(2) in subsection (d) by striking "within one year from the date of enactment of this Act,".

(d) EFFECT ON TIDAL AND SUBMERGED LAND.—Nothing in this section invalidates, validates, or in any other way affects any claim of the State of Alaska to title to any tidal or submerged land in Alaska.

SEC. 340. None of the funds made available in this Act may be used to establish a national wildlife refuge in the Kankakee River watershed in northwestern Indiana and northeastern Illinois.

SEC. 341. Upon the condition that Skamania County conveys title acceptable to the Secretary of Agriculture to all right, title and interest in lands identified on a map dated September 29, 1998 entitled "Skamania County Lands to be Transferred", such lands being located on Table Mountain lying within the Columbia River Gorge National Scenic Area, there is hereby conveyed to Skamania County, notwithstanding any other provision of law, the Wind River Nursery Site lands and facilities and all interests therein, except for the corridor of the Pacific Crest National Scenic Trail, as depicted on a map dated September 29, 1998, entitled "Wind River Conveyance", which is on file and available for public inspection in the Office of the Chief, USDA Forest Service, Washington, D.C. | 16 USC 544g note.

The conveyance of lands to Skamania County shall become automatically effective upon a determination by the Secretary that Skamania County has conveyed acceptable title to the United States to the Skamania County lands. Lands conveyed to the United States shall become part of the Gifford Pinchot National Forest and shall have the status of lands acquired under the Act of March 1, 1911, (commonly called the Weeks Act) and shall be managed in accordance with the laws and regulations applicable to the National Forest System.

SEC. 342. (a) BOUNDARY ADJUSTMENTS.— | 16 USC 90a–1 note.

(1) LAKE CHELAN NATIONAL RECREATION AREA.—The boundary of the Lake Chelan National Recreation Area, established

8a