**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF ALASKA
DEPARTMENT OF FISH AND
GAME,

*Plaintiff - Appellant*,

v.

FEDERAL SUBSISTENCE
BOARD; DAVID SCHMID, in his
official capacity as the Regional
Supervisor for the United States
Forest Service; SONNY PERDUE, in
his official capacity as the United
States Secretary of Agriculture;
GENE PELTOLA, in his official
capacity as Alaska Regional Director,
Bureau of Indian Affairs; GREGORY
SIEKANIEC, in his official capacity
as Alaska Regional Director, United
States Fish and Wildlife Service;
CHAD PADGETT, in his official
capacity as State Director for Alaska,
United States Bureau of Land
Management; DON STRIKER, in his
official capacity as Alaska Regional
Supervisor, National Park Service;
DAVID BERNHARDT, in his

No. 24-179

D.C. No.
3:20-cv-00195-
SLG

OPINION

official capacity as the United States
Secretary of the Interior; ANTHONY
CHRISTIANSON, in his official
capacity as Chair of the Federal
Subsistence Board; CHARLIE
BROWER, in his official capacity as
Member of the Federal Subsistence
Board; RHONDA PITKA, in her
official capacity as Member of the
Federal Subsistence Board,

　　　　*Defendants - Appellees*,

ORGANIZED VILLAGE OF KAKE,

　　　　*Intervenor-Defendant -
　　　　Appellee*.

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, Chief District Judge, Presiding

Argued and Submitted February 7, 2025
Portland, Oregon

Filed June 2, 2025

Before: Carlos T. Bea, Lucy H. Koh, and Jennifer Sung,
Circuit Judges.

Opinion by Judge Bea

**SUMMARY**[*]

**Alaska National Interest Lands Conservation Act**

The panel (1) affirmed in part the district court's judgment that the Federal Subsistence Board had the authority to authorize an emergency subsistence hunt for moose and deer on federal public lands in Alaska by the Organized Village of Kake (the "Kake hunt"); (2) vacated the portion of the district court's judgment reaching the merits of Alaska's improper delegation claim because that claim was beyond the scope of this court's prior remand and therefore the district court exceeded this court's mandate in reaching the improper delegation claim; and (3) remanded with instructions to dismiss the improper delegation claim.

The Federal Subsistence Board authorized the Kake hunt for the Organized Village of Kake because the COVID-19 pandemic had significantly degraded their food supply chains.

The panel held that the text of the Alaska National Interest Lands Conservation Act ("ANILCA") provided the Board with the authority to allow an emergency subsistence hunt. Section 811(a) states that the Board "shall ensure that rural residents engaged in subsistence uses shall have reasonable access to subsistence resources on the public lands." The panel held that the text of Section 811 means access to subsistence resources that are on federal land in Alaska, and not merely access to the federal land where the subsistence resources may exist and be taken. Moreover, the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Board permissibly relied on and adhered to 50 C.F.R. § 100.19, which allows the Board to approve emergency special actions outside its two-year regulatory cycle, when authorizing the Kake Hunt. The panel further held that other relevant provisions of ANILCA confirmed that the Board has authority to authorize an emergency subsistence hunt. In addition, the statutory history of ANILCA reinforced that the Board has this authority.

The panel held that the district court violated this court's mandate in reaching the merits of Alaska's claim that the Board improperly delegated the administration of the Kake hunt to the Tribe, and therefore declined to address that claim. The panel vacated that portion of the district court's judgment addressing the merits of Alaska's improper delegation claim, and remanded to the district court with instructions to dismiss that claim.

---

## COUNSEL

Laura Wolff (argued) and Cheryl R. Brooking, Assistant Attorneys General, Office of the Alaska Attorney General, Anchorage, Alaska; for Plaintiff-Appellant.

Kevin W. McArdle (argued), Shannon Boylan, Paul A. Turcke, and Rachel Heron, Attorneys; Todd Kim, Assistant United States Attorney; Environment & Natural Resources Division, Appellate Section, United States Department of Justice, Washington, D.C.; Kenneth M. Lord, Attorney, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Nathaniel H. Amdur-Clark (argued), Lloyd B. Miller, and
Whitney A. Leonard, Sonosky Chambers Sachse Miller &
Monkman LLP, Anchorage, Alaska; Richard D. Monkman,
Sonosky Chambers Sachse Miller & Monkman LLP,
Juneau, Alaska; Megan R. Condon, Erin C. Dougherty
Lynch, and Heather K. Miller, Native American Rights
Fund, Anchorage, Alaska; for Intervenor-Defendant-
Appellee.

## OPINION

BEA, Circuit Judge:

This appeal arises from an emergency subsistence hunt
of two antlered bull moose and five male Sitka black-tailed
deer, which took place during the COVID-19 pandemic, on
federal public lands in Alaska (the "Kake hunt"). In 2020,
the Federal Subsistence Board (the "Board") authorized the
Kake hunt for Intervenor-Defendant the Organized Village
of Kake (the "Tribe" or the "Tribal government") because
the COVID-19 pandemic had significantly degraded their
food supply chains. The Kake hunt was conducted by
hunters provided by the Tribe, and the harvest from the hunt
was distributed to both tribal citizens and non-tribal citizens
of the Kake community (collectively, the "Kake residents").

This case has been here once before. *See Dep't of Fish
& Game v. Fed. Subsistence Bd.*, 62 F.4th 1177 (9th Cir.
2023). Plaintiff-Appellant State of Alaska Department of
Fish and Game ("Alaska") sued Defendants-Appellees, the
Board and several related federal officials, alleging, *inter
alia*, that the Board's approval of the Kake hunt violated
Title VIII of the Alaska National Interest Lands

Conservation Act ("ANILCA" or the "Act") ("statutory authority claim"), and that the Board improperly delegated management of the Kake hunt to the Tribe ("improper delegation claim"). The district court initially ruled that Alaska's suit was moot. On appeal, Alaska forfeited its improper delegation claim but argued that its statutory authority claim was not moot. We reversed and remanded Alaska's statutory authority claim to the district court.

On remand, the district court ruled that the Board's approval of the Kake hunt did not violate Title VIII of the Act ("Title VIII") and denied Alaska's request for declaratory and permanent injunctive relief. We affirm the district court on this part. We hold that under Title VIII of the Act, the Board has the power to authorize an emergency subsistence hunt on federal public lands for rural residents of the state of Alaska. However, because the district court exceeded our mandate in reaching Alaska's improper delegation claim, we vacate the district court's judgment on this part of its ruling and remand with instructions to dismiss Alaska's improper delegation claim.

## I.

### A. ANILCA

In 1980, Congress enacted ANILCA. Pertinent to this appeal is Title VIII. *See* Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, §§ 801–16, 94 Stat. 2371, 2422–30 (1980) (codified at 16 U.S.C. §§ 3111–26). Utilizing its authority under the Property Clause and Commerce Clause of the U.S. Constitution, Congress passed Title VIII "to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents." 16 U.S.C. § 3111(4). "Subsistence uses," as defined by Title VIII, means "the

customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation . . . ." *Id.* § 3113. In ANILCA, "public lands" means "land situated in Alaska which . . . are Federal lands. . . ." *Id*. § 3102(3).

Recognizing the unique position of rural Alaskan residents, Congress found that "the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life" required a new "administrative structure" to enable rural residents "to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska." *Id.* § 3111(5). So, Congress directed the Secretary [1] to establish resource regions, local advisory committees, and regional advisory councils to accommodate subsistence uses and needs. *Id.* § 3115(a)(1)-(3). The goal of this administrative structure was to accord "nonwasteful subsistence uses" "priority over the taking on [public] lands of fish and wildlife for other purposes." *Id.* § 3114.

In exercising its "complete power" over federal land, *Kleppe v. New Mexico*, 426 U.S. 529, 540-41 (1976), Congress remained cognizant of Alaska's interest in managing its own fish and wildlife. Congress gave Alaska the option to enact its own state laws, in place of a federal regulatory program, which would allow Alaska to implement a preference or priority for subsistence uses on federal public lands. 16 U.S.C. § 3115(d). However, if

---

[1] As used in Title VIII, "Secretary" refers to the Secretary of the Interior, or with respect to National Forest lands, the Secretary of Agriculture. 16 U.S.C. § 3102(12).

Alaska did not implement such a program, Congress required the Secretary of the Interior to "step in and do the job." *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 316 (9th Cir. 1988).

When ANILCA became law in 1980, Alaska had already "enacted the necessary statutes [to comply with ANILCA]," and in 1982 the Secretary of the Interior certified that Alaska's legislative program so complied. *Id.* at 314. But in 1989, the Alaska Supreme Court held that Alaska's legislative program implementing a preference for subsistence users violated the Alaska constitution. *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989). By 1990, the Secretary of the Interior had withdrawn the 1982 certification, and had stepped in to promulgate regulations establishing the Board and the rural subsistence management program required by ANILCA.[2]  *See Alaska v. Babbitt*, 72 F.3d 698, 701 (9th Cir. 1995); 55 Fed. Reg. 27,114 (June 29, 1990) (temporary regulations); 57 Fed. Reg. 22,940 (May 29, 1992) (permanent regulations that still exist today).

## B. The Federal Subsistence Board

The Secretaries of the Interior and Agriculture created the Board and delegated to the Board the authority to "administer[] the subsistence taking and uses of fish and wildlife on public lands . . . ." 50 C.F.R. § 100.10(a); 36 C.F.R. § 242.10(a).[3]  The Board meets at least twice a year and establishes biennial regulations for hunting seasons,

---

[2] Alaska has not amended its state constitution to allow a preference for subsistence uses. *See infra* III.B.

[3] The Secretary of the Interior and the Secretary of Agriculture issue identical regulations under Title VIII of ANILCA. *See* 50 C.F.R. part 100; 36 C.F.R. part 242. For simplicity, we will cite to the Department of the Interior's regulations found in 50 C.F.R. part 100.

harvest limits, and methods and means for the taking of wildlife for subsistence uses on federal public lands. *See* 50 C.F.R. § 100.10(d); 85 Fed. Reg. 74,796 (Nov. 23, 2020) (regulations for the 2020-2022 cycle).

Pertinent to this case, the Board, pursuant to federal regulation, can approve "[e]mergency special actions" outside its normal two-year regulatory cycle. 50 C.F.R. § 100.19(a). An emergency special action allows the Board to "open or close public lands for the taking of fish and wildlife for subsistence uses" "if necessary to . . . continue subsistence uses of fish or wildlife, or for public safety reasons."**[4]** *Id.* Any such emergency special action cannot "exceed 60 days." *Id.*

The Board is permitted to delegate limited authority to regional forest service rangers, as it did during the COVID-19 pandemic, to act on behalf of the Board. *See id*. § 100.10(d)(6). On June 2, 2020, the Board delegated limited authority to the Petersburg District Ranger to "issue emergency special actions affecting moose and deer on [f]ederal lands"; the delegation applied only to requests "related to food security" and could be "exercised only for reasons of public safety, and when doing so will not threaten the continued viability of the wildlife resource." *See id*. Under the Board's delegated authority, the Petersburg District Ranger was still required to follow all procedural requirements for issuing an emergency special action.

---

[4] This regulation was amended in 2010 but existed in similar form since 1992. The 1992 language of the emergency special action allowed the Board to make "a temporary change to open or adjust" subsistence hunting seasons. 57 Fed. Reg. at 22,957.

(10 of 29) Case: 24-1792, 06/02/2025, DktEntry: 50.1, Page 10 of 29

10 STATE OF AK DEP'T OF FISH AND GAME V. FED. SUBSISTENCE BD.

## C. The Kake Hunt

On April 13, 2020, the Tribal government submitted a special action request to the Board requesting an emergency subsistence hunt for moose and deer on federal lands. After the Board delegated the authority to open an emergency subsistence hunt to the Petersburg District Ranger, the Ranger received a letter from the Tribe requesting an emergency subsistence hunt of two moose and five deer per month for a 60-day period. Complying with federal regulation, on June 4, 2020, the Ranger sought Alaska's view on the Tribe's request. Receiving no response from Alaska, the Ranger referred the matter to the Board for a decision.

On June 22, 2020, the Board conducted a telephonic public hearing at which representatives from the state government of Alaska and the Tribal government were present. After the hearing and pursuant to 50 C.F.R. §§ 100.10 and 100.19, the Board authorized the Kake hunt, consisting of a community harvest of up to two antlered bull moose and five male Sitka black-tailed deer for one month on federal land, with possible authorization for a second harvest, if necessary. The Board found no conservation concerns in allowing the Kake hunt.

The Kake hunt took place from June 24, 2020, to July 24, 2020. The Board allowed the Tribal government to select federally qualified subsistence hunters to participate in the Kake hunt. The Board also allowed the Tribe to determine to whom to distribute the two moose and five deer, so long as the Tribe distributed the yield to Kake residents without regard to race or tribal status. The yield was distributed to 135 households of Kake residents.

### D. Procedural History

Once the Kake hunt concluded, Alaska sued the Board in the U.S. District Court for the District of Alaska seeking declaratory and injunctive relief against the Board for the Board's approval of two special action requests. *See Dep't of Fish & Game*, 62 F.4th at 1180. Alaska challenged the Board's authority to open the Kake hunt, the Board's delegation of authority to the Tribe to select hunters and distribute the yield, and the Board's approval to close certain areas of public land. *Id.*; *see also Dep't of Fish & Game v. Fed. Subsistence Bd.*, 574 F. Supp. 3d 710, 726 (D. Alaska 2021), *rev'd in part, vacated in part*, 62 F.4th 1177 (9th Cir. 2023). The Tribe intervened as a defendant. *See Dep't of Fish & Game*, 62 F.4th at 1180. In the district court's order denying declaratory and permanent injunctive relief, the district court dismissed Alaska's claims related to the Kake hunt as moot, and it found the Board did not act arbitrarily or capriciously in closing public land. *Id.* at 1180-81.

Alaska appealed. *Id.* We reversed in part and vacated in part the district court's judgment, holding that Alaska's claim regarding the Board's authority to open the Kake hunt was not moot because the claim was capable of repetition and would evade review. *Id.* at 1182-83. We found that Alaska forfeited its other claims related to the Kake hunt because they were not raised in its opening brief. *Id.* at 1181 n.3. We then remanded the statutory authority claim to the district court for further proceedings. *Id.* at 1185.

On remand, the district court denied Alaska's request for declaratory and permanent injunctive relief. First, the district court held, under *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), that the Board had the authority to open the Kake hunt under ANILCA.

Second, the district court held that Alaska could pursue its improper delegation claim even though the Board argued that this claim was beyond the scope of the remand and violated the mandate rule.[5] The district court then held that Alaska's improper delegation claim failed on the merits. Alaska timely appealed.

## II.

We have jurisdiction to review the district court's final judgment. 28 U.S.C. § 1291. We review a district court's decision denying declaratory relief de novo. *Or. Coast Scenic R.R., LLC v. Or. Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016). And we review a denial of a permanent injunction for abuse of discretion, which in this context means that "the district court based its decision on an erroneous legal standard or clearly erroneous finding of fact." *Id.* (internal citations omitted).

While the district court relied on *Chevron* to reach its decision, the Supreme Court has since overruled *Chevron* and instructed that courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Thus, we must review questions of statutory interpretation de novo. *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024) (citing *Loper Bright*, 603 U.S. at 412).

---

[5] On remand, Alaska also advanced a second improper-delegation claim, alleging that the Board impermissibly delegated authority to open the hunt to local federal land managers. The district court denied that claim. Because Alaska does not advance this second improper-delegation claim in its briefing before this Court, this claim is forfeited, and we will not address it. *See Dep't of Fish & Game*, 62 F.4th at 1181 n.3.

## III.

### A. Title VIII of ANILCA

We start with the text of Title VIII. *See Van Buren v. United States*, 593 U.S. 374, 381 (2021). We asked the parties to address at oral argument whether Section 811 of ANILCA provides the Board with the authority to open an emergency subsistence hunt. Dkt. 48. The Board and the Tribe principally argue that Section 804, Section 805, and Section 814 of ANILCA support the view that the Board has such authority. Alaska argues that no statutory provision can support the Board's purported authority. We must now decide whether the text of ANILCA provides the Board with the authority to allow an emergency subsistence hunt. We hold that it does.

#### 1. "[A]ccess to subsistence resources"

Section 811(a) states that the Board[6] "shall ensure that rural residents engaged in subsistence uses shall have reasonable access to subsistence resources on the public lands." § 811(a), 94 Stat. at 2428 (codified at 16 U.S.C. § 3121(a)). "Subsistence uses" is further defined as "the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food . . . ." § 803, 94 Stat. at 2423 (codified at 16 U.S.C. § 3113). Alaska argues that Section 811 refers only to "physical access," like the granting of easements or licenses to enter property because "access" refers only to "physical access" in other provisions of ANILCA. Not so.

---

[6] Section 811 refers to the "Secretary." 16 U.S.C. § 3121. Because the Board exercises delegated authority on behalf of the "Secretary," *see* 50 C.F.R. § 100.10, we frame our analysis around the Board's authority under ANILCA.

The text of Section 811 does not grant access in a vacuum, but "access to subsistence resources on the public lands." That text means access to subsistence resources that are on federal land in Alaska, not merely access to the federal land where the subsistence resources may exist and be taken.

Start with the plain meaning of "access." "Access" means "the right or opportunity of reaching or using." *Access*, *Oxford American Dictionary* (1980). Under Section 811(a), to what does an Alaskan rural resident have the right or opportunity of reaching or using? Section 811(a) itself provides that answer: "to subsistence resources." 16 U.S.C. § 3121(a). Congress used this prepositional phrase to modify "access," which demonstrates that "access" is not merely limited to "physical access" to public land. For example, one could not have the opportunity to use subsistence resources, like a buck, for food if one could enter the land only to view or observe the buck.

In other sections of ANILCA, Congress defined the scope of "access" by further delineating *to what* access is granted or ensured. These delineations do limit the meaning of "access." No such delineations obtain in Section 811(a). Alaska's citation to Sections 1110, 1111, and 1323 of ANILCA illustrate this point. In those sections, the scope of "access" is limited by reference only to some "physical" access of land because Congress chose to limit "access" in that way.

In Section 1110, Congress granted "access *to inholdings*."**[7]** § 1110, 94 Stat. at 2464-65 (codified at 16

_____

[7] An "inholding" is "State-owned or privately owned land, including subsurface rights of such owners underlying public lands or a valid mining claim or other valid occupancy that is within or is effectively surrounded by one or more areas." 43 C.F.R. § 36.10(a)(4).

U.S.C. § 3170) (emphasis added). Subsection b states that "the State or private owner or occupier shall be given by the Secretary such rights as may be necessary to assure adequate and feasible access for economic and other purposes *to the concerned land . . . .*" 16 U.S.C. § 3170(b) (emphasis added).

In Section 1111, Congress allowed the Secretary to "authorize and permit temporary access by the State or a private landowner *to or across any conservation system unit, national recreation area, national conservation area, the National Petroleum Reserve* . . . in order to permit the State or private landowner access *to its land* . . . ." § 1111(a), 94 Stat. at 2465 (codified at 16 U.S.C. § 3171(a)) (emphasis added). Conservation system units, national recreation areas, national conservation areas, and the National Petroleum Reserve are all geographic demarcations of land. *See* 16 U.S.C. § 3102(4) (defining conservation system units); ANILCA, §§ 401, 403 (creating national recreation areas and national conservation areas in Alaska); 42 U.S.C. § 6502 (defining the National Petroleum Reserve).

And in Section 1323, Congress directed the Secretary of Agriculture to provide "access *to nonfederally owned land* . . . to secure to the owner the reasonable use and enjoyment thereof . . . ." § 1323(a), 94 Stat. at 2488 (codified at 16 U.S.C. § 3210(a)) (emphasis added).

Thus, each prepositional phrase modifying "access" in Sections 1110, 1111, and 1323 limited the scope of access to land. But Congress did not use the same syntax found in these sections when defining the scope of access in Section 811. Instead, Congress stated that the Secretary was to ensure "reasonable access *to subsistence resources* on the public lands." 16 U.S.C. § 3121(a) (emphasis added). In

ANILCA, public lands means "land situated in Alaska which . . . are Federal lands . . . ." *Id*. § 3102(3). And the surrounding statutory language in Section 811(a) clarifies the proper meaning and scope of "access." Because "on public lands" modifies "subsistence resources" and not "access," Congress intended that the Secretary ensure that rural residents of Alaska have the reasonable opportunity to reach and use subsistence resources that can be found on federal land in Alaska.

Accordingly, Alaska's chosen interpretation of Section 811 to mean only physical access to federal lands is incorrect. If Congress wanted to limit Section 811's reach only to physical access (*i.e.*, the right to enter land), it could have done so as it did in Sections 1110, 1111, and 1323. We agree that Section 811 *includes* the right of reasonable physical access to federal lands. *Cf.* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 192 (2012) ("Authorization of an act also authorizes a necessary predicate act."). But the text of Section 811 is not limited to the right of access to land. Section 811's meaning would fit Alaska's purported interpretation only if, for example, Congress required the Secretary to ensure reasonable access to public lands with subsistence resources. Phrased as such, "access to public lands" would be the operative phrase, and not "access to subsistence resources." Because Congress did not write the statute in that way, we decline to adopt Alaska's interpretation of Section 811.**[8]**

---

[8] At oral argument, the Board recognized that nothing in ANILCA limits the word "access" only to physical access. Though the Board later conceded that the word "access" is limited to "physical access," "it is a longstanding principle that 'when an issue or claim is properly before the

We note that our interpretation of Section 811(a) focuses on the operative phrase, "access to subsistence resources," and not merely the word "access," because that is the direct statutory context in which the word "access" is used. As we discussed above, it is true that the word "access" can be used more limitedly in other sections of ANILCA. But that is so because of the distinct context in which the word "access" appears in those specific sections, not because the meaning of the word "access" itself is so limited. *See Dubin v. United States*, 599 U.S. 110, 120 (2023) ("[R]eading 'the whole phrase'" in which language appears "can point to a more targeted reading" of a statute (quoting *Marinello v. United States*, 584 U.S. 1, 7 (2018))). Here, we need opine only on the meaning of "access to subsistence resources"; we are not adjudicating the meaning of "access" as it is used in every other section of ANILCA.**9** Under Section 811(a), "access

---

court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *Does v. Wasden*, 982 F.3d 784, 793 (9th Cir. 2020) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). Notably, the Tribe, as Intervenor-Defendant, did not make the same concession as did the Board.

[9] We are aware that other sections and titles of ANILCA use the word "access." By our count, Congress used the phrase "access to" twenty-four times in ANILCA. Twenty-two of those twenty-four times include a prepositional phrase involving land. The one remaining use of the phrase "access to" other than Section 811(a) does not involve land, but that does not change our interpretation of Section 811(a). *See* § 1310(a), 94 Stat. at 2481 (codified at 16 U.S.C. § 3199(a)) ("reasonable access to . . . existing air and water navigation aids").

Our interpretation is confined only to Section 811(a), as that section is the only section in ANILCA that uses the phrase, "access to subsistence resources." If another case or controversy arises requiring us to address the meaning of "access" as used in other sections of ANILCA, we will

to subsistence resources" allows for the harvesting of those resources.

With Section 811's meaning settled, we can determine whether the Board has the authority to authorize an emergency subsistence hunt. No party disputes that wild animals, specifically the antlered bull moose and Sitka black-tailed deer at issue here, are subsistence resources. And to use such animals for food and clothing, one must be able to obtain them through hunting. Thus, under Section 811(a), the Board has the power to authorize an emergency subsistence hunt to ensure rural residents have reasonable access to subsistence resources, especially when those rural residents would otherwise have no access to subsistence resources for survival.

Here, the Board allowed an emergency subsistence hunt because the COVID-19 pandemic significantly impacted food security for Kake residents. With a dwindling food supply, the Kake residents required access to subsistence resources for their survival. Just as ANILCA contemplated, "no practical alternative means [were] available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses." 16 U.S.C. § 3111(2). Finding no conservation concerns in a hunt of two moose and five deer, the Board authorized an emergency subsistence hunt. Given the lack of conservation concerns, if the Board could not authorize a hunt to ensure that Kake residents could reasonably access subsistence resources for its survival, the Board could not comply with its statutory mandate to

---

do so. Today, all we must decide is whether the Board has the power to authorize an emergency subsistence hunt under Section 811(a).

"ensure" that Kake residents had reasonable access to subsistence resources on federal land in Alaska.

Moreover, the Board permissibly relied on 50 C.F.R. § 100.19 to authorize the Kake hunt. Under Section 814 of ANILCA, the Secretary has the power to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities under [Title VIII]." § 814, 94 Stat. at 2429 (codified at 16 U.S.C. § 3124). Because the Board had the power to authorize an emergency subsistence hunt, the Secretary was within "the outer statutory boundaries" of ANILCA and "exercise[d] [] discretion consistent with the APA" in promulgating 50 C.F.R. § 100.19. *Loper Bright*, 603 U.S. at 404; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929 (9th Cir. 2008).

### 2. "Priority"

Other relevant provisions of ANILCA confirm that the Board has the authority to authorize an emergency subsistence hunt. *See In re Rufener Constr., Inc.*, 53 F.3d 1064, 1067 (9th Cir. 1995) ("We derive meaning from context, and this requires reading the relevant statutory provisions as a whole.").

"As is evident throughout ANILCA, Congress places great emphasis on providing rural residents of Alaska with the opportunity to maintain a subsistence way of life." *Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1192 (9th Cir. 2000) (citing 16 U.S.C. §§ 3101(c), 3111-12, 3114). To protect this way of life, Congress provided in Section 804 of ANILCA that the "taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes." 16 U.S.C. § 3114. Congress prioritized the subsistence uses of fish and wildlife

over other uses such as sport or recreation. *See id*. § 3101(b). That is why the taking of fish and wildlife for subsistence uses could be limited only if the Board complied with the criteria set forth in Section 804. *Id.* § 3114(1)-(3); *see United States v. Alexander*, 938 F.2d 942, 946 n.7 (9th Cir. 1991).

When Congress enacted ANILCA, it recognized, in Section 805, Alaska's traditional police powers over fish and wildlife within Alaska's borders and intended that Alaska would implement a "priority" for subsistence uses of fish and wildlife. 16 U.S.C. § 3115(d). But Alaska's constitution prohibited such a preference. *See McDowell*, 785 P.2d at 9. Thus, in the absence of compliant state laws, the Secretary was required to implement a program that prioritized nonwasteful subsistence uses of fish and wildlife over other uses on federal public lands. *See* 16 U.S.C. §§ 3114, 3115(a)–(d), 3116; *Kenaitze Indian Tribe*, 860 F.2d at 313-16. To comply with this broad mandate, Congress authorized the Secretary to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities." 16 U.S.C. § 3124.

Consistent with the above, the Board's Federal Subsistence Management Program, which ensures that rural residents are afforded the opportunity to engage in subsistence on federal public lands in Alaska, reflects Section 804's subsistence priority mandate. *See* 50 C.F.R. part 100. Because it is the Secretary's responsibility to implement a priority for nonwasteful subsistence uses in the absence of a state program, the Secretary was within his or her authority to promulgate 50 C.F.R. § 100.19, which allows the Board to open federal lands temporarily to subsistence hunting outside of a general hunting season. Put another way, when the Board allows a subsistence hunt, but

not a sport hunt, it grants a "priority" of hunting for subsistence over hunting for sport, just as the statute requires.  It makes no difference that this temporary subsistence hunt was outside of a state hunting season, given that the state of Alaska's hunting seasons cannot prioritize subsistence uses as required by Section 804.  Thus, Sections 804, 805, and 814 confirm that the Board has the authority to authorize an emergency subsistence hunt on federal lands.[10]

## B. Statutory History[11]

Our conclusion that the Board has the authority to open an emergency subsistence hunt is reinforced by the statutory history of ANILCA.  In 1992, the Secretary promulgated two regulations that recognized that the Board has some

---

[10] Alaska argues that because ANILCA is not explicitly preemptive, ANILCA thus cannot give the Board the power to authorize an emergency subsistence hunt as that invades Alaska's traditional state power.  But it appears that Alaska confuses the question of the substantive meaning of Title VIII with the question of whether Title VIII is preemptive. *Cf. Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 (1996).  In any event, ANILCA contains clear preemption language. *See* 16 U.S.C. § 3202(a).  And Alaska makes a fatal concession here: Alaska concedes that "Congress clearly intended the Secretaries' implementation of Title VIII to preempt conflicting state law. . . . But the scope of Title VIII is not as broad as the United States asserts, and the scope of Title VIII is where the Secretaries' preemptive authority ends." As we concluded above, the text of Title VIII provides the Board the power to authorize an emergency subsistence hunt. *See supra* III.A.1. Therefore, regulations regarding the power to open such a hunt are also within the Secretaries' preemptive authority.

[11] Statutory history refers to the changes in the text of a statute when it is subsequently amended by Congress.  That is not to be confused with legislative history, which relates to the various legislative materials and reports produced when a bill is passed by Congress.

(22 of 29)Case: 22-70219, 06/02/2025, DktEntry: 50.1, Page 22 of 29

22 STATE OF AK DEP'T OF FISH AND GAME V. FED. SUBSISTENCE BD.

authority to "open" a hunting season. *See* 50 C.F.R. §§ 100.19(b), 100.25 (1992). The 1992 version of 50 C.F.R. § 100.19 gave the Board the authority to "make or direct a temporary change to open or adjust the [hunting] seasons or to increase the bag limits for subsistence uses of fish and wildlife populations on public lands." *See* 57 Fed. Reg. 22,940, 22957 (May 29, 1992); *see also* 50 C.F.R. § 100.19(b) (2020). **12** The other regulation, 50 C.F.R. § 100.25(b), which remains intact today, provided that "[s]easons are closed unless opened by Federal regulation." 57 Fed. Reg. at 22,536.

Against this regulatory background, Congress twice enacted contingent amendments to Title VIII that gave Alaska the opportunity to pass a state constitutional amendment that would allow Alaska to implement a compliant subsistence priority program. *See* Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. 105-83, § 316(d), 111 Stat. 1543, 1592 (1997); Omnibus Consolidated & Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, § 339(a), 112 Stat. 2681, 2695-96 (1998). Pertinent here is Congress's 1997 contingent amendment to Section 814 of ANILCA— the provision that gives the Secretary the authority to "prescribe such regulations as are necessary and appropriate to carry out his responsibilities under [Title VIII]." 16 U.S.C. § 3124. If Alaska could implement a compliant subsistence priority program, Congress would add the phrase: "During any time that the State has complied with section 805(d) [of ANILCA], the Secretary shall not make or enforce regulations implementing section 805 (a), (b), or

---

[12] The language from this regulation has been edited slightly since 1992, but the word "open" remains in the current version of this regulation.

(c)." Department of the Interior and Related Agencies Appropriations Act § 316(b)(8)(B). However, Alaska did not implement a compliant program, so the amendment to Section 814 was "repealed . . . [as] if such law[] ha[d] not been adopted." *Id.* § 316(d). Congress passed a similar contingent amendment the following year, but Alaska again did not amend its state constitution. Omnibus Consolidated Emergency Supplemental Appropriations Act, 1999, § 339(a), (b)(1)-(2).

These contingent amendments demonstrate that Congress was aware of the existing federal regulatory scheme that allowed the Board to "open" a hunting season, *see* 57 Fed. Reg. at 22,536, 22,957, and that Congress twice left the regulatory scheme in place. Thus, the Congressional choice to "revisit[] a statute giving rise to a longstanding administrative interpretation without pertinent change . . . is persuasive evidence that the interpretation is the one intended by Congress." *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 889 (9th Cir. 2017) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986)).

\* \* \*

Accordingly, we hold that the text of ANILCA provided the Board with the authority to authorize an emergency subsistence hunt. We also hold that the Board permissibly relied on and adhered to 50 C.F.R. § 100.19 when authorizing the emergency subsistence hunt. We thus affirm the district court's judgment that the Board permissibly opened the Kake hunt.

## IV.

Alaska next claims that the Board improperly delegated the administration of the Kake hunt to the Tribe. On remand, the district court rejected Alaska's improper delegation claim on the merits. Before we reach the merits of that claim, however, we must first determine whether our mandate allowed the district court to entertain Alaska's improper delegation claim. We review de novo a district court's compliance with our mandate. *Moldex-Metric, Inc. v. McKeon Prods., Inc.*, 891 F.3d 878, 887 (9th Cir. 2018).

Our initial task is to clarify what claims were before the district court after our first remand. To do so, we rely on our rule of mandate, which provides:

> When a case has been once decided by this court on appeal, and remanded to the district court, whatever was before this court, and disposed of by its decree, is considered as finally settled. . . . [The district court] cannot vary [this court's decree], or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded. . . . But the district court may consider and decide any matters left open by the mandate of this court. . . .

*United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255-56 (1895)) (alterations omitted). Thus, assessing the "scope of our remand" is the relevant inquiry when determining

whether the district court has complied with our mandate. *United States v. Pimentel*, 34 F.3d 799, 800 (9th Cir. 1994) (per curiam) (assessing compliance with the rule of mandate by determining the "scope of our remand"); *Thrasher*, 483 F.3d at 983 (same); *accord Planned Parenthood of Columbia/Willamette Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 966-67 (9th Cir. 2005) (same). "[I]n this circuit, if a district court errs by violating the rule of mandate, the error is a jurisdictional one."[13] *Thrasher*, 483 F.3d at 982. That is, if a claim falls outside the scope of our remand, then the district court is without jurisdiction to hear the claim.

We therefore begin by determining the "scope of our remand" in this case. In analyzing the scope of a remand from our Court to a lower tribunal, "[t]he opinion by this court at the time of rendering its decree may be consulted to ascertain what was intended by [our] mandate. . . ." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. at 256). Any issue conclusively decided or decided by necessary implication in the first appeal is not remanded to the district court. *Id.* at 1094. Thus, "the ultimate task is to distinguish matters that have been decided on appeal . . . from matters that have not." *Id.* at 1093.

In our previous opinion in this case, we first held that Alaska forfeited its improper delegation claim on appeal

---

[13] The circuits are split on whether the rule of mandate is jurisdictional. *See Thrasher*, 483 F.3d at 982 (collecting cases). We, however, have decided that this rule is jurisdictional, *id.*, and we cannot change the position of our Court absent en banc reconsideration. *Overstreet v. United Broth. of Carpenters and Joiners of Am., Loc. Union No. 1506*, 409 F.3d 1199, 1205 n.8 (9th Cir. 2005).

because it did not challenge the district court's determination that the claim was moot.[14] *Dep't of Fish & Game*, 62 F.4th at 1181 & n.3. Then, we turned to Alaska's claim that the Board lacked the authority to authorize the Kake hunt and held that the district court erred in dismissing that claim as moot. *Id.* at 1181-83. In so concluding, we explicitly limited the scope of our remand, stating: "We reverse the district court's dismissal of Alaska's claim that the [Board] did not have the authority to open the Kake hunt and remand *that claim* to the district court." *Id.* at 1185 (emphasis added).

The question presented in this appeal is whether our prior opinion "decided" Alaska's improper delegation claim and excluded it from the scope of our remand to the district court—even though our prior opinion deemed the claim "forfeited" on appeal instead of affirming the dismissal on the merits.

As the Seventh Circuit has aptly recognized, "confusion exists about the . . . question of whether issues [that] were waived [or forfeited] at the initial appeal" fall within the scope of a remand. *United States v. Husband*, 312 F.3d 247, 250 (7th Cir. 2002). Other circuits have consistently held that the scope of remand is limited when "an[] issue . . . on appeal is waived [or forfeited] . . . ."[15] *Id.* at 250-51; *see*

---

[14] Alaska did not challenge that finding before the district court, and it concedes that it forfeited the claim in its first appeal.

[15] As a general matter, waiver is conceptually different than forfeiture. "Waiver is 'the intentional relinquishment or abandonment of a known right,' whereas forfeiture is 'the failure to make the timely assertion of [that] right.'" *United States v. Scott*, 705 F.3d 410, 415 (9th Cir. 2012) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). However, in this context, while forfeiture "would be a more suitable expression,"

*also Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007); *Med. Ctr. Pharm. v. Holder*, 634 F.3d 830, 834 & n.2 (5th Cir. 2001); *Estate of Cummings by and through Montoya v. Comm. Health Sys., Inc.*, 881 F.3d 793, 801 (10th Cir. 2018); *Doe v. United States*, 463 F.3d 1314, 1327 (Fed. Cir. 2006).**[16]**

Although our Circuit has not explicitly addressed this issue,**[17]** we need not decide today whether all waived or forfeited issues are necessarily outside the scope of a subsequent remand order. Our prior opinion makes clear that *here*, Alaska's improper delegation claim was outside the scope of our remand. We expressly held that Alaska had forfeited its improper delegation claim on appeal and declined to reach the merits of that forfeited claim; we then expressly remanded *only* Alaska's statutory authority claim to the district court. *See Dep't of Fish & Game*, 62 F.4th at

---

there is little practical difference in consequences between a waived issue or forfeited issue. 18B Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 4478.6 (3d ed.). Such is the case because both waiver and forfeiture result from the failure to advance a position on appeal. *Id.*

[16] Our sister circuits appear unified on this proposition, regardless of whether they hold that the issue is discretionary or jurisdictional.

[17] In at least one case stemming from a district court's judgment granting a motion to dismiss and denying leave to amend as futile, we noted that a party was not "preclude[d]" from "raising on remand its arguments [in an amended complaint] that have been forfeited in [its] appeal." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 542 n.8 (9th Cir. 2022). We need not read *B&G Foods* too broadly, however, as we did not address there the relevant question that we address today. That is, whether our prior opinion "decided" a claim even though we deemed that claim "forfeited."

1181-83. Under these circumstances, Alaska's forfeited claim was clearly outside the scope of our remand.

We note that were we to adopt Alaska's position, Alaska would get a proverbial "second bite at the apple" for a claim already disposed of by our prior opinion. Consistent with the reasoning of our sister circuits, we conclude that allowing Alaska to reopen its improper delegation claim in this appeal would waste judicial resources and would not further the interests of consistency and finality in our judgments. *See, e.g.*, *Chao*, 511 F.3d at 465-66; *United States v. O'Dell*, 320 F.3d 674, 679 (6th Cir. 2003); *accord Thrasher*, 483 F.3d at 982.

Accordingly, we hold that the district court violated our mandate by reaching Alaska's improper delegation claim,[18] and we therefore decline to address that claim here.

---

[18] We recognize that we have not clearly opined on whether the exceptions that apply to the law of the case doctrine also apply to the rule of mandate. *See United States v. Bad Marriage*, 439 F.3d 534, 540-41 (9th Cir. 2006) (Berzon, J., dissenting); *Thrasher*, 483 F.3d at 983 (Berzon, J., concurring). The law of the case doctrine is subject to three exceptions: "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002) (quotations omitted). However, we need not address this question today. Though we have stated in dicta that an intervening controlling authority could serve as an exception to the mandate rule, *In re Molasky*, 843 F.3d 1179, 1184 n.5 (9th Cir. 2016), no such intervening controlling authority exists in this case. Additionally, Alaska has not raised such an argument below or on appeal. Accordingly, assuming *arguendo* that the rule of mandate is subject to exceptions that apply to the law of the case doctrine, these exceptions do not apply here and cannot save Alaska's improper delegation claim.

**V.**

For the foregoing reasons, we AFFIRM in part the district court's judgment that the Board has the authority to authorize an emergency subsistence hunt. Because the district court violated our mandate and therefore lacked subject matter jurisdiction to reach the merits of Alaska's improper delegation claim, we VACATE that portion of the district court's judgment and REMAND to the district court with instructions to dismiss that claim.

**AFFIRMED IN PART, VACATED IN PART, REMANDED.**